# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RANDY L. MANNING, | ) | |
| REBECCA E. ALLISON, | ) | |
| THOMAS L. ALLISON, | ) | JURY DEMAND |
| KENNETH J. AUFIERO, | ) | |
| JOE L. BANKS, JR., | ) | Case No. |
| BRUCE J. BATTS, | ) | |
| JOHN L. BEARD, | ) | |
| DAVID G. BELL III, | ) | |
| DAVID G. BELL, JR., | ) | |
| KASEY R. BOUTWELL, | ) | Division: _____ |
| PHILLIP E. BROOKINS, | ) | |
| CALVIN G. BROOME, JR., | ) | |
| GLORIA J. BROWN, | ) | |
| JOEL F. BROWN, | ) | |
| CAREY O. BURGER, | ) | |
| CHRISTOPHER L. BUSH, JR., | ) | |
| TYLER A. CANNON, | ) | |
|     a/k/a TYLER A.B. CANNON, | ) | |
| WILLIAM J. CAREY, | ) | |
| ANTONIO J. CARTER, | ) | |
| CHRISTOPHER CASE, | ) | |
| DEAN O. CHARETTE, | ) | |
| DAVID C. CHARIKER, | ) | |
| RONALD R. COBB, | ) | |
| RILEY J. COLLINS, | ) | |
| GERRY D. CRAWFORD, | ) | |
| SANDRA S. CRAWFORD, | ) | |
| PATRICK S. DAVIS, | ) | |
| MICHAEL DUNBAR, | ) | |
| DANIEL G. EATON, | ) | |
| CHRISTOPHER D. ELLIS, | ) | |
| WILLIAM J. ELMORE, | ) | |
|     a/k/a WILLIAM J.J. ELMORE, | ) | |

ALVIN A. FARMER,                                    )
WILLIAM H. FEASTER,                                 )
HENRY L. GIBSON,                                    )
MICHAEL A. GIBSON,                                  )
VAN G. GIBSON,                                      )
WOODROW GOODWIN,                                    )
JANNIE M. GREEN,                                    )
MARVIN S. GREEN,                                    )
JERRY M. HAAK,                                      )
RONALD D. HALE,                                     )
JAMES C. HALL,                                      )
THERESA K. HALL,                                    )
DENNIS C. HEADRICK,                                 )
LANCE M. HIEKE,                                     )
ERIC P. HOLMAN,                                     )
CANDACE R. JAGER,                                   )
BOBBY JOHNSON,                                      )
SHANNON H. JOHNSON,                                 )
JONATHAN D. JOYNER,                                 )
JEFFERY L. KELLER,                                  )
TIMOTHY K. KELLEY,                                  )
CAMERON M. KLIEBERT,                                )
ELMANUAL L. LACY,                                   )
THOMAS LACY,                                        )
MICHAEL T. LAMIE,                                   )
FELIX K. LAWSON,                                    )
JENNIFER L. LAWSON,                                 )
LYDIA M. LEGERE,                                    )
LESLEY R. MARTIN,                                   )
IRENE MCCORKLE,                                     )
MARVIN MCFADDEN, JR.,                               )
CARL M. MIMS, JR.,                                  )
DARRYL A. MIMS,                                     )
DARRYL A. MIMS, JR.,                                )
DAVID A. MIMS,                                      )
DEION A. MIMS,                                      )
DERRICK A. MIMS,                                    )
OLIVIA A. MIMS,                                     )

HILDEBRANDO A. MONDELL, JR.,                )
DENNIS R. MYERS,                            )
GLORIA S. OLINGER,                          )
JENNIFER M. OZMORE SHAW,                    )
EARL L. PARRISH,                            )
WILLIAM S. PASCHAL,                         )
JAMES L. PEOPLES,                           )
ANTHONY M. PHILLIPS,                        )
ERNEST R. PORTER,                           )
RALEIGH W. POTTER,                          )
SHERRY J. PRICE,                            )
STEPHEN PRICE,                              )
JONATHAN E. RABURN,                         )
JOHNNY W. RICHARDS,                         )
ANDREW W. ROBERTSON,                        )
JIMMY F. ROBINSON, JR.,                     )
MICHAEL A. ROBINSON,                        )
CALLENE P. SCRUGGS,                         )
     a/k/a CALLEN P. SCRUGGS,               )
RANDOLPH A. SCURRY,                         )
ALEX S. SHAW,                               )
BENJAMIN L. SHELTON,                        )
NICHOLAS R. SHEPHERD,                       )
CATHY A. SHERRILL,                          )
OTIS R. SHERRILL,                           )
DAVID L. SHIRLING,                          )
LEONARD E. SIMS,                            )
JEFFREY F. SLOAN,                           )
     a/k/a JEFFREY F. SLOAN, SR.,           )
KATIE L.B. SMITH,                           )
IMOGENE C. STEVENSON,                       )
LARRY D. STEVENSON,                         )
RANDY A. STEVENSON, JR.,                    )
HORACE B. SWINT,                            )
FRANK K. TAPLEY,                            )
LINDA B. TILLMAN,                           )
ROBIN S. VANWINKLE,                         )
ANNA F. WAGAHOFF,                           )

DONALD R. WEBB, JR.,                                    )
MARTHA S. WEBB,                                         )
CLYDE T. WELCH, JR.,                                    )
JASON V. WHITE,                                         )
BRIAN J. WILKUS,                                        )
FRANKLIN B. WILLIAMS,                                   )
MICHELLE D. WILLIAMS,                                   )
JONATHAN S. WITHERS,                                    )
SHANNON H. JOHNSON,                                     )
as surviving spouse of                                 )
     KENNETH W. JOHNSON (DECEASED),      )
GLORIA S. OLINGER, as surviving spouse of              )
     WILLIAM M. OLINGER (DECEASED),       )
MARTHA S. WEBB, as surviving spouse of                 )
     DONALD R. WEBB, SR. (DECEASED),      )
          *Plaintiffs,*                 )
v.                                                     )
                                                       )
OLIN CORPORATION,                                      )
     a/k/a OLIN CHLOR ALKALI              )
     PRODUCTS,                            )
     a/k/a OLIN CHLOR ALKALI              )
     PRODUCTS AND VINYLS,                 )
     a/k/a OLIN CHLOR ALKALI              )
     LOGISTICS, INC.,                     )
     a/k/a OLIN NORTH AMERICAN            )
     HOLDINGS, INC.,                      )
     a/k/a OLIN LOGISTICS LLC.,           )
PEN GULF, INC.,                                        )
CDI CORPORATION,                                       )
     f/k/a CDI ENGINEERING GROUP, INC.,   )
CENTURION INDUSTRIES, INC.,                            )
     d/b/a A-LERT CONSTRUCTION            )
     SERVICES,                            )
NGN CURBS, LLC.,                                       )
     f/k/a MTI MANUFACTURING LLC.,        )
     f/k/a MECHANICAL TRADES              )
     INCORPORATED,                        )

f/k/a NORTON SHEET METAL, INC.,    )

NES GLOBAL, LLC.,    )

f/k/a NES OVERSEAS USA, LLC.,    )

YEARGIN POTTER SMITH    )

CONSTRUCTION, INC.,    )

f/k/a YEARGIN POTTER    )

SHACKELFORD    )

CONSTRUCTION, INC.,    )

f/k/a YEARGIN CONSTRUCTION    )

COMPANY,    )

*Defendants*.    )

## COMPLAINT

### TABLE *of* CONTENTS

**CHAPTER I: INTRODUCTION** .................................................**9**

*Statement of the Case*...............................................................*9*

*Who Are Our Party Plaintiffs?* ...............................................*14*

*Overview of the FACILITY's History* ......................................*24*

*Who is OLIN?* ...........................................................................*28*

*Identification of CONTRACTOR DEFENDANTS*.....................*29*

*Jurisdiction and Venue are Proper in this Court*....................*32*

**CHAPTER II: THE CHLOR-ALKALI INDUSTRY** ....................**33**

*Use of Toxic Mercury in the Chlor-Alkali process* ...............*33*

*Operation and Maintenance of a Chlor-Alkali Facility Creates Mercury Exposure Risks.*...........................................................*44*

*Decommissioning and Demolition Creates Known Elevated Mercury Exposures.* ..............................................................................................48

**CHAPTER III: ONSITE AND OFFSITE CONTAMINATION**......................**50**

*A. Cell House Contamination* ..............................................................51

*B. Rescue and First Responder Team* ..................................................56

*C. General Maintenance Contamination – The Entire FACILITY* ......57

*D.  Decommissioning and Demolishing ("D&D")* ..............................59

**CHAPTER IV – ENVIRONMENTAL REGULATORY HISTORY OF THE FACILITY** ......................................................................................**60**

**CHAPTER V - TAKE-HOME EXPOSURE OF PLAINTIFF FAMILY MEMBERS** .............................................................................**96**

**CHAPTER VI: HOW MERCURY HARMS AND INJURES PEOPLE**........**106**

*What is Mercury?*..............................................................................106

*Utilization of Mercury by the Chlor-Alkali Industry.* .........................106

*Mercury Exposure Can Result in Life-Threatening and Debilitating Injuries to Humans.* ............................................................................109

*The Dangerous Nature of Mercury in Vapor Form.* ..........................112

*Mobilization of Mercury – Creating Secondary Exposures* ..............113

*Harmful Effects of Mercury Exposure* ...............................................116

*Toxic Mercury Exposure Causes More Severe Injury to Women*.......124

*Toxic Mercury Exposure Causes More Severe Injury to Children* .....129

*Detection, Testing, and Treatment of Individuals Exposed to Toxic Mercury*....137

*Biomarkers for Mercury Exposure* ....................................................139

**CHAPTER VII: DIAGNOSTIC & MEDICAL CHALLENGES OF MERCURY TOXICITY** ......................................................................**142**

*An Overview of Diagnostic & Medical Challenges Related to Mercury Toxicity* ...................................................................................................*142*

**CHAPTER VIII: ENVIRONMENTAL, HEALTH, AND SAFETY................147**

*Duty of Care - Process Safety Engineering* .......................................*148*

*Mercury Exposure – Standards and Limits*........................................*153*

*Elemental Mercury Vapor Exposure Limits and Health Effects*........*158*

*Duty of Care-Mandatory Medical Evaluations required by OSHA Standards ..160*

**CHAPTER IX: DEFENDANTS' CONDUCT DEMANDS LEGAL LIABILITY................................................................................................162**

*Process Hazard Analysis*....................................................................*162*

*Exposure Assessment and Air Monitoring*..........................................*163*

*Worker Protection Should Have Been Insured Through a Properly Implemented Medical Surveillance Program*....................................*170*

*Base Line Medical Examination* ........................................................*173*

*Routine Medical Examination* ...........................................................*175*

*Biological Monitoring Program* .........................................................*177*

*Medical Surveillance and Biological Monitoring – Early Detection*...............*179*

*Written Respiratory Protection Program*...........................................*182*

*Appropriate PPE Protection*...............................................................*184*

*Job Safety Analysis Program* .............................................................*192*

*Chemical Safety Training – Mercury*..................................................*195*

*Decontamination of Workers' Bodies to avoid Cross Contamination*................*203*

*Plaintiff Workers Were Highly Exposed During Decommissioning and Demolition*..........................................................................................*210*

*Contamination Transported Offsite* ...................................................*220*

*OLIN Failed to Protect Plaintiff Contractor Workers*.......................*227*

*Failure to Recognize Current Scientific Epidemiology*......................*232*

*Defendants Recklessly Ignored Established Data & Information*......................235

*Fraud by OLIN*..........................................................................................242

*Fraudulent Misrepresentations*................................................................243

*Misrepresentation by Concealment by OLIN* .............................................247

*Misrepresentation by Concealment by Contractor Defendants* .....................254

**CHAPTER X: TOLLING** ........................................................................**260**

**CHAPTER XI: COUNTS**..........................................................................**262**

*Count I – Negligence* ..............................................................................262

*Count II – Negligence*.............................................................................268

*Count III – Negligence* ...........................................................................275

*Count VI – Misrepresentation by Concealment*..........................................290

*Count VII –Misrepresentation by Concealment* .........................................296

*Count VIII –Misrepresentation by Concealment* ........................................303

*Count IX –Misrepresentation by Concealment*...........................................309

*Count X- Intentional (Fraudulent) Misrepresentation/Reckless Misrepresentation* ..........................................................................................................317

*Count XI - Premises Liability* ...................................................................325

*Count XII - Premises Liability* ..................................................................330

*Count XIII - Negligence Per Se* .................................................................334

*RELIEF SOUGHT* .....................................................................................338

## CHAPTER I: INTRODUCTION

**Statement of the Case**

*For Corporate Profit, Defendants Knowingly Exposed Their Workers, Contractors, and Select Family Members to Toxic Levels of Mercury for Over Four Decades, Resulting in Hundreds, if Not Thousands, of Individuals Incurring Incurable, Life-Threatening, and Debilitating Injuries and Diseases.*

1. This case is about large corporations willfully using a toxic substance in their manufacturing processes, despite knowing that workers were being harmed. The toxic substance is mercury. Plaintiffs will prove that Defendants' actions were driven by profit, with full knowledge of the harm their actions would cause.

2. Defendants knowingly exposed Plaintiffs - their own workers, contractors, and select family members - to dangerous and harmful levels of mercury at the Augusta, Georgia, manufacturing facility from 1965 forward. From 1965 to approximately 2012, this FACILITY (as defined below) used a "Chlor-Alkali" manufacturing process that required the use of mercury. This long-term mercury usage left behind a work site that remains highly contaminated.

3. Defendants' malfeasance extends to any person to whom harm may reasonably be anticipated, resulting from Defendants' individual and collective conduct.

4. As a direct and proximate cause of Defendants' malfeasance, Plaintiffs suffered illness and disease from exposure to mercury.

5. As a result of the mercury used at the FACILITY, Plaintiffs have experienced bodily injuries including, but not limited to, auto-immune disorders, gastrointestinal injury, organ damage and/or failure, brain damage, cognitional loss, neuropsychological injuries, neurological disorders, and specifically neuropathies, all related to their exposure to mercury at the FACILITY.

6. In addition, other Plaintiffs have experienced injuries from mercury that their family members inadvertently carried home from the FACILITY on their clothing, physical body, personal belongings, and in their cars. This resulted from Defendants' failure to adhere to basic safety protocols. The Plaintiffs who were exposed to mercury while working at the FACILITY must now deal with the horrible reality that they unknowingly poisoned their loved ones through this take-home exposure.

7. Mercury can be transferred from workplaces to home environments, posing health risks to family members and others outside the workplace. Employers are required to implement safety measures in the workplace to reduce the risk of take-home exposure. This includes providing proper protective gear, cleaning protocols, and education on the risks of contamination. Exposure to mercury can cause neurological damage, kidney issues, and developmental problems, particularly for children and pregnant women. Even small amounts of mercury in the home can lead to health issues over time.

8. The subject facility, which is located at 2402 Doug Barnard Parkway, Augusta, Georgia, covers approximately 270.98 acres inside the city limits of Augusta, in Richmond County, Georgia (the "FACILITY").

9. The mercury cell production technology used at the FACILITY was adapted for industrial use in the late 1800s. By the 1970s, this technology was antiquated, and new technologies were available that eliminated the use of mercury. Even though new, safer production technology was available, OLIN, who owned and operated the FACILITY, chose to continue utilizing this toxic and injurious process of manufacturing.

10. Government regulations and industry standards establish how to safely operate facilities that use mercury, how to monitor workers' exposures, and how to avoid cross-contamination beyond the facility. For example, there are specific guidelines for personal protective equipment, environmental monitoring, medical monitoring, and employee training. Defendants failed to comply with these regulations and standards, allowing Plaintiffs to be unknowingly exposed to dangerous levels of toxic mercury. Further, Defendants falsely and fraudulently assured Plaintiffs their work conditions were safe, and the protective measures were adequate, while knowing this was untrue.

11. The harm did not stop with the workers at the FACILITY. Discovery in this action will prove that other workers, contractors, and family members were injured by mercury exposure as a result of the reckless operation of the FACILITY. Beyond the FACILITY and its equipment, Defendants exposed members of the general public when Defendants improperly stored, handled, and disposed of mercury-contaminated materials. Furthermore, contractors were not required to decontaminate their equipment and were not told to keep it at the FACILITY, allowing the equipment to be used offsite. This

offsite use by contractors further contaminated areas throughout the Augusta community.

12. Injury to Plaintiffs did not cease right away once the FACILITY finally stopped using the mercury-based manufacturing process in September 2012, decades after most Chlor-Alkali facilities worldwide had already eliminated the use of mercury. In fact, because Defendants failed to follow well-established safety guidelines developed over many instances of Chlor-Alkali facility closures and conversions in both the United States and Europe, Plaintiffs and their families continued being exposed to mercury, both directly in the workplace and indirectly by take-home exposure, for many years after the mercury-cell process was shut down.

13. These Chlor-Alkali companies, including Defendants, continued using the mercury-cell process because they did not want the expense of switching to a safer process until they were forced to do so. Also, these companies knew that the health effects of chronic mercury exposure could go unnoticed for years. Chlor-Alkali companies hoped this late onset of symptoms would give them enough time to distance themselves from the injuries they caused and get away with not compensating the victims or paying for their medical

needs. The time has come for these companies to take responsibility for the harm they have caused.

14. This action seeks justice in the form of financial compensation for those individuals and families who have been adversely impacted by this outrageous conduct in and around Augusta, Georgia. Further, this Plaintiff group is seeking to establish a medical clinic with specialized treatment designed to treat specific neuropsychological and physical injuries known to be caused by mercury toxicity. In addition to medical treatment, Plaintiffs hope that national attention can bring detailed awareness regarding these neurological injuries, compelling governmental intervention against those companies who have, and continue to, injure the environment and the individuals working for them.

**Who Are Our Party Plaintiffs?**

*Plaintiffs in This Action Are Former Employees and Contractors of Defendants, as well as Family Members of These Employees and Contractors, Who Contracted Mercury-Related Mental and Physical Injuries When Their Loved Ones and Relatives (Former Employees and Contractors) Unknowingly Introduced Mercury into Their Homes Through Their Clothing, Possessions, Hair, Boots, and Bodies After Working at the Facility.*

15. Many of the "Plaintiff Workers" are resident citizens of Augusta, Georgia, or the surrounding area, or were at all relevant times hereto, and are over the age of eighteen (18) years.

16. Some of the "Plaintiff Workers" are also resident citizens of Charleston, Tennessee, or the surrounding areas, or were at all times relevant hereto, and are over the age of eighteen (18) years. This will be explained further in paragraphs 19 and 20C below.

17. At all times material hereto, the said Plaintiff Workers were employed by OLIN or CONTRACTOR DEFENDANTS, as defined below, and/or a subsidiary, sister company, parent company, or successor company thereof (collectively the "Defendants"), or were employed by other companies that employed them to perform services or supplied goods at or for the FACILITY.

18. The Plaintiff Workers are as follows: Thomas L. Allison; Kenneth J. Aufiero; Joe L. Banks, Jr.; Bruce J. Batts; John L. Beard; David G. Bell, Jr.; David G. Bell, III; Phillip E. Brookins; Calvin G. Broome, Jr.; Gloria J. Brown; Joel F. Brown; Carey O. Burger; Christopher L. Bush, Jr.; Tyler A. Cannon, a/k/a Tyler A.B. Cannon; William J. Carey; Antonio J. Carter; Christopher Case; Dean O. Charette; David C. Chariker; Riley J. Collins; Ronald R. Cobb;

Gerry D. Crawford; Patrick S. Davis; Michael Dunbar; Daniel G. Eaton; Christopher D. Ellis; William J. Elmore, a/k/a William J.J. Elmore; Alan A. Farmer; William H. Feaster; Henry L. Gibson; Michael A. Gibson; Van G. Gibson; Woodrow Goodwin; Jannie M. Green; Marvin S. Green; Jerry M. Haak; Ronald D. Hale; James C. Hall; Dennis C. Headrick; Lance M. Hieke; Eric P. Holman; Bobby Johnson; Shannon H. Johnson, as surviving spouse of Kenneth W. Johnson (deceased); Jonathan D. Joyner; Jeffery L. Keller; Timothy K. Kelley; Elmanual L. Lacy; Thomas Lacy; Felix K. Lawson; Jennnifer L. Lawson; Randy L. Manning; Marvin McFadden, Jr.; Lesley R. Martin; Carl M. Mims, Jr.; Darryl A. Mims; Hildebrando A. Mondell, Jr.; Dennis R. Myers; Gloria S. Olinger, as surviving spouse of William M. Olinger (deceased); Earl L. Parrish; William S. Paschal; James L. Peoples; Anthony M. Phillips; Ernest R. Porter; Raleigh W. Potter; Stephen Price; Jonathan E. Raburn; Johnny W. Richards; Andrew W. Robertson; Jimmy F. Robinson, Jr.; Michael A. Robinson; Callene P. Scruggs; Randolph A. Scurry; Alex S. Shaw; Benjamin L. Shelton; Nicholas R. Shepherd; Otis R. Sherrill; David L. Shirling; Leonard E. Sims; Jeffrey F. Sloan, Sr.; Larry D. Stevenson; Randy A. Stevenson, Jr.; Horace B. Swint; Frank K. Tapley; Linda B. Tillman; Donald R. Webb, Jr.; Martha S. Webb, as surviving spouse

of Donald R. Webb, Sr. (deceased); Clyde T. Welch, Jr.; Jason V. White; Brian J. Wilkus; Franklin B. Williams; Michelle D. Williams; and Jonathan S. Withers.

19. In this case involving mercury exposure, some Plaintiff Workers have also filed legal claims of contamination that occurred at another facility owned and operated by Olin Corporation ("TN-OLIN"). The TN-OLIN facility is located at 1186 Lower River Road, Charleston, Tennessee. The case regarding TN-OLIN was filed on January 25, 2024, in the Circuit Court for Hamilton County, Tennessee. The case was removed to the United States District Court, Eastern District of Tennessee, at Chattanooga, case no. 1:24-cv-00096-TRM-CHS. The same lead counsel in that case represents the Plaintiff Workers in this case. These Plaintiff Workers are not included in this Complaint in an effort to obtain double compensation but to demonstrate the extent and far-reaching harm caused by the conditions at the FACILITY, as well as the pattern of mercury contamination and exposure across OLIN's facilities. The allegations at TN-OLIN are consistent with the claims within this Complaint due to this pattern. Plaintiff Workers at TN-OLIN who are included in this Complaint fully accept that damages in one case may be offset by damages in another case under applicable law. Plaintiff Workers at

TN-OLIN allege that they were exposed to hazardous levels of mercury through inadequate safety measures and improper handling of mercury. This mercury exposure is similar, if not identical to the exposure at the FACILITY located in Augusta, Georgia. Plaintiff Workers and their Family Members, currently in the number of 28, were exposed due to work at both OLIN facilities. The majority of these Plaintiff Workers were sent from TN-OLIN to assist in the Decommission and Demolition of the FACILITY in Georgia because they were experienced employees of Decommission and Demolition in TN-OLIN. Negligence at both TN-OLIN and the FACILITY in Georgia has caused severe health issues for these Plaintiff Workers and their family members, leading to long-term physical damage and psychological distress. This case, like the TN-OLIN case, highlights the risks associated with industrial operations that do not adequately safeguard workers against the known toxic hazards of mercury. These risks were knowingly and obscenely ignored in both OLIN locations with the same Plaintiff Workers and ultimately the family members of these same workers.

20. The Plaintiff Workers fall into three categories:

A. Plaintiff Workers who were employed directly by OLIN, which owned and operated the FACILITY (each a "Plaintiff OLIN Worker");

B.  Plaintiff Workers who were employed by one or more of the CONTRACTOR DEFENDANTS to perform work at the FACILITY (each a "Plaintiff Contractor Worker"); or

C.  Plaintiff OLIN Workers and Plaintiff Contractor Workers, classified as crossover Plaintiffs, who worked at both the FACILITY in Augusta, Georgia and the TN-OLIN Facility (each a "Plaintiff Crossover OLIN Worker", or a "Plaintiff Crossover Contractor Worker").

21. Another set of Plaintiffs is the "Plaintiff Family Members" who cohabitated with a Plaintiff Worker while the Plaintiff Worker worked at the FACILITY.

22. Many of the "Plaintiff Family Members" are resident citizens of Augusta, Georgia or the surrounding area, or were at all times material hereto. Some of the Plaintiff Family Members are also resident citizens of Charleston, Tennessee or the surrounding area, or were at all times relevant hereto, and are over the age of eighteen (18) years (see paragraphs 19 and 20C). At all times relevant hereto, the Plaintiff Family Members and the Plaintiff Crossover Family Members were members of the same household as one or more Plaintiff Workers who were working at the FACILITY. The Plaintiff Family Members are as follows: Rebecca E. Allison; David G. Bell, III; Kasey R. Boutwell; Sandra S. Crawford; Theresa K. Hall; Candace R. Jager;

Shannon H. Johnson; Jonathan D Joyner; Cameron M. Kliebert; Michael T. Lamie; Lydia M. Legere; Irene McCorkle; Derrick A. Mims; Darryl A. Mims, Jr.; David A. Mims; Deion A. Mims; Olivia A. Mims; Gloria S. Olinger; Jennifer M. Ozmore Shaw; Earl L. Parrish; Sherry J. Price; Cathy A. Sherril; Katie L.B. Smith; Imogene C. Stevenson; Robin S. VanWinkle; Anna F. Wagahoff; and Martha S. Webb.

23. The Plaintiff Crossover Workers and their Plaintiff Crossover Family Members are: Rebecca E. Allison; Thomas L. Allison; Carey O. Burger; Christopher D. Ellis; Van G. Gibson; Ronald D. Hale; Timothy K. Kelley; Cameron M. Kliebert; Jennifer L. Lawson; Darryl A. Mims; David A. Mims; Deion A. Mims; Olivia A. Mims; Gloria S. Olinger; Gloria S. Olinger, as surviving spouse of William M. Olinger (deceased); Jennifer M. Ozmore Shaw; Anthony M. Phillips; Raleigh W. Potter; Sherry J. Price; Stephen Price; Jonathan E. Raburn; Jimmy F. Robinson, Jr.; Callene P. Scruggs; Alex S. Shaw; Benjamin L. Shelton; Nicholas R. Shepherd; Imogene C. Stevenson; and Larry D. Stevenson.

24. Some Plaintiff Family Members are pursuing causes of action as the surviving spouse, child, next-of-kin, or personal representative of their deceased family member under the Georgia wrongful death statutes at

*Georgia Code Ann.* §51-4-2, et seq. At all times material hereto, these Plaintiff Family Members were members of the same household as one or more of the deceased Plaintiff Workers who were working at the FACILITY. These Plaintiff Family Members and their deceased Plaintiff Workers are as follows: Shannon H. Johnson, as surviving spouse of Kenneth W. Johnson (deceased); Gloria S. Olinger, as surviving spouse of William M. Olinger (deceased); and Martha S. Webb, as surviving spouse of Donald R. Webb, Sr., (deceased).

25. There are additional family members ("Additional Family Members"), living in the same household with one or more Plaintiff Workers, while said employee(s) were working at the FACILITY, but who are not yet listed as Plaintiff Family Members. Additional Family Members were exposed in the same manner as the Plaintiff Family Members.

26. Counsel for the Plaintiffs reserves the right to add Additional Workers and Family Members as named Plaintiffs in the future.

27. As explained below, Defendant OLIN, which owned and operated the FACILITY, together with the other Defendants, owed a duty to all Plaintiff Workers, not just the workers who were OLIN employees.

28. Exhibit 1 is a Matrix of Plaintiff Claims which includes a chart detailing the names, employers, relevant timelines, and counts for each identified Plaintiff OLIN Worker, Plaintiff Contractor Worker, and Plaintiff Family Member. The rows for Plaintiff Family Members specify the family member who exposed them to contaminants, along with their timeline of exposure. Additionally, the chart enables quick identification of Plaintiffs who have submitted affidavits, as previously mentioned, and the Plaintiffs who are Crossovers, including Family Member Crossovers. A legend is provided at the beginning of Exhibit 1 to facilitate the interpretation of the data presented.[1]

29. Exhibit 2 contains maps of the FACILITY and identifies the areas discussed herein.

30. Exhibits 3 through 23 contain Affidavits of certain Plaintiffs as follows:

    Exhibit 3 – Affidavit of Joe Banks, Jr.

    Exhibit 4 – Affidavit of Gloria L. Brown

    Exhibit 5 – Affidavit of Tyler A. Cannon

    Exhibit 6 – Affidavit of Riley J. Collins

---

[1] An electronic, native version of Exhibit 1 is being provided to the Court and to all Defendants to allow them to search, filter, and sort all data contained therein.

Exhibit 7 – Affidavit of William J. Elmore

Exhibit 8 – Affidavit of Lance M. Hieke

Exhibit 9 – Affidavit of Eric P. Holman

Exhibit 10 – Affidavit of Jeffrey L. Keller

Exhibit 11 – Affidavit of Timothy K. Kelley

Exhibit 12 – Affidavit of Thomas Lacy

Exhibit 13 – Affidavit of Jennifer L. Lawson

Exhibit 14 – Affidavit of Randy L. Manning

Exhibit 15 – Affidavit of Darryl A. Mims

Exhibit 16 – Affidavit of David A. Mims

Exhibit 17 – Affidavit of Derrick A. Mims

Exhibit 18 – Affidavit of Olivia A. Mims

Exhibit 19 – Affidavit of Stephen Price

Exhibit 20 – Affidavit of Alex S. Shaw

Exhibit 21 – Affidavit of David L. Shirling

Exhibit 22 – Affidavit of Jeffrey F. Sloan, Sr.

Exhibit 23 – Affidavit of Michelle D. Williams

31. Exhibit 24 is a Matrix of Symptomology which includes a chart detailing the names, reported symptoms, and diagnosed symptoms for each identified

Plaintiff OLIN Worker, Plaintiff Contractor Worker, and Plaintiff Family Member. The rows for Plaintiff Family Members specify the family member who exposed them to contaminants. Exhibit 24 uses the same abbreviations that were provided in the legend at the beginning of Exhibit 1 to facilitate the interpretation of the data presented.[2]

32. Exhibit 25 is a Native File Link. This contains a link to a website location where native versions of Exhibits 1 and 24 can be accessed by the Court and all Defendants. This will allow them to search, filter, and sort all data contained therein.

33. These Affidavits and other Exhibits will be cited throughout the Complaint in support of the allegations against Defendants.

**Overview of the FACILITY's History**

34. The FACILITY began operation in 1965 as a 220-ton per day chlorine plant and ultimately ceased operation in 2012. The FACILITY had 137 full-time employees as of 1982.[3] Upon information and belief, the FACILITY has

---

[2] An electronic, native version of Exhibit 24 is being provided to the Court and to all Defendants to allow them to search, filter, and sort all data contained therein.

[3] Hazardous Waste Landfill Application, August 1982, Box 4; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

been owned and operated by OLIN the entire time and remains so as of the filing of this Complaint.[4]

35. OLIN has operated under a number of names since its founding in 1892. These names, in chronological order are: Equitable Powder Company, founded in 1892; Western Cartridge Company in 1898; Winchester-Western in 1931; Olin Industries, Inc., in 1944; Olin Mathieson Chemical Corporation after merging with Mathieson Chemical Corporation (founded also in 1892) in August of 1954; and Olin Corporation as of 1969. In Georgia and at the FACILITY specifically, OLIN has operated at one time or another under the assumed names or doing business as the following: Olin Corporation; Olin Chemicals and Chlor Alkali, Inc.; Olin Chlor-Alkali Logistics, Inc.; Olin North American Holdings, Inc.; and Olin Logistics, LLC. All such Olin-related entities and names will be collectively referred to as OLIN.

36. As of 1996, the FACILITY manufactured chlorine ($Cl_2$), sodium hydroxide (NaOH), also known as caustic soda, and hydrogen ($H_2$) using the mercury cell process. The FACILITY also manufactured Reductone ($Na_2S_2O_4$), also known as sodium dithionite or sodium hydrosulfite, sodium hypochlorite

---

[4] Richmond Cty Bd. of Assessors, 2402 Doug Barnard Pkwy Assessment Notice (2024).

(NaClO), sulfur dioxide ($SO_2$), and hydrochloric acid (HCl), using chemical reaction processes.[5] Upon information and belief, the FACILITY continued to use the same or similar manufacturing processes until closure.

37. The FACILITY is located approximately 12 miles south of the city of Augusta, Georgia. The FACILITY is located along the Savannah River and originally consisted of 272 acres of land. In 1982, an additional 243 acres of land adjoining the plant site was purchased for investment purposes.[6] As of 1982, it had a production capacity of 315 tons of chlorine and 350 tons of caustic per day from its 58 mercury cells.[7] The FACILITY is bounded on the west by Doug Barnard Parkway, on the north by private farmland and Bush Field Airport, on the east by the Savannah River, and on the south by Continental Forest Industries and Philadelphia Quartz industrial properties.

38. As of 1984, the FACILITY property consisted of 515 acres, of which 110 were used for waste management and plant operation. In 1994, the FACILITY removed 44+ acres of land from the FACILITY property. In 1995, an additional 17 acres of land adjoining the plant site was purchased

---

[5] Tenn. Dept. of Env't Conservation, div. Water Resources, Draft of NPDES Permit No. TN0002461 (2014).

[6] Olin Corporation – Augusta, GA Facility Modification to Permit No. HW-031 (S&D), March 17, 1994, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

[7] Hazardous Waste Landfill Application, August 1982, Box 4; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

by the FACILITY for investment purposes. As of 1996, the FACILITY employed 101 full-time individuals.[8]

39. The FACILITY's hazardous waste management operation, as of 1982, involved six units and five processes: two containers and one surface impoundment storage unit, one surface impoundment treatment unit, one surface impoundment disposal unit, and one landfill disposal unit. In 1982, an application was submitted by the FACILITY to construct an additional landfill. Waste management units E1-E4, considered a landfill by the FACILITY, span approximately six (6) acres.[9]

40. Hazardous wastes produced at the FACILITY include K071 waste (brine purification muds from the mercury cell process), K106 waste (wastewater treatment sludge from the mercury cell process), D009 waste (mercury wastes including retort ash, residues, parts, equipment, and other miscellaneous materials), D002 waste (corrosive wastes from caustic production), and F005 waste (spent nonhalogenated wastes).

---

[8] Olin-GAEPD Permit No. HW-031 Renewal Application, March 31st, 1996, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[9] Olin Corporation – Augusta, GA Facility Modification to Permit No. HW-031 (S&D), March 17, 1994, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

41. The raw materials utilized for the mercury cell process at the FACILITY consisted of CP salt (sodium chloride), rock salt, and electric power. High quality CP salt was acquired from the Olin McIntosh, Alabama, diaphragm cell Chlor-Alkali plant and was delivered to the FACILITY by rail. High quality rock salt was obtained from Morton Salt Company located in Weeks, Louisiana. Electric power was purchased from Georgia Power Co.[10] The FACILITY had a single cell room which started up in 1965 and, as of 1982, had 58 cells. From approximately 1965 to 2012, electrolytic cells containing mercury were used to manufacture chlorine, sodium hydroxide, and hydrogen in the Cell House in the northern part of the FACILITY.

42. Chlorine and hydrogen are by-products of the electrolysis process for both sodium and potassium hydroxide. A notable difference between the two processes is the brine. Sodium chloride brine is used for sodium hydroxide production, and potassium chloride brine is used for potassium hydroxide production.

**Who is OLIN?**

43. Upon information and belief, Olin Corporation is the current name of the company that has done business at the FACILITY during its entire existence,

---

[10] *Ibid.*

and is the successor to all names, divisions, and subsidiaries that have done business at the FACILITY, as previously listed in paragraph 35 (collectively "OLIN").

44. Defendant OLIN is currently known as Olin Corporation, a Virginia corporation with its principal place of business in Missouri that is registered to do business in Lawrenceville, Gwinnett County, Georgia. OLIN is subject to the jurisdiction of this Court.

45. Upon information and belief, OLIN is the entity that owned and operated this FACILITY from 1965 to the present.

46. Upon information and belief, OLIN built the FACILITY in 1965 for the production of chlorine and caustic soda at the Augusta, Georgia location. Later, OLIN added the capacity to make sodium hydrosulfite at the FACILITY. OLIN utilized the mercury-cell production method at the FACILITY until its decommissioning in 2012.

## Identification of CONTRACTOR DEFENDANTS

47. OLIN utilized several contractors to provide work in and around the FACILITY. The Defendants who served as contractors for OLIN are referred to as CONTRACTOR DEFENDANTS.

48. Defendant Pen Gulf, Inc. is a Florida corporation with its principal place of business in Florida that is registered to do business in Lawrenceville, Gwinnett County, Georgia ("Pen"). Upon information and belief, Pen provides industrial painting, insulation, and mechanical fabrication and served as a contractor that provided work in and around the FACILITY. As such, Pen is subject to the jurisdiction of this Court.

49. Defendant Centurion Industries, Inc., is an Indiana corporation with its principal place of business in Indiana that is registered to do business in Peachtree Corners, Gwinnett County, Georgia and also does business in Georgia as A-Lert Construction Services ("Centurion"). Upon information and belief, Centurion provides industrial construction, maintenance, and repair and served as a contractor that provided work in and around the FACILITY. As such, Centurion is subject to the jurisdiction of this Court.

50. Defendant CDI Corporation, formerly known as CDI Engineering Solutions, LLC., CDI Engineering Group, and Comprehensive Designers, Inc., is a Pennsylvania corporation with its principal place of business in West Virginia that is registered to do business in Lawrenceville, Gwinnett County, Georgia (collectively referred to as "CDI"). Upon information and belief, CDI provides engineering services to energy, chemical, and infrastructure

companies and served as a contractor that provided work in and around the FACILITY. As such, CDI is subject to the jurisdiction of this Court.

51. Defendant NGN Curbs, LLC, formerly known as MTI Manufacturing LLC, Mechanical Trades Incorporated, and Norton Sheet Metal, Inc, is a Georgia domestic limited liability company with its principal place of business in Keysville, Georgia (collectively referred to as "NGN"). Upon information and belief, NGN designs and manufactures industrial HVAC products and served as a contractor that provided work in and around the FACILITY. As such, NGN is subject to the jurisdiction of this Court.

52. Defendant NES Global, LLC, formerly known as NES Overseas USA, LLC, is a Florida limited liability company with its principal place of business in Houston, Texas (collectively referred to as "NES"). NES has never been registered to do business in Georgia. Upon information and belief, NES specializes in recruitment services and served as a contractor that provided work in and around the FACILITY. As such, NES is subject to the jurisdiction of this Court.

53. Defendant Yeargin Potter Smith Construction, Inc., formerly known as Yeargin Potter Shackelford Construction, Inc., and Yeargin Construction Company, Inc., is a South Carolina corporation with its principal place of

business in South Carolina that was formerly registered to do business in Lawrenceville, Gwinnett County, Georgia (collectively referred to as "Yeargin"). Upon information and belief, Yeargin provides industrial construction and served as a contractor that provided work in and around the FACILITY. Yeargin is subject to the jurisdiction of this Court.

54. Defendants Pen, Centurion, CDI, NGN, NES, and Yeargin are collectively referred to as the "CONTRACTOR DEFENDANTS".

**Jurisdiction and Venue are Proper in this Court**

55. This case is filed pursuant to the procedural and substantive law of the State of Georgia (including but not limited to, where applicable, the wrongful death statutes at *Ga. Code Ann.* §51-4-1, et seq.).

56. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), in that (a) this is a "mass action" pursuant to 28 U.S.C. §1332(d)(11)(B)(i) as this action seeks monetary relief on behalf of greater than 100 plaintiffs who propose to try their claims jointly and involve common questions of law and fact; (b) the parties are minimally diverse as at least one plaintiff is a citizen of a different state from at least one defendant, 28 U.S.C. §1332(d)(2)(A); (c) the matter in controversy exceeds the sum or value of $5,000,000 in the aggregate, exclusive of

interest and costs, and at least $75,000 for each Plaintiff, 28 U.S.C. §1332(d)(2), (6); and (d) none of the statutory exceptions to jurisdiction apply.

57. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district, and pursuant to Ga. Code § 14-2-510(b)(1), as this district is located in the county where several Defendants maintain their registered office.

## CHAPTER II: THE CHLOR-ALKALI INDUSTRY

**Use of Toxic Mercury in the Chlor-Alkali process**

58. There are three electrolytic cell-type processes used for Chlor-Alkali production on an industrial scale: the mercury cell (beginning in the 1890s), the diaphragm cell (also beginning in the 1890s), and the membrane cell, which, beginning in the 1960s, progressed relatively quickly as a practical alternative to mercury and diaphragm cell technology. Of the three options, the mercury cell process is the only one wherein the use of mercury is required.[11 & 12]

---

[11] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).

[12] Thomas F. O'Brian et al., Handbook of Chlor-Alkali Technology 17-36 (Springer 2005).

59. The mercury-cell process for producing chlorine and caustic utilized by the FACILITY from 1965 to 2012 evolved from the Castner-Kellner mercury-cell process first implemented in the 1890s.[13]

60. The mercury cell Chlor-Alkali process utilizes electrolysis of a saltwater solution (also known as "brine") to produce both chlorine gas ($Cl_2$) and an alkaline solution (either sodium hydroxide or potassium hydroxide). Sodium hydroxide (NaOH), also known as "caustic soda," is produced by the electrolysis of sodium chloride brine. Potassium hydroxide (KOH), also known as "caustic potash," is produced by the electrolysis of potassium chloride brine. This process also yields hydrogen gas ($H_2$) as a by-product.[14]

61. The mercury cell has a steel bottom with rubber-coated steel sides, as well as the boxes for brine and mercury feed and exit streams, with a flexible rubber or rubber-lined steel cover. Horizontal, adjustable metal anodes hang from the top, and mercury flows on the inclined bottom. The current flows from the steel bottom to the flowing mercury. Saturated brine fed from the end box is electrolyzed at the anode to produce chlorine, and the depleted brine flows from the top portion of the trough. The cation, be it sodium or

---

[13] *Ibid.*
[14] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).

potassium, reacts with mercury to form an amalgam, which flows out of the end box to a vertical cylindrical tank. The amalgam reacts with water in the decomposer, packed with graphite particles, and produces caustic soda or potash and hydrogen. Hydrogen saturated with water vapor exits from the top, along with the mercury vapor. The concentration out of the decomposer is either forty-eight to fifty percent (48%-50%) by weight of caustic soda or forty-five to fifty percent (45%-50%) by weight of caustic potash. The depleted brine flows out of the exit end box. Some cells are designed with chlorine and anolyte outlets from the end box, which are separated inside the depleted brine tank. The mercury from the decomposer is pumped back to the cell.[15]

62. A mercury cell plant typically has circuits of 30 or more individual cells electrically connected in a series.[16] Each mercury cell has two primary units, the electrolyzer (electrolytic cell) and the denuder (decomposer). The electrolytic cell has a steel bottom with rubber-coated steel sides, as well as the boxes for brine and mercury feed and exit streams, with a flexible rubber or rubber-lined steel cover.[17] Chlorine gas is produced in the electrolytic cell

---

[15] Thomas F. O'Brian et al., Handbook of Chlor-Alkali Technology 17-36 (Springer 2005).
[16] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[17] Thomas F. O'Brian et al., Handbook of Chlor-Alkali Technology 17-36 (Springer 2005).

and, in a separate compartment, the decomposer produces hydrogen gas and caustic soda or potash solution.[18]

63. The FACILITY had a single Cell Building housing the electrolytic mercury cells from which both caustic soda and caustic potash were produced along with chlorine and hydrogen.[19] The cells were controlled from a centralized control room by an integrated computer system called the Distributed Control System (DCS).

64. Purified, saturated brine is fed into the electrolytic cell at the inlet end-box and then flows through an elongated, slightly inclined trough in between a shallow, co-current stream of mercury (cathode) and an electrode assembly (anode). The adjustable metal anodes, the lower surfaces of which are close to the mercury surface and parallel to it, are dimensionally stable, metal electrodes made of a titanium substrate with a metal catalyst. The cell trough has a gas-tight cover, which also supports the anodes. During electrolysis, which is electrical current applied between the anode and the mercury cathode, chlorine is liberated by the anode and collects at the top of the cell in gaseous form.

---

[18] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[19] EPA, Office of Air Quality Planning and Standards, Regulatory Impact Analysis (2010).

65. The elemental mercury in liquid form flows in a continuous loop between the electrolytic cell and the decomposer. The mercury attracts sodium/potassium ions to form a mercury-sodium (Hg:Na) or mercury-potassium (Hg:K) amalgam as it flows through the cell from the inlet end-box down a slight grade to the outlet end-box. From the outlet end-box, the amalgamated mercury flows to the decomposer where it reacts with deionized water in the presence of a catalyst to remove the sodium/potassium, thus restoring the mercury to its non-amalgamated form and yielding caustic soda/potash (NaOH or KOH) and hydrogen gas. After the caustic soda/potash and mercury are separated in the decomposer, the mercury is pumped back to the electrolytic cell to repeat the process while the caustic soda/potash and hydrogen are transferred to auxiliary processes for purification.

66. Depleted brine also exits the electrolytic cell at the outlet end-box where it is piped to a tank and/or through an auxiliary system designed to reconcentrate (re-saturate) the brine for reuse. Chlorine is collected from the tops of the mercury cells by a common header system. Hydrogen is also collected from the amalgam decomposers in a common header system. The hydrogen stream contains a small amount of mercury vapor from the liquid

mercury processed in the decomposer. To remove the mercury vapor, the hydrogen stream is cooled, passed through a mist eliminator, and sent to a finishing device such as a carbon adsorber. The hydrogen may then be discharged to the atmosphere, used on-site, or sold for use off-site. In a mercury cell process, a fifty percent (50%) caustic solution is obtained directly from the amalgam decomposers. Thus, the mercury cell caustic requires minimal further processing to yield a commercial product. [20 & 21]

67. The brine system contains a series of tanks and pumps for the circulation of potassium chloride and water. First, solid potassium chloride is transported to the brine system and mixed with water. From this point, the solution of potassium chloride and water goes through a purification stage. Impurities in the potassium chloride brine are removed through pH adjustments (adjustments to levels of acidity of the mixture), settling, and filtration. Hazardous waste sludges are generated as part of the purification process.[22]

68. These sludges are dried and shipped offsite as K071 hazardous waste, as defined by RCRA appendix VII.[23]

---

[20] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[21] Thomas F. O'Brian et al., Handbook of Chlor-Alkali Technology 17-36 (Springer 2005).
[22] *Ibid.*
[23] Voluntary Action Program, Phase II Property Assessment, 2010.

**The Mercury Cell Chlor-Alkali Process Generates Dangerous Waste That is Contaminated with Toxic Mercury.**

69. Solid waste from mercury cell plants includes spent graphite from decomposer cells and spent caustic filtration cartridges from the filtration of sodium and potassium hydroxide. It is expected that some amount of mercury will be present in most, if not all, solid waste. The primary waste produced at the FACILITY as part of the mercury cell Chlor-Alkali process is brine purification mud, which typically contains mercury in elemental form and mercuric chloride. This brine purification mud, where separately-purified brine is not used, is listed as a hazardous waste (K071) under RCRA Appendix VII.[24]

70. The Chlor-Alkali process generates 10kg to 45kg of brine mud per metric ton of chlorine. Mercury concentration in brine muds from mercury cell plants varies from 13ppm to 1000ppm, with an average concentration of 200ppm. These muds are considered hazardous and must be disposed of in a RCRA Subtitle C landfill after being treated with sodium sulfide ($Na_2S$), which creates an insoluble sulfide compound.[25]

---

[24] Aziz, Hamidi & Ghazali, Miskiah & Mohd Suffian, Yusoff & Hung, Yung-Tse. (2017). 4 Waste Treatment and Management in Chlor-Alkali Industries.
[25] *Ibid.*

71. Mercury should be recovered from these wastes where possible, and the remainder should be disposed of in secured landfills to prevent the migration of mercury, which can cause damage to the environment. Routinely, mercury-contaminated waste was transported to the FACILITY retort units where the mercury was volatilized, condensed, and recovered to be recycled back into the production process.[26] For decades, the FACILITY used old retorts to attempt to recover mercury from waste. Based on sworn Affidavit testimony, this system was old and inefficient, and there was mercury-contaminated waste throughout the FACILITY. This system failed to adequately recover mercury from the FACILITY's waste, creating hazards for everyone working onsite and anyone receiving the waste offsite. *See Affidavit of Eric P. Holman, Exhibit 9, Affidavit of Darryl A. Mims, Exhibit 15, and Affidavit of Timothy K. Kelley Exhibit 11.*

72. Jeffrey L. Keller is a Plaintiff Contractor Worker who worked on the Construction Crew and General Maintenance (including carpentry, wiring, welding, plumbing, and all other General Maintenance duties) at the FACILITY. Keller started working at the FACILITY in 1987 and again,

---

[26] *Ibid.*

approximately from 1990 to approximately 1993. Keller describes the retort

systems this way:

> I was never assigned to work in the Retort Building, but I had to spend a significant amount of time there. This is where we (and others from all over the FACILITY) carried all hazardous materials for storage or disposal. There were two large crematoriums in the building that were used to reclaim mercury from materials that could not be separated from by any other method. The process itself was fairly simple. We would burn whatever material had mercury in it at an extremely high temperature (they run between fourteen and eighteen hundred degrees Fahrenheit) until the mercury turns to vapor. Then, we would trap the vapor and allow it to coalesce, usually overnight, then collect it from the machine as a liquid after it has cooled enough. The Retort Building was just as big a mercury hazard as the Cell House, and I've only realized this now. I was already in my PPE from the Cell House, but we only had to wear a respirator if they were "cooking" (had the crematories running), or if we were spreading mercury sludge on the floor, and then again when we scooped it back off the floor. We used to store a fifty-five-gallon drum of mercury sludge in the Cell House. It was material we cleaned out of the cells, as we worked on them, consisting mostly of mercury, carbon, or graphite (from the decomposers), and maybe some brine. We had to write the date on the drum, and it couldn't stay in the Cell House for more than a week before being transported to the Retort Building using a forklift. I don't know how long they were allowed to store it in the Retort Building. Usually, once a week, a few of us would go to the Retort and get one of the stored drums and use shovels to spread the contents out onto a section of the floor that was slightly inclined like a ramp. It was all highly contaminated material, and I assumed they had us put it on that incline so some of the mercury would run out. It would sit there

for about a week and then we'd go back and shovel it into forty-gallon plastic containers. It was Rubbermaid stuff, essentially just a garbage can with a snap-on lid. It was still hazmat material. It still had mercury in it. I never understood why they didn't put it in the crematories, but they didn't. Once we shoveled it all off the floor, a coworker named Terry Hair would always stay after hours and load them onto a J.B. Hunt trailer for them to haul away. We never used "shrink wrap" or anything. I never labeled any of those containers as "hazardous materials." I never saw anyone else label them as such. The containers were not lined, even with a plastic garbage bag. There were no other precautions taken past snapping the plastic lid into place. I do remember putting a date on the containers, but that was all. I never saw anyone add a hazardous material placard before loading them onto the trailer. The only thing between all that mercury sludge and the highway was the plastic lid that snapped on and luck. The only reason to take anything else to the Retort was because it was full of mercury and no good anymore. The ash and whatever other leftovers from the crematories were supposed to be nonhazardous since the mercury had burned out of it. Terry Hair drove that forklift through the mercury on the floors of the Cell House, and then on the equally contaminated floor of the Retort Building, and then all over the rest of the FACILITY as well.

Affidavit of Jeffery L. Keller, Ex. 10, pages 6 and 7.

73. David L. Shirling describes the Retort Building this way:

The Retort system in Augusta was not as big, nor as efficient as the one OLIN had at their Charleston, Tennessee location. I know this because I was part of a group of workers that was taken to Charleston for two days to tour that facility, and more specifically, their TRU (Thermal Recovery Unit). It was a large kiln and burned hotter than the FACILITY in Augusta. The Augusta FACILITY had two crematories, like the ones OLIN used

42

to have in Charleston. They were used to dispose of mercury-contaminated materials and simultaneously recover as much of that mercury as possible. You put material in, and it gets hot enough for the mercury to vaporize. The vapor is trapped and allowed to cool until it returns to liquid form which then pours out into a reclamation flask. According to the FACILITY, the remaining ashes were contaminant-free and could be disposed of in non-hazardous sites. That meant we could just put it in any dumpster onsite. It could go to any landfill with the rest of the "normal" garbage. I do not remember ever dealing with any of that. I was allowed a couple of hours of overtime on some evenings. I would stay to load up the crematories with whatever the FACILITY wanted burned, turning them on, and leaving for the night. Then, I could come in a little early the next morning to get the mercury that had been recovered and take it to the Cell House. I know now that I was exposed to a lot of mercury doing this task. The only reason to send material to the Retort was because it was contaminated and no longer of any use. Most of the materials I loaded into the crematories were saturated with mercury. It was not uncommon to see it dripping from the hoppers used to transport materials from building to building.

Affidavit of David L. Shirling, Ex. 21, pages 4 and 5.

74. Wastewater treatment in mercury cell plants typically generates about 1.4 kg of sludge (K106 waste) per metric ton of chlorine produced.[27] Mercury is the main pollutant of concern in wastewater that is released by mercury cell plants. In addition to wastewater treatment sludge, spilled mercury from

---

[27] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (4th ed. 2004).

sumps and mercury cell "butters" may also be classified as K106 listed waste.[28]

75. Elemental mercury is capable of permeating and amalgamating with metal components and metallic structures in a Chlor-Alkali facility. This permeation can turn metal items, which may not be identified as waste products, into potential sources of exposure to mercury. Effectively, the mercury vapor turns the building and production process systems into a prolific source of mercury vapor emissions. Thus, the industrial process itself turns the FACILITY into a source of toxic mercury emissions endangering both workers and the surrounding communities.

**Operation and Maintenance of a Chlor-Alkali Facility Creates Mercury Exposure Risks.**

76. Caustic soda and potash (sodium and potassium hydroxides, respectively) are corrosive chemicals that may cause burns upon contact with the skin. Leaks and spills of caustic chemicals and mercury are known production hazards with the potential to cause serious health effects.[29] As mercury cells age and, in turn, become less efficient, they require more frequent maintenance and must be rebuilt more often. Mercury is supposed to remain

---

[28] *Ibid.*
[29] *Ibid.*

enclosed during production operations. However, many tons of mercury are present in the production equipment, and, inevitably, mercury vapor enters the ambient air during periods of operation, equipment overhaul, maintenance outages, and during cleaning and decontamination of plant equipment and structures.

77. The National Institute for Occupational Safety and Health ("NIOSH") has established an Immediately Dangerous to Life or Health ("IDLH") value for mercury vapor of 10 mg/m$^3$. IDLH is a condition that poses an immediate threat to life, would cause irreversible adverse health effects, or would impair an individual's ability to escape from a dangerous atmosphere. At temperatures around 17°C (62°F) and above, the concentration of mercury vapor in the air exceeds the IDLH level at the point of saturation. The saturation point of mercury in this context can be thought of as the maximum number of mercury molecules the air can hold at a given temperature and pressure.[30] The higher the ambient temperature, the more mercury will be vaporized, which in turn increases the inhalation hazard.[31] & [32] Many workers, Plaintiff Workers among them, have mentioned temperatures of

---

[30] *Ibid.*
[31] *Ibid.*
[32] OSHA, Guidance for the Identification and Control of Safety and Health Hazards in Metal Scrap Recycling, (2008).

80°F or higher being common while they were performing duties in the Cell Room, and that temperatures routinely exceeded 90°F or were "unbearable" during the summer months. *See Affidavit of William J. Elmore Exhibit 7, page 2; and Affidavit of David L. Shirling Exhibit 21, page 2.*

78. In the mercury-cell Chlor-Alkali process, it is possible that chlorine will react with mercury vapor to produce inorganic mercury compounds.[33] There are two mechanisms by which this occurs within a mercury cell Chlor-Alkali facility: 1) Residual chlorine gas (one of the main products of the process) may interact with mercury vapor in the air to form mercuric chloride, which will deposit onto the floor and other surfaces of the FACILITY, and 2) Hypochlorite solutions (e.g., bleach) are used for cleaning and decontaminating surfaces and equipment or sprayed into the ambient air of a Cell Room to decrease levels of mercury vapor in the air. The chlorine in the bleach-containing solutions may interact with mercury to form mercuric chloride. Exposure to mercuric chloride is also a recognized hazard to workers, primarily by way of the ingestion-exposure route.[34]

---

[33] ATSDR, Public Health Statement Mercury (1999).
[34] NIOSH, Criteria for a Recommended Standard: Occupational Exposure to Inorganic Mercury (1973).

79. During the operation of the Chlor-Alkali process at the FACILITY, there was ongoing maintenance work performed on the equipment, buildings, and utilities.

80. Maintenance work is any work that is performed to repair, sustain, upkeep, or refurbish existing materials, property, or equipment in their current state without changing their size, type, or quality. The work scope for maintenance activities performed at the FACILITY during normal production operations, as described by Plaintiff Workers, is wide-ranging in nature. Such activities (collectively the "Maintenance Work") include, but are not limited to:

   A. Housekeeping and mercury vapor control in the Cell House,

   B. Maintaining an inventory, recovering, and adding mercury to cells,

   C. Loading, unloading, and operating mercury retorts or thermal recovery units,

   D. Processing (treatment, storage, and disposal) D009, K071, and K106 wastes,

   E. Monitoring and cleaning or replacing filtration media,

   F. Rebuilding, repairing, and cleaning out cells and other process equipment,

   G. Draining mercury from cells and other process equipment,

   H. Anode construction, installation, adjustment, repair, and removal, and

I.  Removing or replacing pipes and other parts by cutting or sawing.

*See Affidavit of William J. Elmore, Exhibit 7; Affidavit of Eric P. Holman, Exhibit 9; and Affidavit of Timothy K. Kelley, Exhibit 11.*

81. During the performance of maintenance work, Plaintiff Workers were exposed to harmful levels of toxic mercury, causing significant personal injury to themselves and Plaintiffs' Family Members. This increase in exposure is resultant from opening the system, handling contaminated parts, and adding heat to contaminated materials. All of these actions increase mercury vapor exposures.

**Decommissioning and Demolition Creates Known Elevated Mercury Exposures.**

82. In addition to those exposures present during operations and maintenance, even more dangerous exposure occurred during the Decommissioning and Demolition process ("D&D").

83. Decommissioning and Demolition are two distinct phases preceding the shut-down of an industrial mercury cell Chlor-alkali process. Decommissioning typically entails flushing mercury out of the system for recovery, removing any other hazardous chemicals used during production, and ensuring all products and by-products have been removed from the

system. Demolition typically entails the dismantlement of plant equipment and structures upon completion of the Decommissioning phase.

84. D&D is often used singularly to describe any combination of post-production phases and activities necessary to remove hazardous chemicals, remove and/or decontaminate hazardous waste, and to remove contaminated equipment or waste from the FACILITY. This occurs after a mercury cell Chlor-Alkali operation is either shut down permanently or converted from mercury cell to membrane or diaphragm cell.

85. The FACILITY conducted D&D operations while also converting Chlor-Alkali operations to membrane cell technology from approximately 2011 until the foundations of the Mercury Cell Buildings were paved over. This D&D process exposed the Plaintiff Workers to significantly higher levels of mercury contamination. The Plaintiff Workers continue to be exposed because paving over mercury does not eliminate this deadly toxin.

> There wasn't any real cleanup of the Cell Room area once we were done. There was still mercury present on the ground. Everything was just covered with a slab of concrete. David Blair, the FACILITY Manager, told me that the FACILITY sold mercury to a company overseas for $8 million.

Affidavit of Darryl A. Mims, Ex. 15, page 4.

86. Plaintiff Workers were performing plant operations, maintenance, contracting work, and/or D&D at the FACILITY. They thereby came into contact with mercury, mercury vapors, and other toxicants at the FACILITY. They were further exposed in and around a variety of fixtures, equipment, and structures at the FACILITY, which were contaminated with mercury and other toxicants.

87. The Plaintiff Workers were exposed to mercury and other toxicants at the FACILITY, and, in direct and proximate relationship thereto, suffered personal injuries and damages including, but not limited to: death, physical damage to organs and organ systems, brain injuries, severe emotional distress, pain and suffering, impairment of earning capacity, medical expenses, temporary, permanent, partial, or complete disability, and will suffer these personal injuries and damages for the remainder of their lives. *See Affidavit of Timothy K. Kelley, Exhibit 11; Affidavit of William J. Elmore, Exhibit 7; and Affidavit of Alex S. Shaw, Exhibit 20.*

**CHAPTER III: ONSITE AND OFFSITE CONTAMINATION**

*This Antiquated and Dangerous Production Process Highly Contaminated the FACILITY Itself and Offsite Locations Throughout the Augusta Community.*

88. From the preceding, it has been demonstrated that high mercury exposure is possible during the operation, maintenance, and D&D of a Chlor-Alkali mercury cell production facility. In addition to this operational exposure, the maintenance and D&D of parts and systems also present a danger for mercury exposures. Now understanding the general exposure dangers presented by such facilities, the following testimony of Plaintiff Workers will pertain to relevant areas of operations, i.e., (A) Cell House, (B) Rescue and First Responder Team, (C) General Maintenance, and (D) Decommissioning and Demolition. This testimony will reflect the levels of mercury exposures while working in these distinct areas. Lastly, this testimony will show how this toxic mercury spread throughout the Augusta community.

**Cell House Contamination**

89. Demonstrative of the levels of mercury within the Cell House is the testimony of Plaintiff Contractor Worker Lance M. Hieke:

> I worked in the Cell House my entire length of time at the FACILITY. When I came in at 7 a.m., I'd go around to all the cells and make sure everything was working correctly. I'd also check for any mercury leaks or spills. I saw mercury on the ground every day due to leaks or spills. My co-workers and I would have to spray the mercury down the drain into a catch pot with a hose. If the mercury seeped into the cracks of the floor, we'd have to use a wet

vacuum to suck the mercury out. If a cell needed to be more thoroughly checked, such as it was offline or there was a leak, we'd have to open the top of the cell and check for cracks or damage. If there was damage, the anodes or the cell had to be replaced. Many times, the damage was from wear and tear. We would have to change out a cell or its anodes monthly due to wear and tear. Changing an anode set depended on how long it had been in the cell. There were cranes in the building that would lift the top of the cell and take it to the far end of the Cell House. The crane operator would set the top down on a rack where my coworkers and I could work on it. We'd wash it out with a water hose and dismantle and reassemble it, if we had to. We would fill the cell with water so the mercury would be contained. This was mandatory. Cells blew up frequently. Normally, the Control Room workers would switch a cell offline before it could blow up, but sometimes it happened too fast. When a cell blew up, we would give it about 30 minutes or an hour to sit and cool off. No one would go near it. Then, when we felt like it was safe, we'd assess the damage and clean up. A worker would use a Jerome meter to make sure the mercury levels were okay, and they would let us know. I was unaware of the numerical level the area had to be for it to be safe. Some cells would cause more damage if they blew up. My coworkers and I would wash the mercury and other chemicals down the drain and into a catch pot. When the catch pot was full, it would be recovered and reused in the cells. Then, we would take off the rest of the C-clamps and lift the top of the cell to see the extent of the damage. We would run the top of the cell to the end of the building with the crane to thoroughly investigate. If the anodes still looked to be in working order, then we wouldn't replace them. If the anode set was damaged, then we'd replace it. We would bring the top back to the cell with the crane, and we'd check the flow of mercury to ensure it was moving through the cell smoothly. A cell row was split in half by PVC pipe that ran from the middle of the row to both ends. These pipes

would occasionally leak mercury, and they'd have to be replaced.

Affidavit of Lance M. Hieke, Ex. 8, pages 1 and 2.

90. Lance M. Hieke suffers from a number of health problems, as described below:

> Toward the end of my time at the FACILITY, I started to experience sleep disruptions. I only get about three to four hours of sleep each night. I struggle to fall asleep and stay asleep. I always feel fatigued as a result. My wife has noticed that, weekly, I stop breathing when I'm sleeping. I have not seen a doctor about it. While at the FACILITY, I began experiencing dizziness and lightheadedness if I bent down quickly or for too long. This has gotten worse since I left the FACILITY. I have muscle spasms in my thighs weekly. I noticed it started while I was working at the FACILITY, and it still happens. I get tingling in my hands and fingers, which I noticed when I started working at the FACILITY. Once I left, they started to feel numb at times, but I no longer experience the tingling. At the FACILITY, I struggled to smell the strong chemicals when other people said they could. I had never had an issue with my sense of smell. Sometimes my sense of smell is worse than other times. I started having joint pain in my elbows and knees while working at the FACILITY. It has gotten much worse over time. I've had changes in my urine output. I have a persistent cough daily that started while working at the FACILITY. During my time at the FACILITY, I started having night sweats every night, and I constantly sweat during the day. I experienced hair loss, which began toward the end of my time at the FACILITY. I have Restless Leg Syndrome, which I started to notice while working at the FACILITY. I was diagnosed with Non-Hodgkin's Lymphoma in 2021. I had a mass on my eye from the lymphoma that was removed by Dr. Locke at Augusta University Health. After this, I had chemotherapy

once a week over a short period of time before being
cancer free.

Hieke Aff, Ex. 8, pages 4 and 5.

91. Plaintiff Contractor Worker William J. Elmore describes his experience in

the Cell House this way:

> My job was to work on those cells. I repaired or replaced
> broken parts, which very often required climbing into a
> cell to work on it from the inside. There was no way to
> avoid contact with the mercury when I was inside. There
> were times when I had to lie down on the floor of the cell
> to get access to the parts I needed to repair. I would take a
> squeegee and move most of the mercury to one side so I
> could lay down on the other side. The cells were on a
> second-floor mezzanine, and mercury ran down the steel
> girders and cross beams until it landed on the basement
> floor. There were buckets scattered throughout the
> building, catching mercury as while it leaked from pipes
> or pumps. They had to be constantly monitored and
> swapped out because mercury is so heavy it could deform
> and burst a plastic bucket if we let it get much more than
> half full. There was always mercury on the floor. We
> would suck it up with a Shop-Vac until it started getting
> too heavy. Then we would dump the mercury back into
> one of the decomposers to be reused. We did not have the
> equipment designed to work with heavy metals. We just
> had a regular Shop-Vac. We had scaffolding that we used
> to work on the cells from underneath them. That was the
> best way to change out the anodes and switches. It was
> impossible to escape mercury getting on you. There were
> several times I had to leave the building and take an
> emergency shower because I was completely covered with
> mercury.

Affidavit of William J. Elmore, Ex. 7, page 2.

92. William J. Elmore suffers from a number of health problems, as described

below:

> I was diagnosed in 2019 with heart disease and hypertension, and I am on medication for both. I was diagnosed with kidney disease at about the same time. The kidney disease was serious enough for my doctors to put me on the list for a donor. After almost four years of searching and taking medications to get me by, a suitable donor was found. I had kidney transplant surgery about three months ago. It has, so far, been successful. There are weekly bouts with upset stomach, diarrhea, and some nausea as well, I guess it is just part of the process. I also lost an eye about four years ago. My vision started to deteriorate shortly after I left the FACILITY. My doctor told me I was going blind in one eye and recommended surgery. I was told ahead of time that the chances of success were fifty/fifty. It did not work. Obviously, I had to make some adjustments. I can still drive, but I do not risk driving at night.

> I have night sweats and lately I am increasingly short of breath. I have lost over one hundred pounds in the process of dealing with heart and kidney complications. I was not a small man, and honestly, I needed to lose some weight. I did not need to lose that much weight. Now my doctors are telling me that I need to put five or ten pounds back on. It would be easier for me to eat and put that weight back on if I could quit losing teeth. I had a tooth pulled recently. My dentist told me that there is another one that needs to come out. This started before I left the FACILITY. My teeth got brittle and were easily chipped. Then, one would start to swell and hurt and eventually have to be removed. I should not be losing my teeth at this rate. I really should not be losing teeth at all.

> Finally, I get a lot of chills, and sometimes shakes, or tremors. It is unnerving and a little embarrassing. My

doctors warned me that tremors are a side effect of some of the medications I am taking. I am hopeful that it is a side effect and not a permanent condition. It is not something I want to deal with for the rest of my life.

What follows is a list of medications I take daily: Envarsus XR (multiple times daily to prevent organ rejection), mycophenolate (to prevent organ rejection), Rena-Vite (a supplement for transplant patients), sulfamethoxazole-trimethoprim (antibiotics to prevent infection), lidocaine (for skin irritation), amlodipine (for hypertension), HurriCaine (for oral pain relief), insulin (multiple shots daily to control Diabetes), sodium zirconium cyclosilicate (for potassium regulation), rosuvastatin (for cholesterol regulation), prednisone (for inflammation), clopidogrel (for blood clot prevention), and cinacalcet (for calcium regulation).

Elmore Aff, Ex. 7, pages 9 and 10.

**Rescue and First Responder Team**

93. Eric P. Holman is a Plaintiff OLIN Worker who worked as an Incident Commander on the Rescue and First Responder Team. Holman started working at the FACILITY in 2003 and continued until 2013. Holman describes the following in his affidavit:

Part of the job of working in the Boiler House meant becoming an Incident Commander. As Incident Commander, I took on the role of delegating tasks to the Rescue and First Responder Team during an emergency. I assessed the situation, came up with a game plan, and executed the game plan. After the emergency, I would write up an incident report on the situation. The report would include the entry and standby team, a summary of what happened, our response, what went right, what went

wrong, and if we could improve on anything for the future. If there was a senior person working with me on a shift, then that person would take on the Incident Commander role, and I would be back to a Rescue Team member for that shift. I think one of the scariest things I had to respond to happened when I was Incident Commander. One of the Operators, Manny (I think his full name was Manuel Gonzalez), was working on the Track when sulfuric acid spilled all over his face and body. When I drove up to him, at first glance, it looked like his skin was burning. Manny was always concerned about his appearance, so he asked if his face looked okay. I had to stay calm and focused, knowing I needed to get him to a safety shower as quickly as possible. It turned out to be a long day. We ended up stripping him down and taking him to the locker room to get him under cold water for thirty minutes to an hour. Manny ended up not having permanent damage or scarring because we acted fast.

Affidavit of Eric P. Holman, Ex. 9, page 2.

## General Maintenance Contamination – The Entire FACILITY

94. As previously stated, performing maintenance on the systems throughout the FACILITY posed increased exposure to toxic mercury. Affirming this increase in mercury exposure, Plaintiff Contractor Worker William J. Elmore describes it in his affidavit this way:

> There was always mercury that was not where it was supposed to be, it was called, "fugitive mercury." The FACILITY paid many people to spend a lot of time chasing fugitive mercury to recapture it. They had pumps to try and pull it back out of floor drains and Shop-Vacs to get it off the floor. Once the mercury is out of its container,

there is no way to get it all back. It is not that there is no
easy way, no simple way, or no cost-effective way. There
simply is no way. It's like cutting open a feather pillow in
a stiff breeze and trying to chase down all the feathers. The
FACILITY was losing mercury every minute of every day.
Every day I had to add mercury to some of the cells
because they had lost some and were not producing like
they should. At least once every day, someone in the Cell
House emptied a Shop-Vac full of mercury back into a cell
or a decomposer. It was mercury that had been vacuumed
up from the floor. People from the Retort routinely brought
mercury they had recaptured in the crematoriums back to
the Cell House for reuse. The mercury recaptured in a day
never added up to what was lost in a day. Pounds and
pounds of it left the Cell House on the coveralls and boots
of workers, like me, and ended up contaminating the
FACILITY's washing machines and dryers. Gallons of
mercury found a crack in the concrete to hide in or a piece
of machinery to hide under until it seeped into the pores of
the concrete and became a part of the FACILITY, and the
vapors from it made breathing harder.

Elmore Aff, Ex. 7, page 6.

95. Timothy K. Kelley discusses the FACILITY grounds after D&D this way:

There was a lot of mercury, and it was in a lot of places
that it was not supposed to be. It was apparent that tons of
mercury had been spilled over the decades. I really think
the only reason they did not finish the job and tear that Cell
House down was because the FACILITY did not want to
deal with what they would find under the concrete. There
was mercury coming up through the floor. Mercury was in
the ground all around the building. You could see mercury
in the cracks and crevices of the floor. I was not surprised.
It was obvious that mercury had been leaking for years.
Evidence stretched from one end of the building to the
other and in the ground surrounding the building. When
everything was out of the building and the floors and walls

had been cleaned with caustic, OLIN just started using it as a garage/warehouse. There must have been sizeable deposits of mercury elsewhere on the property as well.

Affidavit of Timothy K. Kelley, Ex. 11, page 4.

## Decommissioning and Demolishing ("D&D")

96. Plaintiff Workers who worked on the grounds during the Decommissioning and Demolishing of the FACILITY saw mercury on a regular basis when cutting and grinding pipes in the Cell House.

97. Timothy K. Kelley worked during the Decommissioning and Demolition inside and outside of the Cell House at the FACILITY. He describes the process this way:

> This was an extremely long process and a tremendous amount of work. I worked at the Augusta site for the better part of fourteen months. Eight-hour shifts were the bare minimum, and they were rare. I usually worked more like ten or twelve hours a shift. All the pipes and equipment from the building had to be removed and cleaned. Initially, I worked to tear out the mercury cells from the cell floor. They were large and heavy and still heavily contaminated with residual mercury. Each cell had to go through a process that took at least a day, usually a day and a half, and sometimes two days. Disconnecting the cell from the electricity and then from the floor was just the beginning. All the pipes running in and out of each cell had to be severed. Each cell had to be completely disconnected from everything so they could be, one at a time, picked up by a crane and moved outdoors. We had each one moved to a "wash down" pad where there were pressure washers and

water hoses to clean them inside and out as best we could. There was no way to get all the mercury out of them, but it got most of it. Then, we began the process of cutting the cell into pieces. Some of the parts were made of copper or nickel. Those parts had to be collected and kept separate for sale to a salvage yard. There was a guy named Glenn Ingram that I was acquainted with. He owned or operated (or both) a salvage yard in Chattanooga. He was at the jobsite in Augusta a lot. My natural assumption was that he was transporting offsite whatever was salvageable. I am not sure if those were his trucks carrying off the hazmat stuff or not. We had been demolishing cells for several days or maybe a couple of weeks. This was long enough that we had gotten into a decent groove when everything came to an abrupt halt, and we were all redirected.

Kelley Aff, Ex. 11, page 2.

## CHAPTER IV – ENVIRONMENTAL REGULATORY HISTORY OF THE FACILITY

*The FACILITY has a History of Environmental Contamination and Violations of Environmental Regulations.*

98. In addition to sworn affidavit testimony, records of regulatory interaction between the FACILITY and environmental agencies such as the United States Environmental Protection Agency (EPA) and the Environmental Protection Division in Georgia, are crucial in understanding the extent to which the environment in and around the FACILITY was contaminated with mercury. Every day that mercury continued to be utilized at the FACILITY, the risk to human health increased, both to the person and to greater

community around the FACILITY. Due to the prevalence of environmental mercury contamination in and around the FACILITY, an ever-present exposure potential for workers and the surrounding community persists to this day.

99. These records of regulatory interaction at the FACILITY were not known by Plaintiffs or readily discoverable by Plaintiffs during the time of their work at the FACILITY.

100. Throughout the years of 1965 to 1971, the FACILITY's solid waste disposal site E1 was used for general plant solid waste disposal. This solid waste disposal site consists of an approximately five-acre area, which is located east of the neighboring solid waste disposal site, E2. The site of E1 consisted of a natural ravine and a low-lying area located at the bluff line, with red and white surface soil clays onto which wastes were placed.[35] As was reported in the 1981 CERCLA Survey, "an estimated 230,000 ft$^3$ of hazardous waste (brine muds, cell parts, etc.) was placed in[to] the E1 site during its use." As stated in the FACILITY's 1984 Groundwater Assessment program, "All plant solid wastes – process, construction rubble, etc. (with

---

[35] Olin Corporation Status Update, Accessed June 12, 2024, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

the exception of office and cafeteria wastes) were placed in E1." The E1 solid waste disposal site has since been covered with soil.[36]

101.    Solid waste disposal site E2 was used as an active solid waste disposal site from 1971 to 1977. This site is a one-acre landfill which was constructed by excavating the natural clay stratum and constructing landfill dikes using the clay obtained from the excavation process. E2 was approximately 15 feet deep, and as reported in the 1981 CERCLA Survey, held "an estimated 680,400 ft3 of hazardous waste (brine muds, cell parts, etc.) … during its use." In 1978, the E2 site was capped with a minimum of two feet of sandy clay and an additional six inches of topsoil. [37]

102.    In 1977, OLIN divided a pre-existing lined brine sludge pond into two lined cells, or units, E3 and E4. Unit E3 was to be operated as a dry waste management unit, meant to replace E2, and unit E4 continued operation as a brine sludge settlement unit. The synthetic liner in the unloading area of unit E3 was covered with two feet of soil to avoid damage by possible sharp edges of disposed wastes. Sites E3 and E4 are contiguous with E1 and E2, meaning they are in actual contact with sites E1 and E2, and are separated

---

[36] Olin Groundwater Assessment Program, March 1984, Box 11; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[37] Olin Corporation Status Update, Accessed June 12, 2024, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

only by a common dike.[38] Sites E1 and E2 are synonymous with CERCLA

NPL (National Priority List) areas 1, 2, and 4, a listing which was provided

by the EPA on May 23rd, 1985. Sites E3 and E4 are RCRA regulated units.[39]

103.    In October 1980, OLIN filed a petition with the EPD requesting a

variance for waste disposal site operations.

104.    On November 14th,1980, OLIN presented its geohydrological findings

to the Georgia Department of Natural Resources (DNR) in a report titled

"Geohydrological Survey for the Olin Augusta Plant." This geohydrological

study concluded "that there were greater than DWS concentrations of

mercury in the groundwater in the immediate vicinity of the FACILITY's

landfill, but that this posed no hazard because of the direction of

groundwater movement, the slow rate of movement, and the small mass

loading." However, the wells constructed in August of 1981 identified that

both the active (E3 and E4) and inactive (E1 and E2) waste disposal sites

were actively contributing to groundwater contamination.[40]

---

[38] *Ibid.*
[39] EPA RCRA Olin Hazardous Waste Management Status Update, May 23, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[40] Olin Groundwater Assessment Program, March 1984, Box 11; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

105.    Following the identification of contamination source, on September 15th, 1981, the Director declared that the EPD will not grant OLIN the variance requested in October 1980.[41]

106.    On March 17th, 1982, OLIN and the EPD entered into a Consent Agreement to allow the FACILITY to operate their hazardous waste disposal sites E3 and E4 under certain conditions in lieu of a provided hazardous waste permit.[42]

107.    On January 6th, 1984, a revised and more concise Consent Agreement was agreed on by both parties. This Consent Agreement, EPD-HW-82, allowed OLIN to operate the FACILITY until such time as the results of a groundwater assessment program were compiled and submitted to EPD. In submitting the FACILITY's groundwater assessment, OLIN was required to adequately and accurately define the extent of groundwater contamination emitting from units E1-E4 and the threat of this contamination to the lower (drinking water) aquifer. If no imminent danger to the drinking water aquifer was proven, the FACILITY would be permitted to continue operation of their E3 and E4 hazardous waste management units until the EPD issued or

[41] Consent Agreement, January 6, 1984, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[42] Consent Order for Olin Augusta Manufacturing Plant, July 21, 1983, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

denied a permit for a new hazardous waste landfill. If imminent danger to the drinking water aquifer was proven, OLIN would have to, within 30 days, submit closure and post-closure plans for units E1-E4, cease usage of the units by June 1st, 1984, and commence timely closure of the units.[43]

108.    On February 22nd, 1984, an independent hydrogeologist, Harry E. LeGrand, reviewed the Olin Groundwater Program Report consisting of three years of groundwater monitoring data and summarized his conclusions "that no serious contamination to water supplies has occurred, and none is likely in the immediate future."[44]

109.    On March 1st, 1984, OLIN submitted the Groundwater Program Report to the EPD, where it was then determined that the report did demonstrate "significant and substantial contamination of the groundwater underlying the Augusta facility."[45]

110.    On March 16th, 1984, OLIN received a Notice of Violation (NOV) due to non-compliance with Georgia rules of hazardous waste management.[46]

---

[43] Consent Agreement, January 6, 1984, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[44] Consultant's Overview and Conclusions of Olin's Ground-water Program by Harry E. LeGrand, February 1984, Box 11; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[45] Proposed Compliance Consent Order, April 9, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[46] Restatement of Notice of Violation, July 18th, 1984, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

111.    As requested by the EPD, on June 1st, 1984, OLIN installed an interception system for the purpose of collecting the leakage from hazardous waste disposal sites E1-E4.

112.    The data collected from this interception system, the ongoing Groundwater Assessment Program data, and an implemented aquifer pumping test were compiled to assess the potential impact of existing contamination leaching from surface impoundments (E1-E4) on the lower Tuscaloosa (drinking water) Aquifer. This information was organized into a complete report titled "Hydraulic Analysis of the Cretaceous Aquifer System," which was submitted to the EPD on October 16th, 1984, for further review.[47, 48, & 49]

113.    On January 14th, 1985, the EPD notified OLIN by letter that its review of the "Hydraulic Analysis of the Cretaceous Aquifer System" report concluded that no imminent danger existed to the Richmond County drinking water supply in the lower Tuscaloosa aquifer, as a minimum travel

---

[47] Olin Revised Proposal of Consent Order, May 2, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[48] Review of Georgia EPD Assessment of Potential Impact on Lower Tuscaloosa Aquifer, January 4, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[49] EPD Review of "Hydraulic Analysis of the Cretaceous Aquifer System Report," January 14, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

time of three years would be necessary for contamination to reach the drinking water aquifer. The EPD requested the US EPA's concurrence with their conclusion.[50] The EPA responded to the EPD's conclusions on January 21st, 1985, informing the EPD that, while they concurred with a minimum travel time of three years before contamination would reach the drinking water supply, it might be premature to assume that no imminent danger to the lower Tuscaloosa drinking water aquifer existed. The EPA stated that the lateral extent of aquifer zones may not be as isotropic as originally thought due to possible variation in thickness, minerology, and rock characteristics in the Kt4 aquifer and other zones underlying the plant area.[51]

114.    On January 31st, 1985, OLIN notified the EPD that a statistically significant change in pH levels in a single groundwater monitoring well had been detected. Samples confirming this significant change in pH were taken from downgradient well R-1 showing an average pH value of 5.98 compared to background measurements taken from well R-3 of 5.51. OLIN stated that these changes may have been due to inherent inaccuracies of the student's t-test and possible interference from upgradient contamination from leaky

---

[50] *Ibid.*
[51] Review of Georgia EPD Assessment of Potential Impact on Lower Tuscaloosa Aquifer, January 21, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

disposal sites E1-E4. A significant change in upgradient well pH was also observed.[52]

115.    On March 6th, 1985, OLIN submitted a report to the EPD on "Information Regarding Potential Releases from Solid Waste Management Units" due to the indication of detection of contaminants in groundwater. When reporting on existing or closed, solid waste management units, OLIN did not claim its surface impoundment units E1-E4, though E3 is explicitly operated as a dry, solid waste management unit that was opened to replace the operation of solid waste unit E2 (1971-1977), and unit E1 was operated as a general plant solid waste disposal unit (1965-1971).[53, 54 & 55]

116.    On April 9th, 1985, the EPD presented a Consent Order to OLIN to implement immediate corrective action to remedy past and continuous releases of hazardous waste and constituents into the environment from the plant's units E1-E4, process ponds, and holding ponds in order to be compliant with the GA Hazardous Waste Management Act, O.C.G.A. § 12-

---

[52] Olin Notice of Significant pH Changes, January 31, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

[53] Olin Groundwater Assessment Program, March 1984, Box 11; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

[54] Information Regarding Potential Releases from Solid Waste Management Units, March 6, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

[55] Olin Corporation Status Update, Accessed June 12, 2024, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

8-60 and the rules adopted pursuant to it. Along with the notification of Corrective Order, the EPD notified OLIN that its previously submitted RCRA Part B Application for the proposed development of a new landfill was then incomplete and would not be considered, as corrective action that is compliant with the amendments of law must be included.[56]

117.    In response, OLIN submitted a revision of the EPD's proposed administrative Consent Order on May 2nd, 1985. OLIN maintained the opinion that an administrative order is not necessary for appropriate and compliant corrective action, as it believed the RCRA permitting process is "more than adequate to address the State's concerns." After reviewing this revised Consent order, the EPD concluded that the proposed revisions were not satisfactory. On May 7th, 1985, the EPD revised and proposed a Consent Order which incorporated some language from OLIN's revised proposal and allowed continuation of operation of hazardous waste management units E3 and E4 for 90 days after execution of the Consent Order. The EPD informed OLIN that it would proceed to take enforcement action if OLIN did not accept the order, concluding that the EPD's efforts of "conference,

---

[56] Proposed Compliance Consent Order, April 9, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

conciliation and persuasion have failed to obtain the required corrective action." Once again, OLIN submitted a revision of the EPD's proposed administrative Consent Order on May 20th, 1985, and continued to maintain its belief that an administrative order was not necessary for appropriate corrective action, as it believed the RCRA permitting process was "more than adequate to address the State's concerns." On May 23rd, 1985, following enforcement action claims, the EPD issued an Administrative Order, Order No. EPD-HW-208, directed to OLIN regarding the necessary corrective actions to be taken at the FACILITY. This Administrative Order superseded and rescinded Order No. EPD-HW-82, which was consented to on January 6th, 1984. [57, 58, 59 & 60]

118.    On June 24th, 1985, OLIN petitioned for a hearing in connection with Administrative Order No. EPD-HW-208 issued by the EPD. Exactly a month later, the senior assistant attorney general served the State of Georgia's response to OLIN's petition for hearing. The State of Georgia

---

[57] Olin Revised Proposal of Consent Order, May 2, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[58] EPD Revised Proposal of Consent Order, May 7, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[59] EPD Letter Regarding Olin Administrative Order, May 23, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[60] Administrative Order No. EPD-HW-208, May 23, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

stated that "it is clear that no action has been taken unilaterally and that no action will be final until OLIN has been afforded a full hearing on the legal and factual issues presented in this proceeding."[61]

119.    On August 15th, 1985, OLIN's attorneys, Powell, Goldstein, Frazer & Murphy, Attorneys at Law, submitted a draft of the Joint Prehearing Submission and Order to the Senior Assistant Attorney General. This document displayed, on behalf of OLIN, legal issues presented, relevant factual matters not in dispute, factual matters in dispute, documents to be tendered, and witnesses to be called.[62]

120.    On October 21st, 1985, Joseph F. Keely of the Kerr Environmental Research Laboratory of the US EPA submitted a Summary of Expert Opinions to be used in assistance with the upcoming hearing between the EPD and OLIN. Keely gives expert insight into the quality of OLIN's background data, validity of interpretation, and feasibility of proposed remediation. Keely's statements on the quality of OLIN's background data were as follows:

---

[61] Olin's Petition for Hearing, June 24, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[62] Draft of Joint Prehearing Submission from Olin Attorney's to the Attorney General's Office, August 15, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

1. The monitoring well construction, maintenance, and recordkeeping practices are of poor quality and cast doubt on the ability of the monitoring well network to yield samples which accurately represent the occurrence and extent of contamination of the upper- and lower-Tuscaloosa aquifer formations … Reports indicate that some monitoring wells have not been maintained in adequate condition and that confusion exists over the identity of others; these accounts connote an inadequate quality assurance program.

2. The sampling and analysis techniques employed are substandard and may have resulted in artificially low levels of mercury being detected and reported … Mercury analyses performed by the electrothermal (used by Olin-Augusta) are subject to severe interferences from solutions containing appreciable amounts of salt, causing a loss of sensitivity and precision despite incorporation of background correction methods. This results in an inability to distinguish between 'true' background concentrations of mercury and much higher levels.

3. The pH determinations made by Olin-Augusta are of questionable accuracy; they were not performed immediately after collection of each sample (on site) as is recommended by the EPA.

4. The number of monitoring wells included in each chemical sampling and water-level measurement survey is much smaller than the total number of monitoring wells available for sampling.

5. The data obtained on the thickness, permeability, and hydraulic properties of the stratus referred to as the "principal clay layer" or "Kt4" by Olin-Augusta and their consultants are inadequate to conclude that it is continuous and nonleaky.[63]

---

[63] Summary of Expert Opinions by Joseph F. Keely, October 21, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

121.    On December 3ʳᵈ, 1985, OLIN agreed to settle the ongoing corrective action order by consent, agreeing and consenting to, along with the EPD, an amended Order No. EPD-HW-82. On this same date, the EPD withdrew the previous Order, Order No. EPD-HW-208, as this new Corrective Order, EPD-HW-82, superseded Order No. EPD-HW-208. With this Consent Order, OLIN agreed to cease usage of waste disposal sites E3 and E4 within 90 days from the date of the order and also agreed to close the existing sites following this order.[64]

122.    On August 1ˢᵗ, 1985, Well Violations of § 265.91(c) were found at the FACILITY during a sampling inspection held by the EPD. In summary, five of the twenty wells that were sampled were incapable of providing reliable data due to inaccuracies in well depth. OLIN was required to address and clarify discrepancies in well construction and sampling data.[65]

123.    On September 6ᵗʰ, 1985, the EPD notified OLIN of violations observed by the EPD during the facility and groundwater monitoring quality assurance inspections at the FACILITY. These violations consisted of container storage violations, violating Rules 265.15(d) and 122.24, retort

---

[64] Consent Agreement Order No. EPD-HW-82, December 3, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[65] EPD Memorandum on Monitor Well Inspection, August 1, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

furnace container storage violations, violating Rules 265.14(c), 265.15, and 265.35, and groundwater monitoring system violations, violating Rule 265.91. These regulatory and operational violations identified at the FACILITY are as follows: (a) container storage inspections were not documented during the weeks of June 8th and June 16th, and kerosene was improperly stored within the designated hazardous waste storage unit, contrary to Part A Application requirements; (b) warning signs were missing at each entrance to the retort furnace container storage area; and (c) an adequate inspection program for this area was neither developed nor implemented. Additionally, OLIN failed to maintain the necessary aisle space for inspections and operations within the retort furnace storage area.

124.    The groundwater monitoring system was also compromised: where five of twenty wells had violations involving two wells with broken concrete surface plugs, one concrete surface plug not in contact with the ground, one casing broken above ground level, and one Kt1 upgradient well containing foreign objects in its bore. These issues highlighted significant lapses in both environmental and safety regulations at the FACILITY.[66]

---

[66] Notice of Violation Regarding Hazardous Waste Management Units, September 6, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

125.    On November 7th, 1985, the EPD reiterated the violations listed in the September 6th Notice of Violations, as OLIN disputed the list of violations and asserted that it was compliant. EPD notified OLIN that its perception was erroneous and once again described each violation in detail.[67]

126.    On November 21st, 1985, the EPD notified OLIN of major deficiencies (NOD) with its Part B Application. The EPD informed OLIN that it had 75 days to address these comments, or there was a threat of denial of permit or other enforcement action. The major deficiencies of OLIN's Part B Application included several critical issues. First, there was a failure to define the rate and extent of contamination from regulated units. Additionally, the drawings submitted did not identify the existence of mercury concentrations of approximately 20 ppb in the alluvium at well Y-10 and 500 ppb in Kt-1 at well Y-11. OLIN also failed to adjust the contours of the potentiometric surfaces to account for significant density differences between naturally occurring, uncontaminated groundwater and the very saline groundwater resulting from the operation of units E-1 through E-4. Moreover, OLIN did not perform Appendix VIII sampling for the Holding

---

[67] Notice of Violation Regarding Hazardous Waste Management Units, November 7, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

Ponds at the proper location. The corrective action plan presented was inadequate, as it was not based on an accurate depiction of the plume of contamination and did not provide for remedial action that reflected the geophysical characteristics of the contaminated area. It also failed to isolate the source of contamination that threatened human health or the environment and lacked mechanisms to monitor the groundwater both chemically and hydraulically. Furthermore, the corrective action plan did not address units E-1 and E-2.[68]

127.    On December 4th, 1985, the EPD notified OLIN of the remaining minor deficiencies (NOD) with their Part B Application. OLIN was required to address these comments within the same 75-day period as their major deficiencies NOD (starting November 21st), and failure to do so could, once again, result in denial of permit or other enforcement action. The list of minor deficiencies is extensive, highlighting numerous additional areas where the application does not meet regulatory standards.[69]

128.    Kearney Management Consultants notified the EPA of the results of its completeness/technical review of OLIN's Part B Application on December

---

[68] Notice of Deficiency Regarding Olin's Part B Application, November 21, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[69] Notice of Deficiency Regarding Olin's Part B Application, December 4, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

17th, 1985. Kearney summarized the major deficiencies as follows: (a) the application contained heavily deficient descriptions of the groundwater monitoring program, surface impoundments, and landfills in their corresponding sections; (b) the proposed groundwater corrective actions for a new landfill were inadequate; (c) only one background monitoring well was proposed for the new landfill; and (d) the proposed leachate collection and detection system deviated from the minimum technology guidance.[70]

129.    On March 24th, 1986, Consent Order No. EPD-HW-272 was executed between the EPD and OLIN Augusta. This Consent Order was essentially a corrective action program for groundwater treatment and the removal of mercury contamination from the groundwater underlying the Augusta plant area. The proposed corrective action program to be implemented by OLIN following this agreement was detailed in OLIN's amended Part B Application submitted to the EPD on February 5th, 1986.[71]

130.    A RCRA (Resource Conservation and Recovery Act) permit including HSWA (Health and Safety at Work) provisions was issued to OLIN on September 3rd, 1986. This permit granted OLIN permission to store 14,080

---

[70] Completeness/Technical Review of Olin Part B Application, December 17, 1985, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[71] Consent Order No. EPD-HW-272, March 24, 1986, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

gallons of hazardous waste in containers and implemented post-closure care and corrective action for the hazardous waste landfill area consisting of units E1-E4. This permit also insured HSWA provisions by requiring corrective action for releases from Solid Waste Management Units (SWMUs) and other possible releases at the FACILITY.[72]

131.    On December 19th, 1986, OLIN notified the EPD that the closure of the site's holding ponds was then complete. The EPD approved the certification of closure in accordance with the approved closure plan and changed the regulatory status of the units to reflect closure on February 25th, 1987.[73, 74]

132.    On January 15th, 1987, OLIN wrote to the EPD regarding an incident of permit non-compliance requiring reporting under Section I. Condition C.9. of OLIN's hazardous waste permit between the timeframe of September 30th – December 31st, 1986. Monthly inspection of the fire extinguishers at the FACILITY's two drum units was not performed in the month of December.[75]

---

[72] Olin Corporation Status Update, Accessed June 12, 2024, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[73] Certification of Holding Pond Closure by Olin and Independent Engineer, December 19. 1986, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[74] Closure Certification for Holding Ponds (GAEPD), February 25, 1987, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[75] Notification of Permit Non-Compliance, January 15, 1987, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

133.    On July 13th, 1987, EPD reported on a trip regarding a Comprehensive Monitoring Well Evaluation (CME) inspection at the FACILITY on June 24th and 25th. The EPD made numerous comments on inconsistencies and discrepancies in relation to the groundwater monitoring system and comments, recommendations, and follow-ups required for the corrective action program. Comments regarding OLIN's groundwater monitoring program described questionable structural integrity of wells, inconsistently reported well depths, damage to well components and caps, lack of protective casings and locks on numerous wells, the need to increase well elevations to combat effects of annual and 10-year floods, and incorrect placements of compliance point wells. Comments made on the OLIN corrective action program detailed the appropriate schedule for measuring and recording groundwater elevation and depth of each groundwater withdrawal well and any well within 500 feet of a withdrawal well, along with collecting groundwater samples from groundwater withdrawal wells and analyzing the pH, chloride, and mercury content of each sample.[76]

---

[76] EPD Trip Report for Olin CME Inspection, July 13, 1987, Box 13; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

134.    On July 14th, 1987, OLIN notified the EPD that closure of the site's process ponds was complete.[77]

135.    On July 28th, 1987, OLIN informed the EPD that closure of units E1, E2, E3, and E4 was complete. On October 7th, 1987, the EPD informed OLIN of its approval of the closure certification of hazardous waste disposal sites E1-E4 and changed the regulatory status of these units to reflect closure.[78 & 79]

136.    On September 10th, 1987, OLIN filed an Affidavit of Notice to notify in perpetuity any potential purchaser of the Augusta property used and owned by Olin Corporation that a portion of the property had been used to manage hazardous wastes and that the use of this portion of the property to manage hazardous waste was restricted under 40 CFR Part 265, Subpart G. Records concerning this waste had been filed with the local zoning authority and with the GAEPD director.[80]

---

[77] Certification of Process Pond Closure by Olin and Independent Engineer, July 14, 1987, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[78] Certification of E1/E2/E3/E4 Closure by Olin and Independent Engineer, July 28, 1987, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[79] EPD Approval of E1/E2/E3/E4 Closure Certification, October 7, 1987, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[80] Affidavit of Notice by Olin Regarding Plant Property, August 14, 1987, Box 09; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

137.    On September 5th, 1989, the EPD notified OLIN of several violations

identified during their review of OLIN's Semi-annual Effectiveness Report

dated July 31st, 1989, and a comprehensive monitoring well evaluation

(CME) inspection conducted on June 21st – 22nd, 1989. These violations

included an undesired and insignificant cone of depression that needed

adjustment, uncapped wells that required capping to prevent contamination

from reaching the well casing, the absence of well measuring point

markings, inadequate well-sampling strategies for analyzing volatile

organics, an increase in mercury concentrations from non-detectable levels

to approximately 5 ppb in well G-7, extremely high concentrations of

mercury and chlorides coupled with low pH values in wells 08 and Y-17,

and the absence of large-scale flow net maps and cross sections identifying

the capture zone and area of influence created by groundwater

remediation.[81]

138.    On April 24th, 1990, OLIN informed the EPD that a large concrete

process sump was an ongoing source of chloride and mercury contamination

of the groundwater in the alluvial and Kt1 aquifers. This concrete process

---

[81] Notice of Violation Regarding Semi-Annual Effectiveness Report and CME Inspection, September 5, 1989, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

sump is referred to as the brine pit, containing mercury cell brine, a saturated sodium chloride solution containing levels of mercury ranging from 10-15 ppm, used in the operating process unit.[82]

139.    On August 13th, 1991, the EPD contacted OLIN to confirm a Compliance Evaluation Inspection (CEI) on June 13-14th and a Notice of Violation of Permit No. HW-031 (S&D) following the inspection. These violations included failure to maintain integrity and effectiveness of the final cover required by Condition 1.F.1 of referenced permit and Rule 264.310(b)(1) and failure to maintain at the facility proof of financial assurance as required by Condition 1.B.3.(d), Condition 1.B.2.(h), and Condition 1.B.2.(i) of the referenced permit and Rule 264.142(d).[83]

140.    EPD sent a more detailed NOV from the CEI on August 27th, 1991. Here the violations were described as failure to maintain monitoring wells listed on page 10 of the permit, as well as all groundwater wells required by Condition III.J.1(a), and failure to treat, store, and dispose of all contaminated groundwater in accordance with all applicable federal, state, and local laws as required by Condition III.K.3. Observations of violations

---

[82] Assessment of Solid Waste Management Units, April 24, 1990, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.
[83] Notice of Violation Regarding Compliance Evaluation Inspection, August 13, 1991, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

due to failure to maintain monitoring wells included the lack of presence or visibility of concrete aprons for wells Y-5, Y-15, Z-27, Z-23, X-10, GI-2, and G-1, a cracked concrete apron on well Z-14, accumulation of water between the casing and outer protective device for wells Z-9, Z-27, and GD-4, and a broken hasp on the outer protective layer of well Z-9. Violations due to failure to properly treat, store, and dispose of all contaminated groundwater were found due to the observation of "purged water from wells, which exhibit mercury levels of less than 0.2 ppm, [being] pumped directly onto the ground adjacent to the wells." Any purged groundwater with mercury levels exceeding that of the 0.02 ppm concentration limit listed in the referenced permit needed to be treated before disposal.[84]

141.    On March 17th, 1994, OLIN submitted a Class 1 Permit Modification Request to the EPD requesting modification to Permit No. HW-031 (S&D) to remove 44.11 acres from the Augusta FACILITY description due to a property transfer. This modification would change the total acreage from 272 acres to 228 acres. The 44.11 acres of land at the extreme southwest corner of the FACILITY had allegedly never had any hazardous waste management

---

[84] Notice of Permit Violations Regarding CEI, August 27, 1991, Box 10; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

units located on it, and it was upgradient to any facility hazardous waste units. This land was purchased by the Huron Tech Corporation to construct and operate a sodium chlorate plant where OLIN could supply Huron with specific raw materials and selected services. Within this 44.11-acre area, OLIN would deed a 1.79-acre parcel of land to the County of Richmond for the construction of a roadway from Highway 56 Loop to Huron's property.[85]

142.     Information on this purchase of land is described in a memorandum between OLIN and Huron. Huron would purchase approximately 14 acres of land adjacent to the FACILITY for $150,000 in full at closing. An environmental audit would be performed on the site by a qualified engineering firm found acceptable by OLIN, Huron, and Huron's financial institution. OLIN would pay 50% of the environmental audit cost unless the cost was in excess of $15,000. OLIN would grant Huron the opportunity to install site rail access, at Huron's cost, through the installation of a switch on OLIN's entrance rail, so long as installation and operations would not interfere with OLIN's normal operations. OLIN would agree to sell Huron C.P. salt at the price of $25/ton, with additional interest in supplying Huron

---

[85] Olin Corporation – Augusta, GA Facility Modification to Permit No. HW-031 (S&D), March 17, 1994, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

with fifty percent (50%) caustic and twenty-three-degree Baume hydrochloric acid at prices which would be mutually agreed on. When OLIN had the ability, it agreed to sell Huron warehouse spares, at its request, at prices which would include reasonable mark-ups over OLIN's cost. OLIN agreed to weigh truck shipments from Huron for a $5/shipment fee, so long as Huron's truck shipments would not pose any safety hazards from increased congestion at the FACILITY's main gate. OLIN would provide Huron with lab services for a negotiated fee without being held liable for the outcome of these services. OLIN would sell scheduled plant maintenance services to Huron at their in-house charge rate. At Huron's request, OLIN would provide consultation services regarding state environmental agencies, assisting Huron in their environmental permit application processes without the preparation of permit application documents. With these outlines listed, OLIN stated that, from an environmental standpoint, both OLIN and Huron would operate their facilities completely independently from one another.[86]

143.    In 1995, OLIN purchased an additional 17 acres of adjoining land for "investment purposes." Allegedly, there were no hazardous waste

---

[86] Olin Transmittal Memo on Potential Huron Transaction, December 9, 1993, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

management or manufacturing operations occurring on this portion of the FACILITY.[87]

144.    On June 23, 1995, OLIN submitted a modified RCRA Part B Permit Renewal Application (Volume II) to the Environmental Protection Division (EPD). This modification, which primarily addresses Section X: Groundwater, references information largely sourced from 1985 and earlier. The submission included extensive analysis of groundwater contamination and hydrology in the vicinity of the FACILITY, emphasizing critical findings about aquifer interactions, contamination levels, and the impact of plant operations on groundwater quality. The more significant findings are detailed below.

145.    The Savannah River was identified as a primary discharge area for groundwater from the Alluvial, Kt1, and Kt3 aquifers. High concentrations of mercury contamination were found in the alluvial aquifer between units E3 and E4. The zone of highest mercury concentrations in the Alluvial, Kt1, and Kt3 aquifers was "adjacent to the intake canal and is interpreted to be due to the fringes of the plume of contamination emanating from the plant

---

[87] RCRA Part B Permit Renewal Application, March 27, 1996, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

or E1/E4 area." The concentrations of mercury in the bottom Alluvial and Kt1 aquifers ranged from 100 ppb to 500 ppb. Elevated contamination levels were also noted around the potable water well (PWW) in the Kt3 aquifer, attributed to downward percolation from the Alluvial and Kt1 aquifers. Similarly, mercury contamination of 0.2 ppb and above was detected in Kt5 monitoring wells, contamination of which OLIN attributed to potential well construction errors or materials. Per this documentation, the highest level of detected mercury in the E1/E4 area plume was documented as 775 ppb at the plume center. The highest level of detected mercury in the plant plume area (smaller plume) was documented as 150 ppb. Concentrations in the Kt3 aquifer were documented as reaching levels of 70 ppb mercury at the center. Higher concentrations of mercury existed in the lower part of the Kt1 aquifer due to the high density of the contaminated groundwater within the plume.

146.    The process ponds located at the FACILITY were listed as RCRA regulated units due to the pH of the ponds being, on occasion, less than 2.0 or greater than 12.5. Mercury concentrations within the process ponds were "normally less than 10 ppb and always below 200 ppb." The process pond wastewater did contain chlorides but did not contain organic or halogenated compounds. OLIN stated that there was, in fact, evidence that the quality of

the groundwater at the Process Ponds is influenced by upgradient water quality primarily related to the contamination plume emanating from the E1/E4 disposal site. From regression analyses, it could be statistically confirmed that the groundwater beneath the Process Ponds had the same characteristics as the groundwater underlying waste disposal units E1/E4 but is different from the wastewater held in the Process ponds. The groundwater contamination that had been detected in RCRA wells surrounding the Process ponds had been identified as emanating from the upgradient E1/E4 contamination plume.

147.    Any wastewater that had a concentration of mercury greater than 0.01 ppm was diverted to the Holding Ponds. This had been the operating policy of the FACILITY since the early 1970's. Additionally, all stormwater and a portion of the plant non-contact cooling water was stored in the FACILITY's Holding Pond, a 60-acre surface impoundment, before being discharged to the Savannah River under NPDES permittance.

148.    There are non-OLIN wells located near the FACILITY that may be subject to groundwater contamination. Notably, a non-OLIN well located within 0.25 miles of the FACILITY, owned by Philadelphia Quartz, was utilized for fire protection and supplementary process water needs.

Additionally, six water supply wells lie north of the FACILITY, with the nearest being 1.3 miles upgradient of the site.[88]

149.    On March 31st, 1996, the FACILITY submitted a Permit Renewal Application to the GEPD to renew Permit No. HW-031. This renewal application submission must satisfy the requirements of including the FACILITY's Holding and Process Ponds in the FACILITY's post-closure care, obtaining authorization to install and operate recovery wells G10, G10A, and HW1, making the appropriate updates to the FACILITY permit to continue proper documentation and operation, and continuation of a Corrective Action Program.

150.    From this application there was documentation of the Savannah River having "a background burden of from <11 to 36lbs/day of mercury based on a concentration of <0.0002 to 0.00065 ppm (< 0.2 ppb to 0.65 ppb) and an average flow rate of 10,200 cfs."

151.    Numerous instances of extreme and continuous mercury concentration values in FACILITY property wells were found and reported in this permit application. These concentrations spanned to values reaching 12,800 ppb,

---

[88] RCRA Part B Permit Renewal Application Volume II, June 23rd, 1995, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

which, per the EPA, is 6,400 times greater than the drinking water maximum contaminant level of 2 ppb.

152.     Groundwater at the FACILITY moved laterally through the Alluvial Aquifer toward the south-southeast of the property. This groundwater was then discharged into both the FACILITY and Federal Paper Board Intake Canals, the Savannah River, and the swampy area east-southeast of the E1/E4 area. It was indicated that groundwater in the Kt1 Aquifer flowed laterally below the plant site from west-northwest to the east-southeast. This groundwater ultimately discharged into the general location of the Savanah River valley, which includes the Savannah River, the FACILITY Intake Canal, and possibly the Federal Paper Board Intake Canal. Groundwater in the Kt3 Aquifer moved from west-northwest to east-southeast, and its discharge area was allegedly located parallel to the Savannah River.

153.     There are six Richmond County wells located north of the FACILITY property along Highway 56 Loop that are used to supply drinking water to Richmond County residents and surrounding industries. The nearest Richmond County well is 1.3 miles upgradient from the northern FACILITY property boundary.

154.    The FACILITY's corrective action program involved an activated carbon treatment system from which groundwater which was treated was discharged into the Savannah River under the FACILITY's NPDES permitted outfall allowance. Groundwater recovered from plant production, brine pits, and the E1-E4 units were treated via the use of activated carbon filters and were discharged per the FACILITY's NPDES permitted outfall directly into the Savannah River. The FACILITY claimed that their discharged groundwater normally averaged 0.02 - 0.03 pounds of mercury per day. This would mean that they discharged an average of 0.14 – 0.21 pounds of mercury per week, an average of approximately 0.6083 – 0.91245 pounds per month (using the average of 4.345 weeks per month), and an average of approximately 7.2996 – 10.9494 pounds of mercury per year.

155.    An ongoing brine pit release was detected in early 1990, where the large concrete sump developed a leak that went undetected and became a continuous source of mercury and chlorides contamination in the groundwater in the Alluvial and Kt1 Aquifers. The sump was taken out of service by July 1990 and corrective action wells were installed, but there was no discussion on measures taken for contamination remediation other than corrective action wells and monitoring.

156.    An increase in mercury concentrations in the monitoring wells north of

the plant production site was detected. An investigation of the contamination

was carried out by ABB Environmental Services Inc. in March 1995 and by

Woodward-Clyde Associates in December 1995 to define the extent of this

contamination. Results alleged that contamination did not exceed the plant

site area north of the wells Z02, Z07, and Z08 in the Kt1 aquifer. It was

determined that the then-presently-seen contamination in Z02 would

eventually have some impact on wells Z07 and Z08 as the contamination

gradually moved towards the cone of influence. Mercury concentrations in

Alluvial and Kt1 aquifer wells around the brine pit were significantly

influenced by heavy rainfall, essentially causing a "spillover" effect on

contamination located atop of the perched clay layer beneath the unit. Well

G09, a corrective action well installed to directly address the brine pit release

as previously mentioned, had an apparent decrease in mercury

concentrations since its installation and startup. However, periodic increases

in mercury concentration did occur and, according to the FACILITY, were

due to heavy rainfall onto the perched clay unit beneath the plant site. There

was a delayed impact of mercury concentrations on the deeper portion of the

Kt1 aquifer and the aquifers that lie below Kt1 due to the time necessary for

the mercury contamination plume to "sink" through the sedimentary levels into the deeper levels of the subsurface plant site.

157.    The Kt3 aquifer compliance point well GD1B showed continuous levels of mercury that the FACILITY believed were caused by a leak along the well casing due to the contamination in the upper aquifers. The Kt3 aquifer had been determined to flow east to the Savannah River. The groundwater flow direction of that of the Kt5 aquifer was radial to the plant production wells. The influence of these particular wells extends beyond the boundaries of the plant property.[89]

158.    Plaintiff Contractor Worker Jeffrey F. Sloan, Sr. performed work as a Pipefitter and groundwater tester at the FACILITY from approximately 1990 until approximately 2010. He explains his experience this way:

> I tested groundwater at the FACILITY during my last six or seven years there. This task was in addition to my normal pipefitting duties. It took a solid week to take all those samples for groundwater testing, and we worked from daylight until dark. This happened quarterly. My supervisor for testing groundwater was the lab supervisor, Kelly Hagood. She and the lab tech Amanda (I do not remember her last name) gave us reports that showed previous lab results of groundwater testing. There were approximately 120 wells that were drilled about 200 feet deep. The wells were everywhere, even way down in the

---

[89] Olin-GAEPD Permit No. HW-031 Renewal Application, March 31st, 1996, Box 25; Records of the Environmental Protection Agency, Record Group 412; Acc 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; National Archives at Atlanta.

woods. I am not sure what was on the FACILITY's property back there in the woods, because there were no fences or signs. The EPA made the FACILITY drill wells to monitor them for mercury in the aquifers and water tables. I was in charge of monitoring all of those wells. Each well was numbered on a map. We pumped water out of the wells and took samples. The sample container was a small-neck bottle about as big as a mayonnaise jar. When the lab workers finished testing samples, they poured all those jars of sampled water down the sink in the lab. The wells for which the previous lab results showed no mercury contamination could be pumped on the ground. When the lab results showed that a well had mercury contamination, we pumped the water into a 500-gallon tank. The water could not be put back in the well because it was contaminated. Those tanks had to be hooked to a machine that filtered out the mercury. We took bottles of that water out of the tank and took them to the lab to be monitored. There was a canal that went through the FACILITY, near the lab, that was approximately three football fields long. It was a big man-made canal specifically for wastewater to discharge to the Savannah River. When the river water got high, it would wash over the banks of the canal. That discharge creek would flood if the river got too high. Once they finished processing the contaminated water to a lower pH and a lower mercury level, the people working in the lab emptied the water into the canal. Someone opened a valve to release that water, and it flowed down to the Savannah River. There are signs at the boat landings downstream that say the river is contaminated with mercury. Also, in the free Department of Natural Resources fishing and hunting rules handbook at local Wal-Marts, there are fish consumption warnings.

Affidavit of Jeffrey F. Sloan, Sr., Ex. 22, pages 3 and 4.

159. Plaintiff Contractor Worker Riley J. Collins states:

Mercury was everywhere and on everything in the Cell House. You didn't have to go looking for it because it was just ever-present. I saw varied sizes of liquid mercury puddles, from dime-sized to the size of my hands put together. I saw more mercury on the ground floor of the Cell House than anywhere else. I worked on the ground floor daily. Every time I opened a control panel on the ground floor of the Cell House to do electrical troubleshooting multiple times a week. I would see mercury settled around the edges of the panel opening every time. It would seep out of the panel, too. It dripped on my clothes (both coveralls and personal work clothes), on my hands, and onto the floor. Mercury dripped onto my shoulders, neck, and hands nearly every day when I was on the ground floor of the Cell House. The mercury would slowly drip from the pipes running from the cells. I had mercury on my clothing (both coveralls and personal work clothes) and personal work boots multiple times a week in the Cell House. I saw mercury sitting around in two or three gallon tin buckets. I don't know a specific reason as to why the buckets of mercury were sitting out. At the time, I assumed they were from a leak or spill. I saw them in places such as under or around the cells, and outside on the catwalks for the Cell House. There would be numerous buckets out at a time. Operators would put a layer of water on top of the mercury, which I assumed was to cover what OLIN had deemed "safe" during orientation. I did witness Operators putting water on top of mercury in a bucket with a water hose, one that was also used to wash down the floors of the Cell House. In my orientation safety training, mercury was only discussed in relation to the buckets of mercury that would be left around. Mercury was treated nonchalantly, like working around it was common practice, so I didn't feel like I had to question it. I saw workers washing mercury and other chemicals such as caustic with a water hose into a drain on the ground floor daily.

Affidavit of Riley J. Collins, Ex. 6, pages 4 and 5.

160.    OLIN knew about these numerous environmental and mercury-contamination issues at the FACILITY. OLIN failed to address them, causing harm to the Plaintiffs and the surrounding community.

161.    Eyewitness testimony, in conjunction with the state and federal environmental records of this FACILITY, clearly demonstrates the indoor and outdoor gross mercury contamination that presented an ever-present threat to the health of those working in and around the FACILITY.

## CHAPTER V - TAKE-HOME EXPOSURE OF PLAINTIFF FAMILY MEMBERS

*In addition to allowing contaminated materials to leave the FACILITY, Defendants allowed their workers to transport toxic mercury home to their family members. Allowing clothing contaminated with mercury to leave the FACILITY and be laundered at the houses of their workers added a devastating injury.*

162.    By allowing Plaintiff Workers to wear contaminated clothing home, each of the Defendants have exposed individuals and some children to high levels of mercury. These individuals are the Plaintiff Family Members, several of whom will be introduced below (see paragraphs 164-169).

163.    As a direct and proximate result of the exposure by Plaintiff Workers at the FACILITY, the Plaintiff Family Members were exposed to mercury and

other toxicants from the FACILITY and, in direct and proximate relationship thereto, suffered personal injuries and damages including, but not limited to: death, physical damage to organs and organ systems, brain injuries, severe emotional distress, pain and suffering, impairment of earning capacity, medical expenses, temporary or permanent, partial, or complete disability, and will suffer these personal injuries and damages for the remainder of their lives. Counsel for the Plaintiffs reserves the right to add Additional Family Members as named Plaintiff Family Members in the future.

164.    An example of a Plaintiff Family Member is Olivia A. Mims. Olivia A. Mims' husband, Darryl Mims, worked at the FACILITY on a regular basis, and mercury would be on his work clothes, jackets, and boots. She explains it this way:

> I remember Darryl always being dirty when he came home. I observed a white substance on him many times as well as a gray substance, and he said it's just stuff that gets on him at work. It would be on his clothes and his skin. I recall seeing a gray muddy substance on the floor mats of his car. I now believe that what I saw was mercury mud. He brought his lunchbox to and from work. I packed his lunchbox. Sometimes it would be dirty or have a smell to it, so I would have to wash it. I would bring his lunch to the FACILITY on occasion if I hadn't finished preparing it that morning. I would bring a couple of the kids with me, too. I would wait in the parking lot, and he would come outside to me. He would hug me or kiss me, then go back to work. He changed clothes when he got home, but I

would sometimes hug him when he walked through the door. Darryl would leave his work boots on the porch or in the garage, and I don't recall him walking through the house with them on. I remember them being dirty with a darker colored substance on them. The kids would put them on and play with them. All dirty clothes were stored together in a hamper. All my family's clothes were laundered in the same machines. I would try to wash Darryl's work clothes separately because they were so dirty, but mostly they'd just get thrown in with everyone else's. We had a shared closet and dresser in our first house. When we moved into another house, which is where we currently live, our closets were separated. We have a closet for coat storage, and Darryl would hang his work jacket in there with the rest of the family's coats. The kids and I would ride in his work vehicle. My cousin, Felix "Kirk" Lawson, lived with us for six to twelve months in about 2003. He was a FACILITY direct worker at the time. He would come home just as dirty as Darryl did. I noticed the same white and gray substances on him. He did his laundry separately from ours.

Affidavit of Olivia A. Mims, Ex. 18, pages 1 and 2.

165.    Olivia A. Mims suffers from a number of health problems:

I started to experience mood swings in the late nineties that caused me to feel irritability out of nowhere. This worsened after Darryl started working for OLIN. The mood swings became more frequent. I got to the point where I wanted to isolate myself away from everybody. I would simply go into my bedroom and shut the door. I have no idea where these feelings came from. I have anxiety and paranoia, which started in about 2000. It has caused me to be afraid of going outside. Dr. Peter Grossman, my OBGYN, and Dr. Christopher Apostle, my primary doctor, prescribed me medication for this, and I know if I stop taking it, those feelings will come back. I experience some depressive symptoms. I used to be a

morning person and get up easily. Now, I have to force myself to get up in the morning. In 2000, soon after Darryl started working at the FACILITY, I started having sleeping issues. I wake up in the middle of the night and can't go back to sleep. I was diagnosed with insomnia by Dr. Grossman and given insomnia medication to take. It makes me drowsy during the day, so I only take it when I just can't sleep. I noticed my memory starting to wane in about 2004. I feel like I'm in a brain fog quite often. I forget people's names, which is frustrating for me. I tend to write down everything, so I do not forget an appointment or an item when I'm grocery shopping. One thing that does worry me is when I'm driving, sometimes I'll forget where I'm going. One time I had to pull over to a gas station for a few minutes to try and recall where I was driving because I couldn't remember. That honestly scares me because I've never experienced anything like it before. In about 2006, my attention span started to worsen. I feel like I can't focus on anything. At the same time, I started having cognitive disruptions. I get distracted easily, and I sometimes can't complete a thought.

I've experienced unexplained dizziness, which started around 2007. My vision gets blurry, and I cannot walk straight. I experience spasms in my right arm, which started in the early 2000s. Around the same time, I started experiencing tingling in my hands and feet. I was diagnosed with hypertension in 2000 by an emergency room doctor at MCG Hospital, so the tingling may be linked to my diagnosis. I continue to be treated for hypertension by Dr. Apostle. I have joint pain and muscle weakness in my lower back and right shoulder. In my back, it feels like a sharp, persistent pain. I take muscle relaxers to help. I have night sweats three to four times a week. These episodes consistently occur.

> I had a medical episode around 2000 or 2001 where I lost all control of my body and movements. It felt like my nervous system was shutting down. I started shaking uncontrollably. I was taken to the hospital, and one of the nurses said it was anxiety, but I'd never experienced any anxiety like that. Another one of the emergency room doctors asked me if I worked at a chemical plant, and I told him, "No, but my husband does." That was never followed up on, and I don't really know why he asked me that. I was at the hospital for about five or six hours. The episode put me out of work for two months.

Mims, O. Aff, Ex. 18, pages 2 and 3.

166.    Another example of a Plaintiff Family Member is Derrick A. Mims, the son of Darryl and Olivia Mims. Derrick A. Mims lived with his father the entire time he was employed at the FACILITY. He explains it this way:

> I lived with Dad through most of his employment with OLIN. I moved out to attend college in 2014, and I moved back in 2016. I went back to college in 2017 and moved back again in 2020 due to the COVID pandemic. I officially moved out of the house in July of 2023. When I was attending college, I'd visit home on the weekends. Dad kept his work boots in the garage where I worked out. I noticed that they always had a gray substance on them, but I didn't know that it was mercury at the time. I wore his work boots many times to mow the lawn. His work jacket had the same gray substance on it. He kept it in the mud room with everyone else's jackets. The mud room was just a closet with jackets and shoes. I recall him bringing home a Yeti cup and lunchbox from work every day. When my father came home, he'd always check his mail that'd be waiting for him in the kitchen. My brothers and I would talk and interact with him, in the kitchen, while he was doing this. He would still be dressed in the clothes he wore home from work. We would all eat dinner

together, and he would usually shower before he went to bed. If he felt that he was really dirty, he'd shower when he came home. He had a bench in front of his and mom's bed that he would always sit on wearing his work clothes. He would also sit on top of the kitchen countertops in those same clothes. I had my own personal hamper in my room. When it was full, I dumped it into the communal dirty clothes hamper in the laundry room with everyone else's clothes. My mom mixed mine, my dad's, and my brothers' laundry together. My parents stored their clothes together at the first house we lived in, and separate closets in the house we live in now. I stored my clothes in my own closet. My parents have lived in the same house since 2004. Once, I went with Mom to the FACILITY to drop off something for Dad. We stayed in the parking lot, 2 and he came out to the car. Dad had a vehicle he drove to work that I rode in and drove. He would come to my football games straight from work. I'd drive, or ride with him, home from the games in that vehicle. Mom's cousin, Felix "Kirk" Lawson, lived with us for a short time when I was around seven years old. He also worked at the FACILITY, but I'm not sure what he did.

Affidavit of Derrick A. Mims, Ex. 17, pages 1 and 2.

167. Mims' father, suffered from a number of health problems:

I noticed Dad start to have mood swings when I was around seven years old, which was in 2004. It's like a switch will flip, and he'll get angry on a dime. Around 2012, I noticed Dad having some breathing issues and persistent coughing. He still has these issues. Dad has memory issues that I recall starting around 2014. It seems like he can't retain information. I tell him the same thing over and over again. I'm not even sure if he's listening sometimes. It's like he zones out. When I was around seven years old, Dad had surgery on his eyes to remove bumps which appeared in 2004. I was so young that I did not realize the bumps on Dad's eyes could have been the

result of him working at the FACILITY. Since the Georgia Mercury Investigation, I have learned about other symptoms Dad has been struggling with during and since his employment. These include gum issues, hypertension, muscle spasms, arthritis, paranoia, personality changes, sleep issues, balance issues, neuropathy, night sweats, skin rashes, hearing issues, and vision issues. He has had a stutter since he was a child, and I have learned that it became worse after working at the FACILITY.

Mims, Derrick A. Aff, Ex. 17, page 2.

168.   David A. Mims Plaintiff Family Member is David A. Mims, another son of Darryl and Olivia Mims. David A. Mims would come home from college on the weekends.  He explains it this way:

When I was attending college, I'd visit home on the weekends. Dad kept his work boots in the garage where I worked out. I noticed that they always had a gray substance on them, but I didn't know that it was mercury at the time. I wore his work boots many times to mow the lawn. His work jacket had the same gray substance on it. He kept it in the mud room with everyone else's jackets. The mud room was just a closet with jackets and shoes. I recall him bringing home a Yeti cup and lunchbox from work every day. When my father came home, he'd always check his mail that'd be waiting for him in the kitchen. My brothers and I would talk and interact with him, in the kitchen, while he was doing this. He would still be dressed in the clothes he wore home from work. We would all eat dinner together, and he would usually shower before he went to bed. If he felt that he was really dirty, he'd shower when he came home. He had a bench in front of his and mom's bed that he would always sit on wearing his work clothes. He would also sit on top of the kitchen countertops

in those same clothes. I had my own personal hamper in my room. When it was full, I dumped it into the communal dirty clothes hamper in the laundry room with everyone else's clothes. My mom mixed mine, my dad's, and my brothers' laundry together.

Affidavit of David A. Mims, Ex. 16, page 1.


169.    Other examples of cross-contamination include:

We had a cookout at the FACILITY, and one of my coworkers was kind enough to bring his grill so we could cook up some hamburgers and hot dogs. It was a huge grill/smoker. We set the grill up in the smoking section of the break area. When the grill had cooled down, I went back out to help him load it back into his truck. When I got out there, I noticed a Shop-Vac from the Cell Room sitting close to the grill, and the hose just lay out on the ground. I picked up the hose to roll it up, and when I did, mercury spilled out the end of it onto the concrete. It looked like some mercury had gotten caught in the little rings on the Shop-Vac hose and fell out when I picked the hose up. My coworker, a painter named Jay Peterson ("J.P."), said he sucked the ashes out of the grill with the Shop-Vac before we started cooking. Mercury had spilled out of the Shop-Vac onto the concrete slab of our break area, where the smokers went for a smoke break. At the time, I was used to seeing mercury everywhere at the FACILITY, so I hadn't paid much attention to the mercury spill by the 9 grill. Now, I realize that J.P. was using this mercury-contaminated Shop-Vac on the grill and the mercury that spilled out of it was dangerous to myself and my coworkers.

Keller Aff, Ex. 10, pages 8 and 9.

I worked during decommissioning and demolition at the FACILITY. My shifts were ten hours a day. I worked Monday through Thursday from 8 a.m. to 6 p.m

One of my jobs was to wash mercury down a drain on the ground floor in the Cell House. Mercury would consistently leak from the second floor to the ground floor. I often stepped in mercury puddles. I saw large and small mercury puddles. Whenever I was cutting braces to prep for cell removal, mercury would drip and accumulate on the ground beneath us. The more braces we cut, the more mercury I saw. There were a few times when I saw mercury on the braces themselves before I cut them. I didn't notice at the time that the mercury was dripping onto my skin, particularly onto my neck since it was exposed. There was no way for me to avoid the dripping coming from the cell floor to the ground floor.

Affidavit of Tyler A. Cannon, Ex. 5, page 3.

There are some specialized tools required, not necessarily to work on cells, but to work around that much electricity. There is so much electromagnetism around the cells that it can pull steel tools right out of your pocket or tool pouch and send them dancing across the floor or stick them to another piece of stationary metal. Brass tools were a better choice for a couple of reasons. One, they were not subject to magnetism like steel. Two, brass tools are also naturally "non-sparking." In an environment like the Cell House where hydrogen gas was being produced, sparks are to be avoided at all costs. I brought a tool pouch and multimeter with me from Charleston to use at the FACILITY. I carried them back and forth and kept them with me in the hotel room at night. After a trip to the FACILITY, I returned to Tennessee and brought my tool pouch. The multimeter was from the Charleston OLIN facility, so I returned it there after I used it during trips to the FACILITY. No one at the FACILITY required me to wipe my tools or the multimeter before leaving for the day. There was no safety

protocol for me to follow in bringing my personal tools or the multimeter from another OLIN facility.

Affidavit of Stephen Price, Ex. 19, page 3.

One day after spending an hour or two in the Cafeteria, I went to get my trash can out of the Boiler Room cabinet. No one mentioned anything about something spilling in my trash can when I got to work. It looked like someone had spilled silver liquid and shoveled it into my trash can before my shift. I saw a murky, blueish, silver liquid pooling in my big trash can as I was getting my supplies. The liquid formed a ball about the size of a marble when I moved the trash can. I also saw a gray, greenish mud on the side of the trash can. There wasn't any protocol I was required to follow when I saw mercury. I was not told about the presence of mercury at the FACILITY. The next day I came in, the liquid had been cleaned out. My trash can was completely clean. I didn't know what mercury looked like then. I only knew the liquid was out of the ordinary. It was only during the Georgia Mercury Investigation that I realized it was mercury. 5 On a different occasion, I saw mercury on the floor of the Lab. It was in the middle of my shift when I continued my rounds to the Lab. Most days, I would see a large device shaking a gallonsized jar full of a bluish silver liquid that reminded me of the liquid that was in my trash can. I found that jar shattered on the floor one day when I came in to clean the room. I don't know if someone on day shift was careless, or if an accident happened. What I do know is that I went in there and saw puddles of what I now know to be mercury and shattered glass. I was wearing my safety glasses and latex gloves. I made sure not to touch the mess because I was concerned about the shattered glass. Instead, I told a security guard about the broken jar and the spill. He told me to stay out of the Lab, and someone else would take care of it. The next time I went in there, the spill was gone.

Affidavit of Thomas Lacy, Ex. 12, pages 4 and 5.

## CHAPTER VI: HOW MERCURY HARMS AND INJURES PEOPLE
**What is Mercury?**

170.    Elemental mercury occurs naturally and is present in the earth's crust. Mercury is a naturally-occurring metal, which has several forms. At room temperature, elemental mercury is a shiny, silver-white, odorless liquid metal. If heated, it becomes a colorless, odorless gas. Elemental mercury is used in industry to produce chlorine gas and caustics, and is also used in thermometers, dental fillings, and batteries.[90]

171.    Mercury and its compounds exist in three general forms:

- Elemental (or metallic).

- Inorganic. Mercury can combine with other elements (mainly chlorine, sulfur, and oxygen) to form inorganic mercury compounds.

- Organic. Mercury may combine with carbon or carbon-containing substances to make organic mercury compounds.

**Utilization of Mercury by the Chlor-Alkali Industry.**

172.    Mercury has been used in industrial processes for centuries. The occupational hazards of mercury were established as early as 1860.[91] Hat

---

[90] Agency for Toxic Substances and Disease Registry, ToxFAQsTM for Mercury, CAS#: 7439-97-6, April 1999.
[91] Wedeen, R. P., "Were the hatters of New Jersey 'mad'?", American Journal of Industrial Medicine, Volume 16, Issue 2, pages225-233, 1989.

manufacturers once used a mercury wash to separate fur from pelts.[92] The earliest documentation of the occupational hazards of mercury and mercurial disease was among hat makers.[93] The phrase "mad as a hatter" was associated with industrial felt hat workers in nineteenth-century England. Mercurial disease was common among hatters and included such symptoms as tremors, irritability, and mental instability.[94]

173.    In the United States, the Chlor-Alkali Industry began to utilize the Castner-Kellner mercury-cell process in 1897.[95] As of 2018, according to the Global Mercury Assessment published by the United Nations Environment Program ("UNEP"), the Chlor-Alkali production sector was the ninth largest contributor to global mercury emissions.[96] Through the use of mercury, this industry is able to produce Chlorine ($Cl_2$) and alkaline products like potassium and sodium hydroxides (NaOH and KOH respectively) through the electrolysis of a salt solution.

---

[92] SAM KEAN, THE DISAPPEARING SPOON (2011).
[93] Buckel, M., Hunter, D., R Milton, and Perry, K. M., "Chronic Mercury Poisoning", British Journal of Industrial Medicine, 1993, Volume 50, pages 97-106.
[94] R. E. O'Carroll et al., *The Neuropsychiatric Sequelae of Mercury Poisoning. the Mad Hatter's Disease Revisited*, 167 BR. J. PSYCHIATRY J. MENT. SCI. 95 (1995).
[95] O'Brien, T.F., Bommaraju, T.V., Hine, F. (2005). History of the Chlor-Alkali Industry. In: Handbook of Chlor-Alkali Technology. Springer, Boston, MA.
[96] EPA, Mercury Emissions: The Global Context (2021).

174.    In the 1970s, the membrane cell production method emerged in the Chlor-Alkali industry, which produced Chlorine and alkaline products without the use of mercury.[97] In the United States, following the introduction of Nafion® membranes by DuPont in 1970, research efforts in membrane-cell technology intensified. In 1972, a commercial size electrolyzer and pilot plant were placed in operation in Painesville, Ohio. Four years later, a 20-ton per day membrane-cell demonstration plant was built and integrated into an existing mercury-cell operation in Muscle Shoals, Alabama. [98]

175.    Many production plants in the United States remained committed to the less safe and less efficient mercury-cell method until either closing or converting to membrane-cell technology. The mercury-cell technology had a dominating world share until it began to decline following the mercury poisoning cases in Minamata and Niigata, both in Japan, in 1972. Japan was the first country to convert away from mercury-cell technology, and currently there is no mercury-cell operation in Japan. [99]

---

[97] European Commission Directorate - General, Joint Research Centre, Institute for Prospective Technological Studies (Seville), Technologies for Sustainable Development European Integrated Pollution Prevention and Control (IPPC) Bureau, Reference Document on Best Available Techniques in the Chlor-Alkali Manufacturing industry, October 2000.
[98] O'Brien, T.F., Bommaraju, T.V., Hine, F. (2005). History of the Chlor-Alkali Industry. In: Handbook of Chlor-Alkali Technology. Springer, Boston, MA.
[99] *Ibid.*

176.    The use of elemental mercury in the Chlor-Alkali Industry remained prevalent in the United States market into the 2000s. Even so, its direct effect on individual workers was poorly understood, if at all, due to testing and preventive failures. Although elemental mercury is poorly absorbed through the gastrointestinal ("GI") route, it is highly toxic when inhaled. Mercury is highly volatile in the environment and vaporizes readily. This vapor, if inhaled, is easily absorbed into the body, often attaching to the structures of the central nervous system ("CNS") and peripheral nervous system ("PNS")[100]. This makes it a highly dangerous airborne respiratory hazard when aerosolized or vaporized.

**Mercury Exposure Can Result in Life-Threatening and Debilitating Injuries to Humans.**

177.    When considering how mercury in the workplace mobilizes to expose workers, one must understand how mercury behaves, what forms workers may interact with, how those forms can enter and move through the body, and how they can remain undetected or asymptomatic for many years. Notably, mercury can combine with other elements, such as chlorine, sulfur, or oxygen, to form inorganic mercury compounds or "salts" such as

---

[100] L.W. Cheng & R.B. Tjalkens, Neurotoxicology of Metals, 13 Comprehensive Toxicology 483-497 (2010).

mercuric chloride. These forms are typically white powders or crystals. Mercuric chloride is, of course, likely to be found in an environment where mercury is utilized to produce chlorine and can be kicked up or ingested by workers unknowingly. [101]

178.    Aside from its ability to combine and form various compounds, mercury on its own is highly volatile. Volatilization of mercury increases significantly when it is heated. This heat can come from the atmosphere, from the bodies of workers, or from work that creates heat. The vapor pressure characterization for mercury indicates that, as the temperature increases in a room from 32°F to 68°F, the amount of mercury vaporizing increases six-fold. When the temperature of a room is increased from 68°F to 140°F, the amount of mercury vaporizing into the atmosphere increases 21 times. [102]

179.    Vaporization may also be hastened by aerosolization. This often occurs when workers vacuum metallic mercury from a surface, putting them directly in the path of potential exposure. In fact, the workers vacuuming and those around are running the risk of inhaling mercury vapor which is

---

[101] ATSDR, ToxFAQs for Mercury (2022).
[102] N.Y. Dept of Health, Assessing Mercury Exposure.

easily absorbed into the body through the lungs. In its vaporized state, elemental mercury is nearly completely absorbed across the alveolar membrane, the gas-exchanging region of the lungs, with a retention of 75–80%.[103]

180.    Neither liquid mercury nor mercury vapor has an odor nor provides any warning of hazardous concentration in the air.[104] Workers cannot smell, taste, or feel the mercury vapor as it enters and injures their bodies such that they are unaware in many instances that they are being exposed. Mercury vapor is heavier than air and may therefore accumulate in poorly ventilated or low-lying areas.[105]

181.    Mercury exposure of any amount can result in potentially significant harm and injury. There are three primary routes of exposure: inhalation, ingestion, and injection (transdermal permeation).

A. Inhalation is often the route of exposure in the most extreme cases of mercury poisoning. Mercury can vaporize at room temperature, and it becomes a colorless, odorless gas. Given that up to eighty percent (80%) of all mercury vapor inhaled is absorbed into the body through blood-gas exchange ("BGE") in the alveoli of the lungs,[106] this route

---

[103] Goldfrank's Toxicologic Emergencies 5th edition, Mercury- Page 1051.
[104] ATSDR, Mercury Mgmt. Guidelines, (2015).
[105] *Ibid.*
[106] The Chlorine Institute, Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry

is the fastest avenue for mercury to enter the bloodstream and begin mobilizing through the body.

B. Ingestion, unlike inhalation, is a slower route of exposure, but mercury can cause damage to the alimentary canal and other tissues of the gastrointestinal ("GI") system.

C. Transdermal permeation of mercury depends a great deal on the species of mercury and the polarity of the molecule. However, the transdermal route is the least common of the exposure pathways. It often results in rashes or other skin reactions. Still, there can be significant absorption of mercury through the skin if mercury or mercury vapor is in continuous contact with the skin.

**The Dangerous Nature of Mercury in Vapor Form.**

182.    Elemental mercury and inorganic mercury salts can enter the body through inhalation, skin contact, and ingestion. Inhalation of mercury vapor and/or particles of mercury chloride are the major route of entry from industrial exposures. Approximately 80 percent of inhaled mercury is absorbed. [107]

183.    There can be significant absorption of mercury through the skin if mercury or mercury vapor is in continuous contact with the skin. Uptake via the skin of elemental mercury vapor, with whole body exposure, is only

---

[107] *Ibid.*

2.2% (or 1.76% of contacted material) of uptake via inhalation. Vapor at 0.050 mg/m$^3$ penetrates the skin at a rate of about 7.2 x 10-8 mg/cm$^2$/hr.[108]

**Mobilization of Mercury – Creating Secondary Exposures**

184.    At the FACILITY, acute exposures were often the result of compromising the closed mercury-cell system, or system upset conditions, in the Cell Room. Such conditions include cell explosions, mercury leaks, and maintenance work. Whenever that closed system was opened, elemental mercury would vaporize and be released into the atmosphere. The process of vaporization was often expedited by "hot work," such as the use of saws, torches, or other tools to break down the mercury cell system. This heat-producing work exacerbated the vaporization problem by increasing vaporization exponentially.[109] In addition to these acute exposure events are chronic exposure events. Slow exposures due to environmental conditions present a chronic exposure risk. Here, the FACILITY itself was a source of mercury exposure. These environmental conditions created an ever-present mercury plume within which the Plaintiff Workers were chronically

---

[108] *Ibid.*
[109] Euro Chlor, Guideline for Decommissioning of Mercury Chlor-Alkali Plants (5th ed. 2009).

breathing, although most were unaware of the toxic effect this was having on their bodies. Shirling Aff, Ex. 21.

185.    Injury from exposure to mercury is not limited to individuals working in the Chlor-Alkali plant. In fact, many exposures occur outside these facilities and are equally, or even more, injurious than those that occur onsite. Workers are able to track the mercury home on contaminated tools, clothing, or other items from the worksite. These items have absorbed mercury and then such items can release mercury into the workers' homes unbeknownst to the workers or their family members.[110]

186.    The Chlorine Institute's Pamphlet 154 (which is the Chlorine Manufacturers Association) states, "In addition, shoes and/or clothing contaminated with mercury transported into clean areas including those away from work may result in additional exposure to the employee or possibly to family members. As a result, contaminated materials (e.g., clothing, tools) should be isolated and kept at the workplace."[111] Even the Chlorine Manufacturers' Association themselves recognize this ever-present danger.

---

[110]ATSDR, Toxicology Profile for Mercury (2022).
[111] The Chlorine Inst., Inc., Pamphlet 154 Guidelines for the Handling of Rubber-lined Cell Parts Potentially Contaminated with Mercury, (1st ed., 1998).

187.    Such cross-contamination creates an exposure hazard in the home which can be very dangerous for both the workers and their families. This was confirmed by a study performed by the Agency for Toxic Substances and Disease Registry ("ATSDR" - an agency of the U.S. Department of Health and Human Services). This and other studies have confirmed that workers performing a scheduled maintenance operation, including replacement of pipes and fittings in the cell room, did carry mercury home on their clothing.[112] & [113] There the items would be stored, washed, or otherwise incorporated into the environment of the home. Washing machines in these circumstances have been shown to carry mercury from workers' clothes and spread it to the other clothes in the load, or in any load done thereafter. This store of mercury can contaminate clothing, linens, and even the air in the home for years. Any gray water from these machines is also contaminated and, in some cases, is released into the worker's yard.

188.    The vaporization characteristics of mercury combined with the gross mercury contamination of the FACILITY created a highly dangerous setting

---

[112] ATSDR, Technical Assistance to the Tenn Dept of Health & Env't Mercury Exposure Study (1990).
[113] *Report to Congress on Workers' Home Contamination Study Conducted Under the Workers' Family Protection Act (29 U.S.C. 671a)* (2025), https://www.cdc.gov/niosh/docs/95-123/default.html.

for significant mercury exposures by the Plaintiff Workers, both chronic and acute, as well as exposure to their family members.

**Harmful Effects of Mercury Exposure**

*Exposure to Toxic Mercury Can Result in Myriad Health and Physical Injuries, Including, but not Limited to: Death; Neurological Damage; Neuropsychological Impairment; Auto-immune Diseases; Organ Damage/or Failure; Memory Loss; Seizures; Loss of Vision; and a Host of Gastrointestinal Issues.*

189.    Mercury toxicity is generally characterized by a wide spectrum of "nonspecific symptoms such as fatigue, gingivitis, gastrointestinal disturbance, insomnia, shyness, increased excitability, loss of memory, personality changes, and depression. These symptoms are sometimes referred to as erethism or micromercurialism."[114] In addition, mercury is a recognized toxin causing organ system damage throughout the body. Mercury toxicity can manifest with a broad constellation of symptoms and may not manifest identically in people even if they share identical exposures. This can complicate the diagnostic process. Additionally, elemental, organic, and inorganic mercury have different exposure pathways and therefore

---

[114] Friberg, L., et al. Mercury in the Environment: An Epidemiological and Toxicological Appraisal. CRC Press1972 Ib. 76, 1972.

different constellations of symptoms initially. Due to the lack of specificity of symptoms, and differences between individuals in their resilience to mercury, it is often hard to track and diagnose mercury toxicity. Therefore, Defendants had a duty to follow national health standards which recommend that anyone who may be exposed to mercury receive appropriate testing.

190.    All species of mercury can cause significant manifestations of symptoms, and many overlap with chronic exposure. The National Institutes of Health, the Centers for Disease Control and Prevention, and the Environmental Protection Agency have defined classifications for mercury symptomologies.[115 & 116]

191.    Inorganic mercury is poisonous when swallowed; it infiltrates the bloodstream and attacks internal organs. Symptoms of this species include burning sensations in the gastrointestinal tract (if ingested), nausea, vomiting, diarrhea, gastrointestinal bleeding, and changes in urination.[117]

192.    Organic mercury results in primary neurological symptoms; it may be symptomatic only after prolonged, chronic exposure, or it can be imminently lethal, depending on its form. Symptoms of this toxicity include pain or

---

[115] ATSDR, Toxicology Profile for Mercury (2022).
[116] ATSDR, ToxFAQs for Mercury (2022).
[117] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).

numbness in different parts of the body, memory loss, tremors, seizures, loss of balance, loss or deterioration of vision, and death.[118]

193.     Elemental mercury causes coughing, respiratory illness, difficulty breathing, nausea, vomiting, bleeding gums, and a metallic taste in the mouth.[119]

194.     Elemental mercury will cross the blood-brain barrier and become oxidized to the Hg(II) oxidation state. The oxidized species of mercury cannot re-cross the blood-brain barrier, and thus mercury accumulates in the brain.[120] Mercury in other organs is removed slowly from the body via the kidneys.[121] The average half-time for the clearance of mercury from different parts of the human body is as follows: lungs: 1.7 days; head: 21 days; kidney region: 64 days; chest: 43 days; whole body: 58 days. The evacuation of mercury from the body is generally complete after 60 days but may take as long as 90 days or as few as 40 days based on the level of exposure and species in question.[122, 123, & 124] However, mercury that crosses

---

[118] ATSDR, Toxicology Profile for Mercury (2022).

[119] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).

[120] Park JD, Zheng W. Human exposure and health effects of inorganic and elemental mercury. J Prev Med Public Health. 2012 Nov;45(6):344-52.

[121] Ibid.

[122] ATSDR, Mercury Mgmt. Guidelines, (2015).

[123] Byeong-Jin Ye et al., Evaluation of Mercury Exposure Level, Clinical Diagnosis & Treatment for Mercury Intoxication, Annals of Occupational and Envtl. Med. (2016).

[124] Elizabeth Brodkin et al., Lead and Mercury Exposures: Interpretation &Action, Can. Med. Ass'n J. 59-63 (2007).

the blood-brain barrier can persist for up to 20 years in nervous tissues, specifically grey matter.[125] Although certain levels of mercury are cleared from the body, significant portions of this mercury are absorbed into the tissue of the body and thus reside there to cause neurological damage over an extended period of time.

195.    The nervous system of the human body is very sensitive to all forms of mercury.[126] Organic methylmercury and elemental mercury vapors are more harmful than other forms. This is because more mercury in these forms reaches the brain. Exposure to high levels of elemental, inorganic, or organic mercury can permanently damage the brain, kidneys, developing fetus, and other organs. Effects on brain functioning may result in irritability, shyness, personality changes, tremors, changes in vision or hearing, and memory problems.[127]

196.    Mercury vapor is an irritant to both the skin and eyes. Prolonged contact may lead to ulceration of the skin and damage to the ocular nerve. Allergic reactions (i.e., rashes, welts) may occur in sensitive individuals. Short-term over-exposure to high concentrations of mercury vapors can lead to

---

[125] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).
[126] ATSDR, Toxicology Profile for Mercury (2022).
[127] ATSDR, ToxFAQs for Mercury (2022).

breathing difficulty, coughing, and acute and potentially fatal lung disorders. Depending on the concentration of inhalation, over-exposure, heart problems, damage to the kidney, liver or nerves, and effects on the brain may occur.[128]

197.    Short-term exposure to high levels of elemental mercury vapors may cause effects including lung damage, nausea, vomiting, diarrhea, increases in blood pressure or heart rate, skin rashes, and eye irritation.[129]

198.    The length and dose of exposure also play a significant role in determining the effects of the mercury toxicity. Chronic exposures, which develop slowly and last for months or years, can be latent and go undiagnosed for years. They can also have a longer latency, or the time between exposure and the development of symptoms, such as in children, and become more severe.

199.    A review of manufacturers' Safety Data Sheets ("SDS") indicates short term and long-term effects from mercury exposure.[130 & 131]

> Short term effects of mercury exposure are observed as skin irritation and allergic reactions. Additional effects

---

[128] Acros Organics N. V., Materials Safety Data Sheet Mercury, 99.999%, (5th rev., 2007).
[129] *Ibid.*
[130] *Ibid.*
[131] Safety Data Sheet, Mercury, The Hazard Communication Standard (HCS), 29 CFR § 1910.1200(g), requires chemical manufacturers to create SDS sheets for the chemicals they produce. These sheets must be made available through the manufacturer, distributor, and seller of these products.

that have been observed due to mercury exposure are: redness and swelling of the skin, redness and swelling of the mouth, redness and swelling of the gums, coughing, sweating, metallic taste, thirst, chills, fever, drooling, nausea, vomiting, diarrhea, frequent urination, chest pain, difficulty breathing, headache, weakness, muscle pain, sexual disorders, impotence, lung damage, heart disorders, kidney damage, liver damage, nerve damage and effects on the brain. Additional effects may include metallic taste, digestive disorders, kidney damage, and nerve damage.

The long-term effects in addition to the effects from short term exposure include blue lines on the gums, loosening of the teeth, lack of appetite, weight loss, an inability to urinate, anemia, difficulty walking, sleeplessness, twitching, loss of memory and hallucinations may occur. It may also cause reproductive effects.

200.    Additionally, mercury is known to accumulate in various tissues of the body. Particularly vulnerable to this sequestration are the kidneys. As a part of the urinary system, a route for somatic mercury evacuation, the kidneys are the primary location for mercury accumulation. They are vulnerable to and will sequester both inorganic and organic forms of mercury. [132]

201.    All forms of mercury can be nephrotoxic (i.e., damaging to structures in the kidneys called nephrons). The damage to the nephrons ultimately reduces kidney function. [133]

---

[132]  Sarah E. Orr et al., Chronic Kidney Disease and Exposure to Nephrotoxic Metals, Int'l J. Molecular Sci. (2017).
[133]  *Ibid.*

202.    This targeting of renal tissue is not limited to exogenous exposure in adults. Exposure during childhood and in utero can create permanent developmental injury to the kidneys and result in life-long disease.[134]

203.    However, since many of the symptoms associated with mercury toxicity described above are nonspecific and often mimic those of other medical conditions and may develop gradually, individuals may have no reason to suspect that exposure to mercury was the root cause of their condition.

204.    Jennifer L. Lawson was a Plaintiff Facility Worker. Jennifer worked for OLIN from approximately 2011 to 2018. Lawson worked at the Charleston, TN location and worked at the FACILITY, until 2014. She explains her time at the FACILITY this way:

> My first trip to Augusta was in April of 2011 … I made trips to Augusta roughly once every three months after that until OLIN closed chlor-alkali operations there late in 2012. After that my trips were less frequent. My last trip was early in 2014 just before the decommissioning and demolition was completed in February.

Affidavit of Jennifer L. Lawson, Ex. 13, pages 1 and 2.

> I started my position with OLIN in February of 2011. I got pregnant three months later, in May. As assigned, I worked at the Augusta FACILITY for a week in September and another in November of 2011, during that first pregnancy. Almost exactly one year after my OLIN hire date, on

---

[134] Stephan Bose-O'Reilly et al., Mercury Exposure and Children's Health, Current Probs. in Pediatric & Adolescent Health Care 186-215 (2011).

February 10, 2012, I gave birth to my oldest son. His name is Cameron Kliebert. It was truly an ordeal both to get him here and then keep him here for the first year and a half. I started getting blood clots in my legs and had to be on blood thinners. I limped around work, including when I was sent to Augusta to the FACILITY. I could barely stand and walk. My kidneys and back were killing me. My legs were killing me. It was awful. I was in a lot of pain. That started three or four months into my pregnancy. I thought it was odd. I had no symptoms like that previously, but it was my first pregnancy, so I thought maybe that was just how my body reacted to it. I thought I was going to end up in a wheelchair. At the same time, I was having terrible headaches and severe mood swings. Again, it was my first pregnancy. I knew some of that was to be expected, Now, two children later, I know my experience was not normal. The pain was severe and debilitating. I dealt with all of that pain until Cameron was born and then for another three or four months thereafter. Sometime in May or June, the joint pain and mood swings finally subsided. The headaches did not. My husband and I also knew early on that something with Cameron was not right. His kidneys were not developing or functioning properly. While I was pregnant, we had an amniocentesis done to determine exactly what it was we were dealing with. Cameron was diagnosed with Multicystic Dysplastic Kidney. It seemed like I was at a doctor's office every other day. I had my regular OBGYN and another specialist. Cameron was assigned a high-risk fetus specialist. It was a lot to deal with. Because of Cameron's diagnosis, my medical team thought it best to take him early. Cameron was born with only one kidney. The other kidney never fully formed or functioned at all. Cameron's disease is not hereditary. Neither I, nor anyone in our families has any history of this. We had Cameron's DNA genetically tested. There are two types of polycystic kidney diseases that are hereditary. That is not what Cameron has. Cameron's was caused by a genetic mutation due to environmental exposures. His

one functioning kidney was not fully developed at birth. He had to stay on antibiotics for over a year because of urine reflux that continuously caused urinary tract infections and pain in his bladder and kidney. After almost eighteen months, his kidney matured on its own and stopped the reflux without needing surgery. Aside from getting him into the world, it felt like our first victory. At that time, I had no idea my work environment could be contributing to medical issues for my baby and me.

Lawson Aff, Ex. 13, pages 4 and 5.

## Toxic Mercury Exposure Causes More Severe Injury to Women

205.    Mercury can have significant effects on the female reproductive system. Mercury, as a neurotoxin that targets brain tissues, can affect the hypothalamic-pituitary-gonadal axis ("HPGA"). The HPGA, comprised of the hypothalamus, anterior pituitary gland, and the gonads, is the system in the body that regulates the hormonal functioning of the female reproductive system. Rates of menstrual disorder in occupationally-exposed subjects has been found to be as high as sixty-seven percent (67%) where an unexposed population under otherwise similar conditions only expressed a rate of disorder of forty-six percent (46%).[135] Additionally, inhaled mercury vapor has been shown to increase the occurrence of adverse reproductive

---

[135] Shuku C. Kaishwa, Mercury Exposure & Menstrual Disorders, MedCrave Online J. Pub. Health, (vol. 9, Iss. 4, 2020).

outcomes.[136] The following excerpt describes the mechanisms of harm in the female reproductive system:

> In women, infertility is influenced by an imbalance of the female hormonal system due to Hg exposure. The progesterone/estrogen ratio changes in favor of estrogen growth, which inhibits the release of LH-luteinizing hormone. Thus, Hg may induce feminine infertility by increasing the prolactin secretion—analogous to the dopamine effect at the pituitary and midbrain level, with negative effects on galactopoiesis and female genitalia.[137]

206.    The proportion of toxic mercury in the body has been shown to negatively correlate with the number of mature oocytes (the mother cells of ova) in the body.[138]

207.    Exposure to mercury in women can result in many reproductive symptoms: amenorrhea (the absence of menstruation), dysmenorrhea (excessively painful menstruation, typically including abdominal cramping), early menopause, reduced fecundability (probability of conception during each menstrual cycle), irregular menstrual cycles, endometriosis (cells similar to those lining the inside of the uterus grow outside the uterus), polycystic ovary syndrome (enlarged ovaries with cysts

---

[136] Geir Bjørklund et al., Mercury Exposure & Fertility & Pregnancy Outcomes, Basic & Clinical Pharmacology & Toxicology (2019).
[137] *Ibid.*
[138] *Ibid.*

on the outside), benign breast disorders, galactorrhea (a milky discharge from the breasts unrelated to lactation), premenstrual syndrome, and general abdominal pain.[139]

208.    Jennifer L. Lawson was a Plaintiff Facility Worker at the TN-OLIN facility from approximately 2011 to 2018. She was sent to the FACILITY in Augusta on an "as needed" basis from 2011 - 2014. She explains her time at the FACILITY this way:

> My main work area in Augusta was, of course, the Laboratory. It was not as well-equipped as my Lab in Charleston, so I transported a lot of samples back with me for further testing. The FACILITY had a few titration/wet chemistry set-ups in the Lab, but little else. I normally carried between five and ten samples back with me to Charleston. They were typically caustic and chlorine (which was transported in a chlorine cylinder), but one or two of the samples was usually something different that OLIN wanted tested. In Charleston I could use Inductively Coupled Plasma (ICP), Inductively Coupled Plasma + Mass Spectrometer (ICP-MS), Ion Chromatography (IC), Gas Chromatography (GC), and one very old mercury analyzer, none of which were available at the Augusta FACILITY. Even in Charleston, the mercury analyzer was so outdated that it still used analog technology with a needle and graph paper attached to print results. OLIN spent money and paid great attention to everything but mercury.
>
> In order to do my job in the Laboratory, I had to generate fumes. I had to do the best I could at the time. I now realize

---

[139] *Ibid.*

the harmful effects of my on-the-job exposure. The FACILITY Lab was air conditioned, but now I know that it was not ventilated well enough to protect me from the volume of fumes from all the samples. We did not have adequate fume hoods at the FACILITY, either. Sometimes other Lab workers would bring me samples to run, and I would find beads of liquid mercury in the samples. That was only in caustic samples, though the results of most of the samples I tested showed mercury in them as well. Unless mercury was what I was looking for, I would have to go get another sample that was not contaminated with the different substances. That was a frequent occurrence. The Lab techs used the same cylinders that I used to run my own tests. They were not of the highest quality. There were a lot of spills because lids did not always fit snugly on the cups, no matter what was in them. In my work, I had frequent problems with the sample cylinders rupturing. It was common to catch a nose and mouth full of chlorine because a cylinder ruptured just a few feet from me. Typically, the valve would stick or break. It was the same with mercury, caustic, hydrochloric acid, sulfuric acid or whatever I was working on that day. I ended up breathing a lot of fumes.

Lawson Aff, Ex. 13, page 3.

209.    She explains her fertility experience this way:

I was still young, having just turned twenty-six before Cameron was born. His care was difficult. It remains difficult. The fact that he only has one kidney necessitates a very strict diet and particular attention to his physical activities. My husband and I, after much deliberation, decided we would try to have another child within a few months of Cameron's birth. We both wanted it. Neither of us had any idea how difficult or expensive it would be to make that happen. It took more than five years. When trying naturally produced no results, I began working with my OBGYN and trying different things to make it happen.

> We started with fertility drugs. That did not work. I do not recall exactly how much time passed. It was several months or a year. Things continued to go well at work, but I was still unable to conceive. After more time had passed, we moved on to Inner Uterine Insemination ("IUI"). That phase lasted for a long time but yielded no results. At that point, we had been trying for three and a half or four years with nothing to show for our efforts. We spent a lot of money. We decided to try In Vitro Fertilization ("IVF"). It is extremely expensive and, just like all the other things we tried, not a guarantee. I wanted another child, so I was willing to pay the expense. The first round of IVF was unsuccessful. I had been trying to get pregnant for about four years. Finally, after the second transfer using IVF, and almost five full years, I got pregnant.

Lawson Aff, Ex. 13, page 5.

> In 2018, when pregnant with my second child, I started having seizures just a month or two into the pregnancy. They were completely debilitating and frightening. In January or February of that year, I had a CT (Computed Tomography) Scan to see if a cause could be determined. They found nothing definitive. After leaving OLIN, I never had another seizure. They stopped just as mysteriously as they started and have never returned.

Lawson Aff, Ex. 13, page 8.

210.    Olivia A. Mims is an example of a female Plaintiff Family Member who experienced menstrual problems. Olivia Mims' husband worked at the FACILITY on a regular basis. She explains her menstrual cycle this way:

> I was having heavy bleeding during my menstrual cycle in 2002 and into 2003, which was a change because my cycle had been consistent and normal. As a result, my

hemoglobin was low. My gynecologist, Dr. Grossman, didn't know why my hemoglobin was dropping as much as it was. Two different times, I was given two shots to help increase my hemoglobin. However, my hemoglobin kept dropping, and I started to experience pains in my abdominal area. Dr. Grossman concluded that I developed fibroid cysts on my uterus. Two fibroid cysts formed over the course of two years. The first one I had drained in the doctor's office. I had the other one surgically removed. In 2003, when I was 39 years old, one of my ovaries had to be removed due to a fibroid cyst growing and connecting to that ovary. I had reached menopause in 2005 when I was 41 years old.

Mims, O. Aff, Ex. 18, page 3.

211.    With this subjective knowledge, OLIN clearly failed to exercise its duty of care to the Plaintiff Workers working in and around the FACILITY. Additionally, OLIN failed to exercise its duty of care to the Plaintiff Family Members who were exposed to mercury through cross-contamination.

**Toxic Mercury Exposure Causes More Severe Injury to Children**

212.    The exposure of a child to mercury is a vastly dangerous health threat. The latency of mercury toxicity in children can be longer than that of adults. Additionally, the effect on the development of children is often permanent and can be debilitating.

213.    Plaintiff Worker Alex S. Shaw discusses the health issues of his children during his time at the FACILITY:

Our first child together, Alexandra, was born in February of the next year. She was twenty-two months old when I began working at the facility in Charleston. Our third child (the second one together), Cody, was born in May 2003. That was six months after I began work at OLIN in Charleston. I point to that because that is also when we began to have some profoundly serious health problems.

Affidavit of Alex S. Shaw, Ex. 20, pages 5 and 6.

214.    Alex Shaw's son Cody suffers from several health issues, including:

Cody was born with Hydrocephalus. A brief time later, he was also diagnosed with Macrocephaly and Sub Ventricular Tachycardia. There was no history of problems like this on either side of the family. Cody's medical team never made the decision or recommended that we put a shunt in, but he was on a lot of medication for a long time. We spent a tremendous amount of time at his neurologist's office. The trauma from his birth defects left him severely dyslexic and with other learning disabilities. He has also dealt with terrible migraine headaches since birth. Even as an infant, only weeks old, Cody's head hurt so badly that he pulled out plugs of his hair to find relief. He was on adult doses of Keppra by the time he was two years old. We managed it the only way we could, one day at a time. Despite the challenges, I am immensely proud to say that Cody was able to graduate high school with his class. He had to work extra hard, and he had a lot of help from some wonderful teachers. He never took "special ed" classes. Instead, Cody got a lot of one-on-one attention that most kids do not get, but most kids do not need. Most kids got to play sports and do other things that Cody never could. We could never risk further head injury. It was not easy for his teachers, either. Cody has his own very unique way of speaking. His early years in school were challenging for everyone. It was not routine, but it was also not uncommon for one of Cody's teachers to go pull Alexandra out of class

to come and translate for them. His sister always understood him.

Cody is twenty-one now. He still lives at home. He wants to work and tries extremely hard, but his dyslexia is so severe that reading is still a challenge. He can do it. He cannot do it quickly. He has been through a couple of jobs that just did not pan out in the end. He currently has a part-time job with M&M Mars. He works a couple of days a week in a packaging area. The search for long-term relief continues.

Shaw Aff, Ex. 20, page 6.

215.    Alex Shaw's daughter, Alexandra, suffers from a number of health issues, including:

Alexandra started having headaches when she was five or six years old. They are not usually to the severity of Cody's, but they are bad, and they were too frequent for a child her age. They were severe on occasion. We once had her admitted to the hospital because of one that had been raging for three days. None of the medical professionals we have consulted over the years has been able to do more than guess at the cause. It is a problem she continues to deal with today. Alexandra started her period for the first time when she was nine. There were problems immediately. There was no regulation. She might bleed for a month, even six weeks. Then nothing at all would happen for two or three months. When she was fourteen, her OB/GYN thought it might help to go ahead and put her on birth control. Instead, it almost killed her. They gave her a Depo-Provera shot which her body promptly rejected violently. She started bleeding. She went through sixteen pads in five hours. We did not know she was also hemorrhaging internally. By the time we got her to the emergency room, she was in terrible shape. They considered giving her a transfusion but decided that they

had been able to stop the bleeding in time. She could quite literally have bled to death. In the aftermath, we were told to stay away from any form of birth control for her. She has never tried again.

In her early teens, Alexandra was also diagnosed with anxiety and depression. She was prescribed Prozac at the time. It helped and it continues to help. Alexandra is twenty-three now and has two children of her own. There are still days when coping with anxiety and depression is harder than others, but she takes her medication like she is supposed to and takes it one day at a time.

Shaw Aff, Ex. 20, page 6.

216.     One study assessed the impact of industrial mercury emissions on children's health and found that an estimated 300,000-600,000 American children could have reductions in IQ related to mercury. Estimates are that the loss of productivity due to loss of intelligence caused by methylmercury are on average $8.7 billion annually, with emissions from American power plants accounting for $1.3 billion. [140]

217.     Another study assessed, globally, the societal damage caused by ingestion of methylmercury for the year 2020 and estimated the annual cost to be approximately $3.7 billion due to a loss of IQ. The corresponding cost

---

[140] Stephan Bose-O'Reilly et al., Mercury Exposure and Children's Health, Current Probs. in Pediatric & Adolescent Health Care 186-215 (2011).

of damages due to inhalation of methylmercury was estimated to be $2.9 million.[141]



*This figure demonstrates the general trends in prenatal exposure to mercury.[142]*

218.    Mercury exposure in early childhood may result in skeletal malformations, brittle bones, neurological development issues, psychological issues, kidney toxicity, acrodynia, respiratory system issues,

---

[141] *Ibid.*
[142] *Ibid.*

cardiovascular diseases, reduced IQ, memory issues, language skills impediment, spatial reasoning impairment, and attention deficits.[143]

219.    The symptoms of mercury exposure in middle childhood and adolescence include psychiatric issues, neurological issues, kidney toxicity, respiratory system issues, cardiovascular diseases, tremors, seizures, loss of balance, anxiety, depression, emotional dysregulation, memory issues, insomnia, anorexia, erethism, and fatigue.[144]

220.    Autosomal Dominant Polycystic Kidney Disease (ADPKD) is an inherited condition that results in cyst development in the renal tissue.[145] There are two known genes that cause this disorder: PKD1, which accounts for roughly 78 percent of cases, and PKD2, which results in 15 percent of cases.[146] The course of this disease is highly variable, however, most cases are detected between the ages of 30 and 50, approximately when the growth of cysts begins to impede kidney function.[147]

221.    Given that this disease is an inherited genetic disorder, most cases will be passed from parent to child. Some cases may be the result of *De Novo*

---

[143] WHO, Children's Exposures to Mercury Compounds, (2010).
[144] *Ibid.*
[145] Mayo Foundation for Medical Education and Research, Polycystic Kidney Disease, Mayo Clinic (2022).
[146] NHS, Autosomal Polycystic Kidney Disease, NHS Choices (2023).
[147] *Ibid.*

variants that occur during the formation of the sperm, ova, or in early embryonic development.[148] Mercury is a known cause of genetic mutations in sperm cells.[149] Therefore, paternal exposure to mercury around the time of conception can result in a genetic mutation to PKD1 or PKD2. Further, given the dominance of these genes, only one parent must past them down for the disease to present in their offspring.

222.    This disease course is further complicated by the fact that mercury targets the renal tissues as they are central to the evacuation of mercury. It is well established that in the case of ADPKD, healthy lifestyle choices can slow the progression of the disease and mitigate some of its effects. Conversely, the injury the kidneys incur from mercury can exacerbate and expedite the worsening of ADPKD.

---

[148] MedlinePlus, Risk Assessment and Inheritance Patterns (2021).
[149] Magda Carvalho Henriques et al., Exposure to Mercury and Human Reproductive Health: A Systematic Review, 85 Reproductive Toxicology 93, 93-103 (2019).



*This figure shows the deteriorating handwriting of a nine-year-old female at monthly intervals after accidental mercury exposure.*[150]

223.     The primary reproductive effects in the mother from mercury exposure are reduced fertility due to challenging intrauterine environments and reduced fecundability. However, mercury is a known teratogen and has

---

[150] Stephan Bose-O'Reilly et al., Mercury Exposure and Children's Health, Current Probs. in Pediatric & Adolescent Health Care 186-215 (2011).

many negative health impacts on a developing fetus. Some of these effects are spontaneous abortions (miscarriages up to 20 weeks), stillbirth (miscarriages after 20 weeks), infertility, subfertility, fetal malformations, and Minamata disease (in infants). Additionally, some research indicates that the mother may use the fetal route (via the placenta) as an excretory route for mercury.[151, 152, 153, & 154]

**Detection, Testing, and Treatment of Individuals Exposed to Toxic Mercury**

224.     Biological detection of mercury in the body requires laboratory testing. Most commonly this is urine testing, but mercury may also be detected in blood tests, among others. Mercury is detectable in the urine only for between 30 and 90 days after exposure.[155] Thereafter, blood panels, symptom analysis, and environmental evaluations must be used to diagnose mercury poisoning. There are three pillars in assessing the general or potential health consequences of exposures:[156]

- Amount and species of mercury available in the environment;

- Duration of exposure; and

---

[151] Magda Carvalho Henriques et al., Exposure to Mercury and Human Reproductive Health: A Systematic Review, 85 Reproductive Toxicology 93, 93-103 (2019).
[152] *Ibid.*
[153] Wash. Dept of Health, Mercury Best Practices (2016).
[154] Minai Mandana, Methylmercury & Human Embryonic Development, Embryo Project Encyclopedia (2016).
[155] N.Y. Dept of Health, Assessing Mercury Exposure.
[156] ATSDR, Evaluating Mercury Exposure (2019).

- Sensitivity of an individual to mercury.

225.    Mercury, as discussed in the previous sections, needs varying amounts of time to infiltrate the body based on the route of exposure. This is a key factor in assessing potential exposures.[157] The inhalation of vapor often takes less time than transdermal absorption.[158] Therefore, determining whether vapor was present is critical.

226.    Currently, the standard of care for mercury toxicity detection is laboratory testing involving samples of urine (most commonly), blood plasma (in clinical settings), fecal matter, hair, and nails. These samples allow for the determination of the volume of mercury in the system and generally the severity of the exposure.[159]

227.    The standard treatments for mercury poisoning are chelation (the use of chemical bonding to allow heavy metals to be excreted), fluid transfusions (to remove metals from the blood manually), and supportive care like intubation for respiration, endoscopic treatment for the GI tract, and IV fluids to supplement where needed.[160 & 161]

---

[157] WHO, Mercury and Health (2017).
[158] *Ibid.*
[159] ATSDR, Mercury Mgmt. Guidelines, (2015).
[160] Cleveland Clinic, *Mercury Poisoning* Cleaveland Clinic, Mercury Poisoning (2022).
[161] Robin A. Bernhoft, Mercury Toxicity and Treatment: A Review of the Literature, J. Envtl. Pub. Health (2012).

228.    Unfortunately, chronic exposures leave lasting damage that is not easily detected or undone. Rehabilitation, physical therapy, psychiatric care, and continuous clinical treatment are requisites of many victims' care. In many cases, these treatments only stop the progression, rather than reverse the damage.[162] Furthermore, there is some indication that mercury poisoning sequelae worsen over time. As victims age, these symptoms increase in severity.

**Biomarkers for Mercury Exposure[163]**

229.    The following charts describe the biomarkers for mercury and the length of time mercury can be detected via these markers and their relevant tests:

---

[162] *Ibid.*
[163] N.Y. Dept of Health, Assessing Mercury Exposure.

| | Biomarker | Form of Mercury Exposure | | Comments |
|---|---|---|---|---|
| | | $Hg^0$ | MeHg | |
| Common Background Source | | Dental amalgams | Fish diet | |
| Useful Biomarkers | | Urine, blood | Blood, hair | |
| Half-life[1] | Urine | 30-90 days | NA | |
| | Blood | Phase 1: 1–3 days Phase 2: several weeks | Phase 1: 1-3 days Phase 2: 30-90 days | |
| U.S. General Population Background Level (95th percentile) | Urine[3] | 6–11 yrs: 0.89 mcg/L 1.1 mcg/gC 12–19 yrs: 1.0 mcg/L 0.85 mcg/gC ≥ 20 yrs: 1.8 mcg/L 1.8 mcg/gC | | Represents primarily $Hg^0$ and inorganic Hg |
| | Blood[3] | 1–5 yrs: 1.2 mcg/L 6–11 yrs: 1.6 mcg/L 12–19 yrs: 1.9 mcg/L ≥ 20 yrs: 4.9 mcg/L | | |
| U.S. Women Population Background Level (95th percentile 16-49 yrs) | Hair[4] | 1.7 ppm | | Primarily MeHg |
| NYS Reportable Level [2] | Urine | 20 mcg/L | NA | Represents primarily $Hg^0$ and inorganic Hg |
| | Blood | 5 mcg/L | | All forms of Hg |

| Mercury (total) in Urine | Comments |
|---|---|
| **Typical Levels of Total Mercury in Urine** | |
| 2.8 mcg/L<br>2.6 mcg/gC | 95th percentile, U.S. adults, □20 years old, 2007–2008 (n=1861) [CDC, 2011] |
| 1.82 mcg/L<br>1.18 mcg/gC | 95th percentile, U.S. young adults, 12–19 years old, 2007–2008(n=375) [CDC, 2011] |
| 1.82 mcg/L<br>1.71 mcg/gC | 95th percentile, U.S. children, 6–11 years old, 2007–2008 (n=398) [CDC, 2011] |
| <1 – 7 mcg/gC | Commonly (~99% of US population) associated with dental amalgams (n=520) [Barregard et al., 1995]. |
| 1 – 2 mcg/gC | Mean level in children (6–10 yrs old) without dental amalgams (n=521) [Bellinger et al., 2006; DeRouen et al., 2006] |
| 1 – 3 mcg/gC | Mean level in children (6–10 yrs old) with dental amalgams (n=520) [Bellinger et al., 2006; DeRouen et al., 2006]; no neurological effects observed. |
| Highest Levels Associated with Dental Amalgams: Estimated Highest 1% of US Population. | |
| 7 – 50 mcg/gC | Highest values are from case reports of nicotine gum chewers. [Barregard, 1995, 2005]. |
| **Health Effects of Chronic Occupational Exposure (many years) to Mercury Vapor** | |
| ≥ 200 mcg/L | High incidence (80%) of *erithism* (fatigue, emotional lability, insomnia, shyness) (n=77 exposed workers) [Urban et al., 1996] |
| 100+ mcg/L | Subtle cognitive deficits: attention, memory, reasoning, manual dexterity [reviewed by Echeverria et al., 2005] |
| 30 – 100 mcg/L | Inconsistent effects: fatigue, mood, tremor, memory, confusion [reviewed by ACGIH (2001) and Echeverria et al. (1995, 2005)] |
| 25 – 35 mcg/gC | Low effect levels for early biochemical markers of kidney toxicity (chloralkali workers) (n=89 exposed, 75 control) [Langworth et al., 1992]. |
| 20 mcg/gC | Low effect level for increased hand tremor (chloralkali workers).  Highly dependent on duration of exposure (15 yea r mean, n=26) [Fawer et al., 1983]. |
| 5.3 mcg/gC<br>(1.6 – 26 mcg/gC) | Mean (range) in dental professionals where urine mercury concentration was correlated with an early biomarker of kidney toxicity (p=0.001) (n=44) [Langworth et al., 1997]. |
| Dentists:<br>3.32 mcg/L<br>(0 – 18 mcg/L)<br>Dental Assistants:<br>1.98 mcg/L<br>(0 – 15 mcg/L) | Mean (range) in dental professionals where urine mercury concentration was related to deficits in attention, visual memory, manual coordination, complex coordination in male dentists (n=194) and female dental assistants (n=233) (p<0.05); [Echeverria et al., 2005]. |

## CHAPTER VII: DIAGNOSTIC & MEDICAL CHALLENGES OF MERCURY TOXICITY

### An Overview of Diagnostic & Medical Challenges Related to Mercury Toxicity

230.    Mercury, as an etiologic agent, presents with a wide and varied constellation of symptoms. Due to the complexity of mercury intoxication and that this intoxication varies by route of exposure and the form of the mercury a person is exposed to, characterizing the exposure and injury can often present a challenge for clinicians and patients alike.

231.    Mercury intoxication can present as one of five defined syndromes, as follows:[164]

    a.  Acute inhalation of elemental mercury vapor,

    b.  Acute ingestion of mercuric salts,

    c.  Chronic inorganic mercury intoxication,

    d.  Chronic elemental mercury,

    e.  Chronic sequalae of inorganic salts, and

        i.  Aryl and long-chain alkyl mercurials,

        ii.  Acrodynia, and

        iii.  Methylmercury intoxication.

---

[164] Lewis R. Goldfrank et al., Goldfrank's Toxicologic Emergencies 1051 (Young Jin Sue et al. eds. 5th ed. 1994).

232.    The most significant barrier to early treatment and characterization of exposure is the latency period of most chronic mercury intoxications. Many victims of mercury intoxication do not develop detectable symptoms for weeks, months, or years after exposure.[165 & 166]

233.    In spite of the amorphous appearance of mercurial injuries, science has settled, beyond reasonable certainty, that exposure to mercury vapor, or other species of mercury, will result in injury.[167, 168, 169, 170, & 171]

234.    However, as described herein, symptoms of mercury intoxication are nonspecific and may easily be attributed to another etiological cause.

235.    Many Physiologically Based Pharmacokinetic (PBPK) and Pharmacodynamic (PBPD) models have been developed to demonstrate the movement and sequestration of mercury throughout the human body. They use mathematical analysis to track the exposure. These models are highly specific and are designed for a specific species of mercury (i.e., elemental,

---

[165] ATSDR, Toxicological Profile for Mercury (2022).
[166] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).
[167] ATSDR, Toxicological Profile for Mercury (2022).
[168] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).
[169] Lewis R. Goldfrank et al., Goldfrank's Toxicologic Emergencies (Young Jin Sue et al. eds. 5th ed. 1994).
[170] Yuan-Seng Wu et al., The Toxicity of Mercury and Its Chemical Compounds: Molecular Mechanisms and Environmental and Human Health Implications: A Comprehensive Review, ACS Omega 5100–5126 (2024).
[171] Caicheng Long et al., Adsorption-improved MoSe2 nanosheet by heteroatom doping and its application for simultaneous detection and removal of mercury (II), J. of Hazardous Materials (2021).

inorganic, or organic). Additionally, these models utilize medical case data to calibrate the system and to compare the results.[172]

236.   These models provide such critical insights as:

> Mercury toxicity can be very difficult to identify with multisystem involvement. It is imperative to have a high index of suspicion and obtain a thorough history while always keeping in mind the complex of symptoms found in the toxidromes. Symptoms of mercury exposure and toxicity can easily be misdiagnosed as normal medical problems such as gastritis, GI bleeding, and respiratory distress. A keen awareness leading to early identification and treatment is critical due to the severe and potentially irreversible damage.[173]

237.   This necessary awareness of the pathology of mercury intoxication, or lack thereof, by even the most well-meaning medical practitioners, can result in misdiagnoses or missed diagnoses.

238.   Mercury is evacuated from the body by various routes between 15 and 90 days from the last exposure. Many diagnostic tests become unusable after that window closes. Additionally, symptoms of mercury intoxication have a delayed onset that often gives the victim no notice or reason to seek medical attention. The major neurological symptoms can be delayed and then persist for many decades after exposure.[174] This can leave victims completely

---

[172] ATSDR, Toxicological Profile for Mercury (2022).
[173] Shawn L. Posin, StatPearls, Mercury Toxicity (2014).
[174] *Ibid.*

unaware of the nature of their injury until they are beyond the timeframe of simple diagnostic tests.

239.    The symptomology of mercury intoxication is based on its sequestration in, or route of evacuation through, the body. The brain, the lungs and the kidneys are the primary target organs for mercury burden. Mercury has a high affinity for selenium and sulfur groups, both of which are abundant and critical to the function of the central nervous system.[175]

240.    Due to this affinity and relative abundance, the brain takes on a significant burden of the somatic mercury load.[176]

241.    The kidneys, however, get their burden from their primary functionality as primary organs of the primary evacuation route of mercury. Fifty-five percent (55%) of the somatic mercury load will be excreted through the kidneys, resulting in high mercury levels and constant exposure in those tissues.[177]

242.    The lungs become early targets of elemental mercury as its primary route of toxicity is through inhalation. Between seventy-five (75%) and

---

[175] Thomas W. Clarkson et al., The Toxicology of Mercury & Its Chemical Compounds, Critical Review of Toxicology (2006).
[176] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).
[177] ATSDR, Toxicological Profile for Mercury (2022).

eighty percent (80%) of all elemental mercury that enters the lungs will be absorbed into the body tissues through blood gas exchange. Significant exposures can lead to respiratory injury, respiratory depression, and potentially death due to hypoxia.[178]

243.    A primary exemplar of mercury's relationship with neurological injury is that mercury exposure has been linked to Dementias, such as Alzheimer's Disease. Although the link to this particular pathology is not precisely clear, it remains the subject of much inquiry. The results of that inquiry have shown that the mercury burden in the brain can persist for decades, up to an estimated 20 years.[179] Furthermore, this persistence in the brain has shown itself to be causal to many significant neurodegenerative diseases. In many cases the full deleteriousness of those injuries does not become clear until years after exposure, well past the time when they might have been attenuated or prevented.[180]

244.    The Plaintiffs in this case have experienced symptoms consistent with the symptomology of mercury intoxication, although they had no reason to know until recently that their symptoms were caused by exposure to mercury

---

[178] Jung-Duck Park, et al., Human Exposure and Health Effects of Inorganic and Elemental Mercury, J. Preventative Med. & Pub. Health 344-352 (2012).
[179] *Ibid.*
[180] *Ibid.*

at the FACILITY, either directly or through a family member. These symptoms have been detailed by Plaintiffs in an attached exhibit. See Matrix of Plaintiff's Symptoms, Exhibit 24.

## CHAPTER VIII: ENVIRONMENTAL, HEALTH, AND SAFETY

245.    In this chapter, Plaintiffs will discuss the unique intersection of Environmental, Health and Safety regulations, guidelines, and duties that are applicable to the FACILITY (collectively the "EH&S Guidelines"). The EH&S Guidelines include Process Safety Engineering, accepted Chemical Engineering safety practices, international industrial safety standards, national and global chlorine trade associations (e.g. Euro Chlor and the Chlorine Institute), applicable governmental regulations, and non-governmental scientific associations (e.g. ATSDR, ACGIH and NIOSH). These EH&S Guidelines will be discussed in detail in this chapter.

246.    However, these EH&S Guidelines are not being used to establish claims by any Plaintiff against his or her employer for the time he or she was an employee of one of the Defendants. Plaintiffs are using the EH&S Guidelines to establish the general standard of care that Defendants should have exercised at the FACILITY.

247.    Although certain EH&S Guidelines, such as OSHA and/or EPA regulations, are not mandated for the purpose of non-employees, they provide the knowledge that Defendants should have exercised to protect other workers and the public. Said knowledge should have been exercised to protect the non-employee Plaintiffs in this case from the known hazardous conditions at the FACILITY.

**Duty of Care - Process Safety Engineering**

248.    Process Safety Engineering ("PSE") represents one of the most valuable and informative methods to prevent injury to workers in a wide array of industries. However, it is critically important to safety in industries handling or producing hazardous chemical constituents, products, or waste. This strategy allows for systems to be analyzed, designed, and revised prior to operations, thereby minimizing the major risks to workers. PSE is the first part of a Process Safety Management ("PSM") program. Employers with potentially hazardous operations are required by OSHA to perform Process Safety Engineering to reduce risk to their employees. This is codified in 29 CFR § 1910.119.

249.    OSHA requires employers to inform and consult with their employees on the development and implementation of the Process Safety Management

program.[181] They must also release to their employees the results of their process hazard analyses.[182] This information should be compiled into a written plan that is available to all employees working at the site.[183] The goal here, as stated by 29 CFR § 1910.119(d), is to "enable the employer and the employees involved in operating the process to identify and understand the hazards posed by those processes involving highly hazardous chemicals." This statute continues to enumerate the exact information that must be acquired and provided to employees. That information includes toxicity information, permissible exposure limits, physical data, reactivity data, corrosivity data, thermal and chemical stability data, hazardous effects of inadvertent mixing, and technology in the process.

250.    Process Safety Engineering aims to reduce all risks to a worker's health. The process is also designed, and should be implemented, to protect others from harm who may be within the zone of danger. It achieves this by breaking down the system in question and its design into parts. First, PSE will evaluate the process as a whole and, in particular, will evaluate known and potential risks. Then, it will identify and isolate each unique risk from

---

[181] 29 CFR § 1910.119.
[182] 29 CFR § 1910.119(c)(3).
[183] 29 CFR § 1910.119(d).

the others so that they may each be addressed individually. This allows for each risk to be properly monitored. After that, the risks are designed out of the system. The redesign phase has the potential to introduce new risks that must also be designed out. Those new risks and any risks left in the system will be worked on until there is no reasonable way to design out the risks and maintain the function of the system. From that point onward, it becomes the onus of the operators, who should now understand all the risks to their workers and the public, to properly monitor and protect against the remaining risks. The results of this monitoring program, which should include environmental monitoring and medical surveillance (biological monitoring and medical examinations of workers), should be used not simply to protect workers and the public, but also to confirm the efficacy of the system's safeguards.

251.    It is the vehement contention of the Plaintiffs that Defendants failed to initiate and/or implement a proper safety analysis and program to protect those in and around the FACILITY. Below, in paragraph 253, is an informative flow chart that presents some of the fundamental Safety Engineering steps that are required. OSHA, with its "Standard Duty Clause" (29 U.S.C. § 654(a)) and regulations, clearly establishes the legal duty of

care owed by employers to their employees. In addition, Process Safety Engineering requires the institution of measures designed not only to protect workers but also members of the general public who may be in harm's way.

252.    Process Safety Engineering and established, accepted chemical-handling, and engineering practices comprise critical parts of the applicable standard of care that is required of the chemical industry in protecting both the workers and the general public. These fundamental principles are well-recognized within the chemical engineering community as well as the global chlorine industry.

253.    The following chart was produced with data from 29 CFR § 1910.119, the American Institute of Chemical Engineers (AIChE), Euro Chlor, and The Chlorine Institute.



## Process Safety Engineering

The goal of Process Safety Engineering is two-fold. First, it identifies hazards and determines their likelihood to interact with (i.e., potentially harm) employees. Second, it attempts to design out or protect against those hazards. Ultimately, PSE aims to reduce all risks to an employee's health while working in the analized system. There are many routes that PSEs take. This chart represents a generic path.

## Mercury Exposure – Standards and Limits

*Established Standards and Limits Relative to Mercury Exposure have been Identified by Myriad Regulatory Agencies and Institutes for Decades. These were all Known within the Chlor-Alkali Industry.*

254.    The workroom air standard, or Permissible Exposure Limit ("PEL"), for elemental/inorganic mercury established under the OSH Act of 1970 for airborne mercury is 0.1 mg/m$^3$ as an eight-hour Time-Weighted Average ("TWA").[184] A TWA is used to calculate a worker's daily exposure averaged to an eight-hour workday, taking into account the average levels of the substance and the time spent in the area. The OSHA workplace mercury exposure is not a ceiling PEL, but rather an eight-hour TWA.[185] In 1978, the National Institute for Occupational Safety and Health ("NIOSH") recommended the OSHA PEL for elemental/inorganic mercury be lowered to its own Recommended Exposure Limit ("REL") of 0.05 mg/m$^3$.[186 & 187]

255.    The American Conference of Governmental Industrial Hygienists ("ACGIH") is a private, not-for-profit, nongovernmental corporation whose

---

[184] OSHA, Permissible Exposure Limit (PEL) for General Industry, 29 C.F.R. § 1910.1000 tbl. Z-2 (2024) (see also Directive CPL 2-2.6).
[185] OSHA., Memorandum: PEL for Inorganic Mercury (Corrected 2005).
[186] U.S. Dept of Health & Human Servs., Occupational Health Guideline for Inorganic Mercury (1978).
[187] ACGIH, About the ACGIH (2024).

members are industrial hygienists or other occupational health and safety professionals dedicated to promoting health and safety within the workplace. While ACGIH is not a regulatory or official standards-setting body, regulatory bodies should view the recommendations of ACGIH as an expression of scientific opinion.[188]

256.    Professional industrial hygienists, as defined by the American Industrial Hygiene Association ("AIHA"), "are scientists and engineers committed to protecting the health and safety of people in the workplace and the community. The industrial hygienist is part of a broader family of professionals often referred to collectively as the practice of occupational and environmental health and safety."[189]

257.    ACGIH publishes guidelines known as Threshold Limit Values ("TLVs") and Biological Exposure Indices ("BEIs") to be used by professionals trained in the practice of industrial hygiene.[190] The TLV of a chemical substance is a level to which it is believed a worker can be exposed day after day for a working lifetime without adverse health effects. This level of exposure should be corrected for an extended work shift.

---

[189] Am. Indus. Hygiene Ass'n,, Occupational & Envtl. Health & Safety Careers (2024).
[190] ACGIH, Threshold Limit Values & Biological Exposure Indices (2022).

258.    Since 1994, ACGIH has recommended a TLV of 0.025 mg/m$^3$ as an 8-hour TWA standard for elemental and inorganic mercury.[191]

259.    The ACGIH BEI for mercury in urine and blood are 20 µg/g creatinine and 15 µg/L, respectively. BEI indices are values used by safety and health professionals for guidance in the assessment of biological monitoring results. With respect to mercury exposure, biological monitoring is the measurement of the concentration of a chemical marker in a human biological media that indicates the extent to which mercury exposure has occurred.[192]

260.    The Chlorine Institute ("CI") is an industry trade association of companies that are involved in the production, distribution, and use of chlorine, sodium and potassium hydroxides, and other related chemicals.[193] The CI recommends that mercury-in-air exposures be controlled at 0.05 mg/m$^3$ for an 8-hour work shift. The level of mercury-in-air exposures should be corrected for an extended work shift. As an example, the TWA for a 10-hour work shift would be 0.04 mg/m$^3$ and 0.033 mg/m$^3$ for a 12-hour work shift.[194]

---

[191] N.J. Dept of Health, Hazardous Substance Fact Sheet (2009).
[192] *Ibid.*
[193] The Chlorine Inst., Inc., About Us (2024).
[194] Peter Bellin, Calculations & Occupational Exposure Limits.

261.    The Chlorine Institute also recommends a Short-Term Exposure Level ("STEL") of 0.15 mg/m$^3$. ACGIH defines a Threshold Limit Value – Short-Term Exposure Limit ("TLV-STEL") as a 15-minute TWA exposure that should not be exceeded at any time during a workday even if the eight-hour TWA is within the TLV-TWA. TLV-STEL is the concentration to which workers can be exposed continuously for up to 15 minutes without suffering from irritation, chronic or irreversible tissue damage, dose-rate-dependent toxic effects, or narcosis of sufficient degree to increase the likelihood of accidental injury, impaired self-rescue, or materially-reduced work efficiency. [195]

262.    A summary of the relevant organizations and their established exposure limits for mercury follows:

A. OSHA Permissible Exposure Limit ("PEL")[196]: 0.1 mg/m3

B. NIOSH Recommended Exposure Limit ("REL")[197]: 0.05 mg/m3

    i.    Ceiling: 0.1 mg/m3

    ii.    IDLH: 10 mg/m3

---

[195]ACGIH, Threshold Limit Values & Biological Exposure Indices (2006).
[196] 29 CFR §1910.1000 Table Z-2.
[197] Center for Disease Control and Prevention, DHHS - NIOSH Pocket Guide to Chemical Hazards, Publication No.2005-149, 2007.

C. ACGIH ("mercury-in-air")[198]

    i.    Threshold Limit Value ("TLV-TWA"): 0.025 mg/m3

    ii.    TLV-TWA was lowered from 0.05 to 0.025 mg/m3 in 1994

D. ACGIH ("mercury-in-urine")[199]

    i.    ACGIH BEI: 20 µg/g creatinine

    ii.    BEI was lowered from 35 µg/g creatinine (1993 BEI) to 20 in 2012

E. Chlorine Institute ("CI") ("mercury-in-air")[200]

    i.    8-hour TWA exposure limit: 0.05 mg/m3

    ii.    15-min STEL: 0.15 mg/m3

F. Chlorine Institute ("CI") ("mercury in urine")[201]

    i.    1994 recommendation for removal from Mercury exposure: 200 µg/L

    ii.    CI lowered removal level from 300 µg/L to 200 µg/L in 1994

---

[198] ACGIH TLVs and BEIs Booklet, 2013.
[199] *Ibid.*
[200] Chlorine Institute Pamphlet 125, 1994.
[201] Chlorine Institute Pamphlet 125, 2004.

iii.   2004 recommendation for removal from Mercury exposure: 100 µg/g creatinine

iv.   CI recommends urine samples be standardized to incorporate creatinine levels in 2004.

263.   Through the implementation of a proper Safety Monitoring Program, the over-exposure of workers and their family members can easily be avoided.

**Elemental Mercury Vapor Exposure Limits and Health Effects**[202]

| Exposure Limit | Limit Values | HE Codes | Health Factors & Target Organs |
|---|---|---|---|
| OSHA PEL Construction Industry | 0.1 mg/m$^2$ | HE3 | Gingivitis, Stomatitis |
| | | HE3 | Renal effects: Proteinuria, nephritic syndrome |
| | | HE7 | Erethism |
| | | HE11 | Mercurial pneumonitis |
| | | HE14 | Dermatitis |
| National Institute for Occupational Safety and Health ("NIOSH") | 0.05 mg/m$^2$ | HE3 | Gingivitis, stomatitis accompanied by excess salivation or a metallic taste |

---

[202] OSHA, Sampling & Analytical Methods.

| | | | |
|---|---|---|---|
| Recommended Exposure Limit ("REL") | | HE3 | Renal damage (nephritic edema, nephritic syndrome, renal failure) |
| | | HE7 | Erethism and micromercurialism |
| | | HE10 | Respiratory effects – pneumonitis, bronchitis, chest pains, dyspnea, coughing |
| | | HE14 | Dermatitis, greyish-brown or yellowish haze on the lens of the eye |
| American Conference of Governmental Industrial Hygienists ("ACGIH") Threshold Limit Value ("TLV") (2001) | 0.025 mg/m$^3$ | HE3 | Gingivitis, stomatitis, ocular and vision changes, hearing loss |
| | | HE3 | Renal effects |
| | | HE5 | Teratogenic effects |
| | | HE7 | Central nervous system changes resulting in tremors, emotional instability and irritability, peripheral neuropathy |
| CAL/OSHA PELs | 0.1 mg/m$^3$, ceiling | HE5 | Reproductive effects |

CODES

HE3 – Chronic (Cumulative) Toxicity – Long-term organ toxicity other than nervous, respiratory, hematologic or reproductive

HE5 – Reproductive Hazards – Teratogenesis or other reproductive impairment

HE7 – Nervous System Disturbances – Nervous system effects other than narcosis

HE10 – Respiratory Effects Other Than irritation – Cumulative lung damage

HE11 – Respiratory Effects – Acute lung damage/edema or other

HE14 – Irritation-Eyes, Nose, Throat, Skin – Marked

## Duty of Care—Mandatory Medical Evaluations required by OSHA Standards

264. According to 29 CFR §1910.134(c) employers are required to "develop and implement a written respiratory protection program with required worksite-specific procedures and elements for required respirator use. The program must be administered by a suitably-trained program administrator."[203] Additionally, this section goes on to state that, in any workplace where respirators are "necessary to protect the health of the employee," the employer must produce a workplace specific respiratory protection program (RPP) and that "medical evaluations of employees

---

[203] 29 CFR § 1910.134(c).

required to use respirators" are specifically mandated in 29 CFR §1910.134(c)(1)(ii).[204]

265.   EH&S Guidelines, as specifically defined above pertaining to Process Safety Engineering, accepted chemical-handling, and engineering practices, also mirror those requirements set forth by OSHA. This establishes the standard of care for those within the zone of danger.

266.   Based on the sworn testimony from Plaintiff Workers, OLIN and the CONTRACTOR DEFENDANTS failed to meet the standard of care under the EH&S Guidelines.   *For example, see Affidavits of Jeffrey F. Sloan, Sr., (Exhibit 22), Jennifer L. Lawson (Exhibit 13), and Randy L. Manning (Exhibit 14).*

267.   Plaintiff Randy L. Manning describes the fit testing process this way:

> I was only fit-tested once for my respirator. I had to blow into a spectrometer during a physical to prove that I had the lung capacity to use one. Banana oil was waved in front of the mask to check for leakages. If I could smell that, then that meant it wasn't sealed properly.

Affidavit of Randy L. Manning, Ex. 14, page 7.

---

[204] *Ibid.*

## CHAPTER IX: DEFENDANTS' CONDUCT DEMANDS LEGAL LIABILITY

*This Complaint has introduced the Chlor-Alkali process used at the Augusta FACILITY, the dangers associated with mercury, and the proper safety systems and processes to protect both workers and the public from the harmful effects of mercury exposure. Now, let us turn to specific allegations against Defendants in this matter.*

### Process Hazard Analysis

*OLIN and the CONTRACTOR DEFENDANTS Failed to Properly Conduct a Process Hazard Analysis and, as a direct result, Subjected the Plaintiff Workers to a Dangerous Work Environment, thereby Exposing their Family Members.*

268.    A Process Hazard Analysis ("PHA") or evaluation is one of the most important elements of the OSHA PSM program. A PHA is an organized and systematic effort to identify and analyze the significance of potential hazards associated with the processing or handling of highly-hazardous chemicals.[205] A PHA analyzes potential causes and consequences of fires, explosions, releases of toxic or flammable chemicals, and major spills of hazardous chemicals. The PHA focuses on equipment, instrumentation, utilities, human actions (routine and non- routine), and external factors that

---

[205] 29 CFR § 1910.119.

might affect the process. The PHA will formulate recommendations for appropriate engineering and administrative controls for the production, maintenance, and D&D activities to mitigate an inherent physical or chemical hazard that has the potential for causing harm to people, the environment, or the property.[206]

269.    The failure of Defendants to satisfy requirements for conducting a PHA as part of compliance with PSM standards (29 CFR § 1910.119) in the development of the production, maintenance, and D&D work scope was a breach of Defendants' duty of care owed to Plaintiffs and resulted in dangerous conditions for the workers who were performing said work. Defendants failed to adequately analyze the dangers produced and to effectively prevent exposure to the Plaintiffs. This was a breach of industrial safety practice and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Exposure Assessment and Air Monitoring**

*OLIN and the CONTRACTOR DEFENDANTS failed to Undertake Appropriate Exposure Assessment and Conduct Personnel Air Monitoring, Which Deprived the Plaintiff Workers of Necessary Protections Established by Industry Standards,*

---

[206] OSHA, Process Hazard Analysis, OSHAcademy, Course 736 (2024).

*Regulations, and Organizations that Study Mercury Exposure, Resulting in Plaintiff Workers being Exposed to Toxic Levels of Mercury.*

270.    The first step in protecting workers from hazardous chemicals such as mercury is the Exposure Assessment. 29 CFR § 1910.134(d)(1)(iii), codified since 2006, states, "The employer shall identify and evaluate the respiratory hazard(s) in the workplace; this evaluation shall include a reasonable estimate of employee exposures to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form."

271.    Prior to this regulation, 29 CFR § 1926.103(b)(1), codified in 1971, stated that employers should know and understand the dangers a particular constituent posed to life and health to the extent that they can competently select protective equipment for that condition. 29 CFR § 1910.134(a)(8 and 9) stated, "8. Appropriate surveillance of work area conditions and degree of employee exposure or stress shall be maintained. 9. There shall be regular inspection and evaluation to determine the continued effectiveness of the program."

272.    OSHA requirements for air monitoring are set forth in the Hazardous Waste Operations and Emergency Response standards at 29 CFR § 1910.120(h). Specifically, § 1910.120(h)(1)(i) states that monitoring must

be performed "where there may be a question of employee exposure to hazardous concentrations of hazardous substances in order to assure proper selection of engineering controls, work practices, and personal protective equipment [PPE] so that employees are not exposed to levels which exceed permissible exposure limits [PELs], or other published exposure levels." The regulations also require air monitoring for use in identifying health hazards to determine the appropriate level of PPE. Once the appropriate PPE is selected, personal air sampling should be continued to ensure that personnel exposures do not exceed established exposure limits.[207]

273.    Therefore, based on site, hazard, and exposure-specific considerations, a range of monitoring techniques may be employed to comply with section (h) requirements, to include personal protection equipment decision-making. These techniques might include NIOSH standard methods, direct reading instruments, colorimetric indicator tubes, and other methods appropriate to the site conditions. The OSHA rule directs the conduct of initial, periodic, and ongoing air monitoring for all hazardous substances of exposure concern.[208]

---

[207] EPA, Personal Air Sampling and Air Monitoring Requirements Under 29 CFR 1910.120, EPA Pub. No. 9360.8-1 (1993).
[208] OSHA, Interpretation Letter.

274.    The Chlor-Alkali industry's own Chlorine Institute recommends "that a program of monitoring breathing-zone air mercury concentration be in place and documented" for any employees potentially affected by the volatility of mercury.[209]

275.    According to standards and practices established by NIOSH, a half-face respirator with cartridges appropriate for mercury vapor (except organo alkyl molecules) has an assigned protection factor ("APF") of 10 which means it provides adequate respiratory protection for mercury concentrations in air up to $1.0 \text{ mg/m}^3$. In the context of mercury Chlor-Alkali production, maintenance, and D&D activities, concentrations of mercury in air exceeding this level would likely require the use of a full-face respirator and/or some type of supplied air.[210] Additionally, a half-mask respirator is not recommended for mercury organo alkyl molecules.[211]

276.    29 CFR § 1910.134(d)(1)(iii) also states, "Where the employer cannot identify or reasonably estimate the employee exposure, the employer shall consider the atmosphere to be IDLH." Unknown concentrations or concentrations exceeding $2.5 \text{ mg/m}^3$ should be treated as IDLH conditions,

[209] The Chlorine Inst., Inc., Pamphlet 154: Guidelines for the Handling of Rubber-Lined Cell Parts Potentially Contaminated with Mercury, 1st ed. (1998).
[210] NIOSH, Pocket Guide to Chemical Hazards, Mercury Compounds (Except Organo Alkyls) (2019).
[211] NIOSH, Pocket Guide to Chemical Hazards - Mercury (Organo) Alkyl Compounds (as Hg) (2019).

a situation that would be expected with any torch cutting, welding, or any other hot work taking place in the cell room, or any other area contaminated by mercury.[212]

277.    Pursuant to federal regulations, the employer shall provide the following respirators for employee use in IDLH atmospheres:[213]

   A. A full facepiece pressure demand SCBA certified by NIOSH for a minimum service life of 30 minutes, or

   B. A combination full facepiece pressure demand supplied-air respirator (SAR) with auxiliary self-contained air supply.

278.    At the FACILITY, an exposure assessment and personnel monitoring program should have been conducted for all activities taking place throughout the FACILITY where mercury exposure was probable. The exposure assessment and personnel monitoring program was necessary to quantify mercury exposure levels to ensure that workers wore the correct level of respiratory protection. As shown by the testimony of the Plaintiff Workers, proper industrial hygiene exposure assessments and personnel monitoring were not routinely conducted at the FACILITY by OLIN and/or

---

[212] NIOSH, Pocket Guide to Chemical Hazards, Pub. No. 2005-149 (2007).
[213] 29 C.F.R § 1910.134(d)(2).

the CONTRACTOR DEFENDANTS in accordance with 29 CFR §
1910.120(h) and 29 CFR § 1910.134.

279.    The failure of OLIN and/or the CONTRACTOR DEFENDANTS to
perform an exposure assessment including personnel air monitoring is a
failure to quantify and mitigate hazardous workplace conditions which
denied the Plaintiff Workers the protections afforded by the standard of care
duly established by industry standards, applicable regulations, and
recommendations of scientific organizations.

280.    The failure of OLIN and/or the CONTRACTOR DEFENDANTS to
establish adequate workplace controls, engineering, administrative, and
PPE, as part of an industrial hygiene exposure assessment of the workplace
resulted in a failure to properly recognize, evaluate, and control hazardous
workplace conditions to which the Plaintiff Workers were exposed during
operations.

281.    This failure of OLIN and/or the CONTRACTOR DEFENDANTS to
meet the standard of care for worker protection resulted in unknown worker
exposures to mercury. Unless they had quantified the mercury-in-air
concentrations during operations, OLIN and/or the CONTRACTOR
DEFENDANTS should have known to treat the workplace atmosphere as

IDLH until mercury-in-air concentrations were known for the work scope being performed by accepted methods of measurement.

282.    OLIN and/or the CONTRACTOR DEFENDANTS should have known to provide employees with respirators that were "applicable and suitable" for the purpose intended, i.e., for the protection of employee health. Defendants failed to provide employees with such respirators. The failure of Defendants to perform worker exposure assessments and the failure of Defendants to require the performance of exposure assessments was a breach of Defendants' duty of care and resulted in unquantified mercury exposures and injury to the Plaintiff Workers at the FACILITY.[214]

283.    These failures by Defendants constitute a breach of industrial safety practice and legally constitute a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

284.    Plaintiff OLIN Worker William J. Elmore worked at the FACILITY from 2010 to approximately 2017. Elmore explains his experience this way:

> Periodically, OSHA would come for a "surprise" inspection. I used to think it was funny when my boss, Mr. Adkinson, would tell me that we were having a surprise inspection in three days. It was never a surprise. He would have me use some caustic to clean the floors and everyone pitched in to do a thorough, but quick clean-up of the Cell

---

[214] OSHA., CPL 02-00-124 Multi-Employer Citation Policy (1999).

House. It was mostly just so the visiting inspectors could look at it from outside. Most of them never came inside because they did not want to put on the extra PPE required to enter. We were instructed not to let an inspector in if he or she was not wearing the required PPE. When inspectors did come in, the FACILITY did not want us to talk to them any more than necessary. Mr. Adkinson told us to be nice and answer a question or two, before saying something like, "I am sorry. This work is a little dangerous and I need to keep my focus on what I am doing." I never had to use that line. There was an unused office upstairs with a few chairs and blinds in the windows. We could hide in there so we did not have to be on the floor or in the break room where inspectors might ask us questions. Most of us just stayed in there and napped or played cards until the inspectors left.

Elmore Aff, Ex. 7, page 8.

**Worker Protection Should Have Been Insured Through a Properly Implemented Medical Surveillance Program**

*A Medical Surveillance Program Should Have Been Implemented to Ensure Workers Exposed to Mercury Were Not Experiencing Adverse Health Effects.*

285.    Medical Surveillance Programs, a cornerstone of proper industrial protection for employees in hazardous industries, are a multi-faceted approach to maintaining and protecting human health. These programs can be broken down into Biological Monitoring (the regular and routine sampling of various media from the human body), Medical Examinations (regular treatment and assessment by a qualified medical professional),

Baseline Physiological Assessments (collection of medical, biological, and psychological data prior to exposure), Post-Exposure Assessments (collection of medical, biological, and psychological data after exposure), and various comparisons between an employee's medical results and known variables in the environment.

286.    The goal of medical surveillance programs is to monitor human health in environments where exposure to toxic substances is likely and, if exposure does occur, catch it early enough to enable effective medical interventions to mitigate injury. Therefore, these programs function as the backstop to the various on-site environmental monitoring programs that should determine the possible severity and likelihood of exposure.

287.    Biological monitoring refers to any number of laboratory tests, including urinalysis, that are used to detect the level of mercury in or leaving the employee's body. Medical Examinations refer to assessments of an employee by a qualified medical professional.[215]

288.    Per NIOSH, the following tests are indicated for employees exposed to organo alkyl mercury compounds: Body Hair Sampling, Whole Blood (Chemical/Metabolite) Tests, Biologic Tissue/Biopsy, Blood Urea Nitrogen

---

[215] OSHA, Medical Screening and Surveillance (n.d.).

Test, Neurologic Examination/Electromyography Tests, Urine (Chemical/Metabolite) Tests, and Urinalysis (Routine) Tests.[216]

289.    Per NIOSH, the following tests are indicated for employees exposed to organo alkyl mercury compounds: Body Hair Sampling, Whole Blood (Chemical/Metabolite) Tests, Neurologic Examination/Electromyography Tests, Urine (Chemical/Metabolite) Tests, and Urinalysis (Routine) Tests.[217]

290.    A Medical Surveillance Program is required to be established for employees, including contract employees, who are or will be exposed to airborne concentrations of mercury vapor or dust or its inorganic compounds above the PEL.[218] The potential for exposure to mercury is to be determined by the exposure assessment.[219] The program should provide each employee with an opportunity for biological monitoring and medical examination performed by or under the supervision of a licensed physician and provided during the employee's normal working hours without cost to the employee.[220 & 221]

---

[216] NIOSH, Specific Medical Tests or Examinations Published in the Literature for OSHA-Regulated Substances, Pub. No. 2005-110 (2005).
[217] *Ibid.*
[218] OSHA, Medical Screening and Surveillance (n.d.).
[219] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (4th ed. 2004).
[220] OSHA., Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).
[221] Euro Chlor, Determination of Mercury and Creatinine in Urine, Analytical 11, 1st ed. (2007).

291.    Medical surveillance should be under the overall direction of a qualified physician.[222 & 223] Portions of the program can be implemented by a qualified medical professional. The interpretation of the group medical surveillance data should be undertaken only by a trained occupational health physician or other physician with expertise in performing such analyses. The results of the physical examinations should also be evaluated on a group basis. This is important because early mercury poisoning might cause only very mild, clinically-insignificant increases in symptomatology in each case which, when seen in the aggregate, might nonetheless provide an important clue that toxic exposure to mercury is taking place.

292.    The minimum requirements for a medical surveillance program are defined by OSHA. [224]

**Baseline Medical Examination**

293.    According to OSHA, an initial (baseline) medical examination should be performed on all employees exposed to potentially hazardous levels of mercury. This baseline examination will provide a reference for comparison of future health monitoring.[225]

---

[222] *Ibid.*
[223] Euro Chlor, Audit Questionnaire Mercury, Health 6, (2nd ed. 2006).
[224] *Ibid.*
[225] *Ibid.*

294.    The examination should include a complete medical history and symptom work-up, with emphasis on the nervous system (target organ system for chronic exposure), the kidneys (target organ for acute and chronic exposure), the oral cavity (target region for chronic exposure), the lungs (target organs for acute exposure), the eyes (affected by chronic exposure), and the skin (mercury is a known skin sensitizer). Examinations should perform testing for symptoms of the earliest stages of mercury exposure; these include personality changes, weight loss, irritability, fatigue, nervousness, loss of memory, indecision, and intellectual deterioration. Complaints of tremors and loss of coordination should also be thoroughly examined. Physical examinations should include the target organs described above. [226]

295.    In addition to the physical examination, a baseline handwriting sample should be obtained, and any laboratory evaluation should include, at minimum, a complete urinalysis (UA Test).[227]

---

[226] *Ibid.*
[227] *Ibid.*

**Routine Medical Examination**

296.    Once the baseline has been identified, routine medical examinations should be repeated annually. Results should be compared with the findings on the baseline examination for changes indicative of mercury toxicity. Handwriting samples should be compared to the baseline sample for evidence of tremors. Interim evaluations should be conducted if symptoms suggestive of mercury intoxication are occurring.[228]

297.    Each employer is required under OSHA to make available or provide a medical examination for employees exposed, or potentially exposed, to mercury. These examinations typically should include a complete medical history, a physical examination, a complete blood count, a routine urinalysis (specific gravity, sugar, protein determinations, and microscopic examination), and a voluntary pregnancy test, where appropriate.

298.    Medical examinations should be made available under the following non-routine conditions:

- To employees prior to their assignment to areas where airborne concentrations of mercury are above the permissible exposure limit;

- At least annually for each employee exposed to airborne concentrations of mercury or its inorganic compounds above the

---

[228] *Ibid.*

permissible exposure limit at any time during the preceding six months;

- For each employee whose urine analysis sampling series indicates elemental mercury level at or above 0.02 mg per liter of urine or total mercury level in excess of .200 mg per liter of urine, which is not receding;

- Immediately upon notification by the employee that the employee has developed signs or symptoms commonly associated with toxic exposure to inorganic mercury or its compounds.[229]

299.    Where medical examinations are performed, the employer should provide the examining physician with the following information:

- The reason for the medical examination requested;

- A description of the affected employee's duties as they relate to the employee's exposure;

- A description of any personal protective equipment used or to be used;

- The results of the employee's exposure measurements, if available;

- The employee's anticipated or estimated exposure level;

- The results of the employee's biological monitoring; and

---

[229] *Ibid.*

- Upon request of the physician, information concerning previous medical examination of the affected employee.[230]

**Biological Monitoring Program**

300.    Biological monitoring is a necessary element of a proper Medical Surveillance Program. However, biological monitoring is meant to complement, not substitute for, industrial hygiene exposure assessment.[231] Urine sampling and analysis is the appropriate biological monitoring method used in order to verify that the respiratory protection program is working properly. The method of analysis for total, ionic, and elemental mercury in urine is described in the American Industrial Hygiene Association Journal, September 1974, pp. 576-580. For the analysis at least 100 mL of urine should be collected during a workday when sampling is scheduled.

301.    Even if OLIN and/or the CONTRACTOR DEFENDANTS had an effective medical monitoring program, they knew or should have known of the need to continue the medical monitoring program after the use of mercury at the FACILITY was discontinued. They should have adopted the CI document Pamphlet 125, "Guidelines – Medical Surveillance and

---

[230] *Ibid.*
[231] The Chlorine Inst., Inc., Pamphlet 156: Guidelines to Physicians in Conducting Mercury Medical Surveillance Programs (1998).

Hygiene Monitoring Practice for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry." This document establishes the following requirements for a medical surveillance program.[232]

302.    A Medical Surveillance Program should be established for workers, including employees of contractors, who have the potential for exposure to mercury as determined by the exposure assessment. The medical surveillance program should be under the overall direction of a qualified physician. Many portions of the program can be implemented by any qualified medical professional. The detailed nature of pre-placement and periodic physical examinations is left to the professional judgment of the physician. The physician should be knowledgeable about both the job requirements and the health effects of mercury. Participation should be based on potential for exposure (e.g. job classification) or an appropriate alternative method. The medical examinations should:

- Be performed by a qualified medical professional experienced in addressing occupational medicine and mercury related issues;

- Include pre-placement, periodic (e.g., annual), and exit-from-program exams for all participants; and

---

[232] The Chlorine Inst., Inc., Pamphlet 125: Guidelines for Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (2004).

- Include employees who may have been exposed to relatively large quantities of mercury during an emergency such as a massive spill or fire.

**Medical Surveillance and Biological Monitoring – Early Detection**

303.    To detect the adverse effects of mercury exposure as early as possible, at a stage where the damage is still reversible, a physical examination must be performed. The physical examination program should be integrated with industrial hygiene and biological monitoring information. Biological monitoring is also an integral part of the medical review and surveillance program.[233]

304.    OLIN and the CONTRACTOR DEFENDANTS failed to perform pre-placement biological baselines for workers such that the levels of exposure could be determined, as required by the EH&S Guidelines. Defendants failed to perform follow-up physicals for workers exposed to or potentially exposed to mercury. The results of the workers' biological monitoring program were not provided to occupational medicine professionals for evaluation contrary to OSHA regulations and other accepted standards of

---

[233] *Ibid.*

care.[234 & 235] No adequate yearly exams after hiring were performed on most of the Plaintiffs, and no post-employment medical monitoring (exit examinations) were performed to evaluate the health of former workers following acute and chronic exposures to mercury.

305.    Upon the completion of the employee's physical examination, a qualified medical professional's opinion is to be written addressing the following:[236]

- The ability of the affected employee to perform the work with the appropriate personal protective equipment including respiratory protection;

- Any limitations in the ability of the employee to perform the work or use any necessary personal protective equipment should be discussed; and

- Whether the employee has any medical condition that would place him/her at risk of health impairment from exposure to mercury.

306.    If the routine medical surveillance and non-routine medical review (first screening level) reveal objective signs compatible with mercury absorption, referral to an appropriate specialist may be considered for

---

[234] OSHA., OSHA Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).
[235] The Chlorine Inst., Inc., Pamphlet 125: Guidelines for Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (2003).
[236] *Ibid.*

verification (second level). More complex diagnostic procedures or referrals to third-level specialists, such as a specialist in Occupational Neurology, may be required for more complex cases.[237]

307.    Defendants had a duty to implement a proper medical surveillance program under the direction of a physician or other qualified health professional. The failure to do so created a dangerous condition for workers.

308.    Defendants failed to perform proper pre-placement biological baselines to establish baseline levels of mercury in urine for workers performing work. Such a failure resulted in the levels of exposure going undetected, which created a risk of injury and a dangerous condition for workers.

309.    Defendants had a duty to properly perform follow-up physicals to evaluate the acute and chronic exposures to mercury. Their failure to do so created a dangerous condition for these workers.

310.    Defendants had a duty to perform proper post-employment medical monitoring. No exit medical examinations were performed to evaluate the health of former workers following acute and chronic exposures to mercury. Defendants' failure to do so created dangerous conditions for workers.

---

[237] *Ibid.*

311.    Defendants had a duty to provide proper written opinions following medical surveillance and non-routine medical reviews. Defendants' failure to do so created a dangerous condition for workers.

312.    Upon information and belief, some of these Defendants improperly performed incomplete portions of a medical surveillance program. Nevertheless, failure to select and properly perform a complete medical surveillance program, was a breach of Defendants' duty of care, which proximately caused the injuries suffered by the Plaintiffs.

313.    Defendants' failure to properly institute a complete and effective Medical Surveillance Program constituted a breach of industrial safety practice and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Written Respiratory Protection Program**

*EH&S Guidelines Required Defendants to Establish a Written Respiratory Protection Program to Ensure Respirators Used by Workers are in Proper Form, Free from Mercury Contamination, and Effectively Used in the Field.*

314.    OSHA regulation 29 CFR § 1910.134(c)(2)(ii) states that "the employer must establish and implement those elements of a written respiratory protection program necessary to ensure that any employee using a respirator

voluntarily is medically able to use that respirator, and that the respirator is cleaned, stored, and maintained so that its use does not present a health hazard to the user." Also, 29 CFR § 1910.134(h)(1) states that "the employer shall provide each respirator user with a respirator that is clean, sanitary, and in good working order. The employer shall ensure that respirators are cleaned and disinfected using the procedures in Appendix B-2 of this section, or procedures recommended by the respirator manufacturer, provided that such procedures are of equivalent effectiveness.[238 & 239]

315.    Respirators may be washed by hand or in the respirator washer. When it is suspected that respirators have been contaminated by mercury-contaminated materials, workers should use Mercon™ wipes to clean the respirator surface before placing it in the washer. Respirators are to be washed in the respirator washer after the Mercon wipe is applied. Escape respirators for SCBAs can be decontaminated by using Mercon wipes on the outside shell. Anything other than bleach and water on the mouthpiece should not be used.

---

[238] 29 C.F.R. §1910.134.
[239] 29 C.F.R. §. 1910.134 App B2.

316.    The failure of Defendants to create and implement an adequate written Respiratory Protection Program constituted a breach of Industrial Safety Practice and legally constitutes a breach of the duty of care owed to Plaintiffs, which proximately caused their injuries.

**Appropriate PPE Protection**

*The Dangers of Mercury are so Significant that Personal Protective Equipment Must be Worn by all Individuals Working in Close Proximity to Mercury.*

317.    In addition to respiratory protection, protective clothing necessary to prevent dermal exposure to mercury was regulatorily mandated. Again, sworn testimony establishes that many of the Plaintiff Workers were not provided with appropriate protective clothing while working in and around mercury hazards. For example, Plaintiff Contractor Worker William J. Elmore says:

> When I worked with the General Maintenance and Construction crew, I was allowed to wear my personal work clothes and not required to shower before leaving the FACILITY. Whatever stains or contaminants got on me during a workday went home with me. All those pipes we replaced were supposed to be completely evacuated before we started cutting on them, but there was normally some residual material. It could have been mercury, chlorine, caustic, or other chemicals. It was not in tremendous amounts, like in the Cell House, but it was there. Those

> personal work clothes got washed and dried at home along
> with the rest of my family's clothes.

Elmore Aff, Ex. 7, page 9.

318.    For those provided with clothing, this clothing was particularly
unsuited and created additional exposure hazards. Many of the uniforms
provided were made of a cotton blend material. This material is highly
absorbent. As mercury vapor filled the air in and around the employee
workers, this vapor was absorbed into the clothing tasked with protection.
Thus, unbeknownst to Plaintiffs, the clothing worn became a source of
mercury vapor exposure. These workers were walking around in a plume of
mercury vapor sourced by the clothes they were wearing.

319.    Compounding the contamination was the fact that many of these
contaminated uniforms were laundered together. While washing these
uniforms together, they were cross-contaminating each other. The washing
machines and dryers were also being cross-contaminated, thereby
contaminating all that was washed therein. Therefore, for those Plaintiff
Workers who were provided uniforms, these uniforms were contaminated
with mercury and were another source of mercury exposure to these Plaintiff
Workers.

320.     This is supported by the testimony of Plaintiff Workers. Here is how

Plaintiff OLIN Worker Jennifer L. Lawson describes her use of uniforms:

> I was never offered much instruction where Personal
> Protective Equipment was concerned. I carried my steel-
> toed boots and a pair of safety glasses with me every time
> I went to work at the Augusta FACILITY. I did not usually
> carry a respirator with me. Chlorine escape respirators
> were available in certain areas at the FACILITY, if I
> needed one. The escape respirators were a small, in-mouth
> type. It did not cover any of my face. It was like a big
> single-filter pacifier. Spare rubber boots were also stored
> in the Lab if I needed to use them. Mercury was not
> discussed. No one ever offered me mercury filters to put
> in my respirator, only chlorine. No one ever told me that I
> had to wear a respirator when production was going on in
> the Cell House. I usually wore rubber gloves, or at least a
> rubber glove if I was out of the Laboratory collecting
> samples. I had my hard hat and safety glasses. I had proper
> footwear on. I had my escape respirator on my hip, but that
> was it. Noone ever told me I needed anything further.
> Incidentally, I never once used that escape respirator. It
> was never inspected, upgraded, or checked in any way. I
> do not even know if it worked. I never had it in my mouth.
> There was no additional PPE offered or required when I
> worked at the Augusta FACILITY. As far as I know, I was
> wearing the proper PPE. I was never told otherwise.

Lawson Aff, Ex. 13, pages 5 and 6.

321.     Plaintiff Contractor Worker Alex S. Shaw explains the uniform process

this way:

> OLIN provided us with fresh coveralls to wear daily and
> rubber boots to wear, as needed. We already had the
> prerequisite hard hats, eye protection, and steel-toed work

> boots. Our half-face respirators were fitted with asbestos filters since that is what we were there to work with.

Shaw Aff, Ex. 20, page 2.

> My coworkers and I already had asbestos removal certifications which we received from a third-party contractor through PEN. I cannot recall the name of the company, but our instructor's name was Bob. We called him Bermuda Bob because that island is where he was originally from and still had a home there. There was no additional training offered in Augusta. We had the same morning safety briefing every day. They talked about checking electrical cords, harnesses, and other equipment for wear and tear. They talked about reportable injuries. They did not talk about the mercury that was still in puddles on the Mercury Cell House floor or any further discussion concerning fugitive mercury.

Shaw Aff, Ex. 20, page 2.

322.    Defendants, by implementing a defective and inadequate PPE program, directly increased the mercury exposure suffered by the Plaintiff Workers. When working in the presence of mercury, protection is required for the eyes, face, and any additional exposed skin. Respiratory protection is also necessary for Plaintiff Workers, and only those respiratory protection devices which meet the minimum respirator and filter requirements set by the National Institute of Occupational Safety and Health under the provision of 42 CFR Part 84 should be used.[240, 241, & 242] For the protection of the eyes,

---

[240] 42 C.F.R. § 84 4.
[241] 42 C.F.R. § 84 (2024).
[242] 42 C.F.R. § 84 (1997).

chemical safety goggles are required. A face shield (with safety goggles) may also be necessary. There should also be an established in-FACILITY procedure with means and facilities provided to issue respiratory protective equipment, to return used contaminated equipment, to decontaminate and disinfect the equipment, and to repair or exchange damaged equipment.[243]

323.    This is supported by the testimony of Plaintiff Contractor Workers. Here is how Plaintiff Contractor Worker Jeffery L. Keller describes his use of cartridges for his respirator:

> Working on an open cell was the only time the FACILITY required that we wear a respirator. It was so hot, and I got so sweaty that it was hard to keep the respirator in place and impossible to keep it sealed. It just slid around like an egg on Teflon.

Keller Aff, Ex. 10, page 3.

Plaintiff Contractor Worker Riley J. Collins describes his use of cartridges for his respirator like this:

> To my understanding, my cartridges were for chlorine. Since I was not informed of the possibility of mercury exposure, I would not have known if my cartridges were also for mercury. I was not required to wear any specific PPE for line breaks.

Collins, Aff, Ex. 6, page 3.

---

[243] OSHA, Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).

324.    When working in the presence of mercury, clothing which protects the skin is necessary. An evaluation of hazards and exposure assessment must be conducted to establish which protective measures to assign for the task. In some operations, it may be necessary to wear a chemical protective, full-body-encapsulating suit and self-contained breathing apparatus (SCBA) or supplied air respirator.

325.    NIOSH recommends the following respiratory protection options provided all respiratory protection equipment and filter media are NIOSH-approved:

- For the presence of organo alkyl mercury compounds in the air at a concentration not to exceed 0.1 mg/m$^3$, or the presence of up to 1.0 mg/m$^3$ of elemental mercury, any air-purifying half-mask respirator operated in continuous-flow mode with appropriate cartridge(s) and end-of-service life indicator ("ESLI"), or a supplied air respirator can be utilized; up to 0.25 mg/m$^3$ of organo alkyl mercury compounds or 2.5 mg/m$^3$ elemental mercury, any supplied-air respirator operated in a continuous-flow mode or any powered air-purifying respirator with appropriate cartridge(s) and ESLI can be utilized;

- Up to 0.5 mg/m$^3$ organo alkyl mercury or 5.0 mg/m$^3$ elemental mercury, any air-purifying full-facepiece respirator equipped with cartridge(s) and ESLI, or any air-purifying, full-facepiece respirator (gas mask) with a chin-style, front- or back-mounted canister and

ESLI, or any supplied-air respirator that has a tight-fitting facepiece and is operated in a continuous-flow mode, or any powered air-purifying respirator with a tight-fitting facepiece and appropriate canister, or any self-contained breathing apparatus with a full facepiece, or any supplied-air respirator with a full facepiece can be utilized;

- Up to 2 mg/m$^3$ of organo alkyl mercury or 10 mg/m$^3$ elemental mercury, any supplied-air respirator operated in a pressure-demand or other positive-pressure mode, or any self-contained breathing apparatus that has a full facepiece and is operated in a pressure-demand or other positive-pressure mode, or any supplied-air respirator that has a full-facepiece and is operated in a pressure-demand or other positive-pressure mode in combination with an auxiliary self-contained breathing apparatus operated in pressure-demand or other positive-pressure mode can be utilized.[244 & 245]

326.    For much of the work Plaintiff Workers were doing, they were not required to wear their assigned half-mask respirators. Furthermore, many were not instructed on the proper replacement protocols for the mercury cartridges, proper cleaning, or proper storage of their masks. Based upon sworn testimony, much of the maintenance required "Hot Work". This work

---

[244] NIOSH, Pocket Guide to Chemical Hazards, Mercury Compounds (Except Organo Alkyls) (2019).
[245] NIOSH, Pocket Guide to Chemical Hazards - Mercury (Organo) Alkyl Compounds (as Hg) (2019).

elevated the mercury vapor exposure, thus requiring supplied air respiratory protection. This higher grade of protection was often not provided.

327.    Plaintiffs were often required to use "Shop Vacs" to vacuum mercury. This was often done with no respiratory protection. Such work, again, should have required supplied air respiratory equipment.

328.    Evidence of this is found in the testimony of Plaintiff Contractor Worker Timothy K. Kelley. He says this about vacuums:

> There were literally tons of equipment that we just pressure washed and put into a container. This equipment still had mercury on it, or in it. Sometimes the containers we put the equipment in would leak mercury while we loaded it onto a truck. Mercury would continue to leak as the truck went down the road. I have watched grown men, with a regular old Shop-Vac, vacuum mercury off the road as the dripping truck rolled offsite. I continued to wear my respirator inside the building until they took all the siding off the walls. After that nobody wore one. It was all considered outdoors then.

Kelley Aff, Ex. 11, page 3.

329.    Plaintiff Contractor Worker William J. Elmore further describes the FACILITY's use of a Shop-Vac:

> The cells were on a second-floor mezzanine and mercury ran down the steel girders and cross beams until it landed on the basement floor. There were buckets scattered throughout the building, catching mercury as it leaked from pipes or pumps. They had to be constantly monitored and swapped out because mercury is so heavy it could deform and burst a plastic bucket if we let it get much more

> than half full. There was always mercury on the floor. We would suck it up with a Shop-Vac until it started getting too heavy. Then we would dump the mercury back into one of the decomposers to be reused. We did not have the equipment designed to work with heavy metals. We just had a regular Shop-Vac.

Elmore Aff, Ex. 7, page 2.

330.    The failure of Defendants to create and implement a proper PPE Program constituted a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Job Safety Analysis Program**

*Defendants Failed to Properly Implement a Job Safety Analysis Program Resulting in Plaintiff Workers being Exposed to Toxic Mercury.*

331.    Job Safety Analysis ("JSA") is an OSHA procedure that helps integrate accepted safety and health principles and practices into a particular task or job operation. In a JSA, each basic step of the job is analyzed to identify potential hazards and to recommend the safest way to do the job.[246]

332.    A properly-performed JSA will identify hazards and increase the job knowledge of workers. An exposure assessment, which is the process of

---

[246] OSHA, Job Hazard Analysis, OSHA 3071 (rev. 2002).

estimating or measuring the magnitude, frequency, and duration of exposure to mercury, is a necessary component of the JSA. An exposure assessment will identify the number and characteristics of the workers that may be exposed. The exposure assessment will also describe the sources, pathways, routes, and uncertainties in the assessment. A JSA with an exposure assessment will elevate the safety and health awareness of the job to be performed, improve the communication between workers and supervisors, and promote the acceptance of safe work procedures.[247]

333.    A JSA, or better still, a written work procedure based on it, can form the basis for regular contact between supervisors and workers. It can serve as a teaching aid for initial job training as well as a briefing guide for infrequent jobs. It may be used as a standard for health and safety inspections or observations, and a JSA will assist in completing comprehensive accident investigations.

334.    The four basic stages in conducting a JSA are as follows:

A. Selecting the job to be analyzed;

B. Breaking the job down into a sequence of steps;

C. Identifying potential hazards;

---

[247] *Ibid.*

D. Determining preventive measures to overcome these hazards.

335.    Based upon sworn testimony, there was some form of Job Safety Analysis Program initiated by some of the Defendants. Nevertheless, it is clearly proven to have been ineffectual since high mercury exposure work was being performed without the proper PPE. The current assignment of and required wearing of appropriate PPE is the product of the Job Safety Analysis Program. Failure to require proper PPE is prima facie evidence of an improper Job Safety Analysis Program.

336.    The sworn testimony shows that the PPE requirements were poorly managed in multiple departments of the FACILITY.

337.    Plaintiff Contractor Worker William J. Elmore had this to say about the lack of requirements for a respirator when working in the Cell House:

> If I was working on an open cell, or there was one nearby, I had my mask on. If all cells were closed and the Testing and Laboratory guys said the air quality was "good" enough, we could take our masks off. That combination did not happen very often. The full-face was for emergencies. I was told to keep it in my locker and that I would be notified if I needed it. I do not remember ever putting it on other than to test it when it was first issued to me.

Elmore Aff, Ex. 7, pages 5 and 6.

338.    Here is how Plaintiff Contractor Worker Timothy K. Kelley describes his use of cartridges for respirators:

"I was not given any mercury filters to use with my respirator. Chlorine filters were the only ones made available to us."

Kelley Aff, Ex. 11, page 3.

339.    At this time, it is unknown the extent to which the JSA process was followed at the FACILITY. Regardless, OLIN and the CONTRACTOR DEFENDANTS knew or should have known that their implementation, if any, of the JSA process was not effective to identify potential hazards and to ensure the jobs at the FACILITY were performed in the safest possible way.

340.    The failure of OLIN and the CONTRACTOR DEFENDANTS to implement an effective Job Safety Analysis Program constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Chemical Safety Training – Mercury**

*Due to the Extremely Dangerous Nature of Mercury, Defendants were Required to Undertake Extensive Safety Training of its Workers Relative to Chemicals Present at the FACILITY, Including, but not limited to, Mercury.*

341.    Safety Training and Education is required under OSHA Standard 1926.21, "Safety Training and Education." Standard 1926.21(b)(2) states that "the employer shall instruct each employee in the recognition and

avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury." [248] Such programs as may be necessary to comply with OSHA Standard 1926.21 shall provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to workers, and who have authorization to take prompt corrective measures to eliminate them, designated by the employers.

342.    Further, this standard also specifically mentions in 1926.21(b)(3) that "[e]mployees required to handle or use poisons, caustics, and other harmful substances shall be instructed regarding the safe handling and use, and be made aware of the potential hazards, personal hygiene, and personal protective measures required."[249]

343.    An employer who has a workplace in which elemental mercury or its inorganic compounds are stored and used, and where airborne mists, fumes, vapors, or dusts may be accidentally or intentionally produced and released

---

[248] OSHA, Training Requirements in OSHA Standards and Training Guidelines, OSHA 2254 (1998).
[249] *Ibid.*

in the work environment due to handling, storage, or use is required by OSHA to inform employees who work or will be working with mercury or its inorganic compounds occasionally of potential health hazards.[250] Employers are required by OSHA to provide and perform the following:[251]

A. Inform employees of the correct work and storage practices, written emergency procedures to be followed in case of spills or leaks, and the personal protective equipment necessary in emergencies;

B. Provide employees equipment and/or materials necessary to control mercury-containing spills or leaks in quantity sufficient to control the entire amount of mercury or compound used;

C. Provide written procedures and means for removal of mercury or its compounds from body surfaces and working surfaces, machinery, or tools to be used later for other work activities;

D. Establish limited areas within the workplace where mercury or its compounds can be used; and

E. Assure that the permissible exposure limit is not exceeded in the work environment during the occasional uses.

---

[250] OSHA, Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).
[251] *Ibid.*

344.    Employees are to be trained at the time they are assigned to work with a hazardous chemical such as mercury.[252] The intent of Hazard Communication, the act of informing persons likely to come into contact with a hazardous substance about the dangers it may present and how they might be exposed, is to provide information to the employee prior to exposure to prevent the occurrence of adverse health effects. The training provisions of Hazard Communication are not satisfied solely by giving employees the Safety Data Sheets ("SDS") to read.[253] An employer's training program is to be a forum for explaining to employees not only the hazards of the chemicals in their work area, but also how to use the information generated in the Hazard Communication Program. This can be accomplished in many ways (audiovisuals, classroom instruction, interactive video) and should include an opportunity for employees to ask questions to ensure they understand the information presented to them. Training does not need to be conducted on each specific chemical found in the workplace but may be conducted by categories of hazard (e.g., carcinogens, sensitizers, acutely toxic agents) that are or may be encountered

---

[252] 29 CFR § 1910.1200(h).
[253] *Ibid.*

by an employee during the course of their duties. Furthermore, the training must be comprehensible.

345.    With respect to mercury, the training program should:

- Advise the affected employees of the signs and symptoms of over-exposure to mercury;

- Instruct affected employees to advise the employer of the development of the signs and symptoms of overexposure to mercury;

- Inform employees of the specific nature of operations which could result in exposure to mercury above the permissible exposure limit, as well as safe work practices for the handling, use, release, storage, or disposal of the mercury or its compounds in normal operations;

- Instruct employees in proper housekeeping practices, decontamination procedures in the event of a mercury or mercury compound spill, and fire emergency procedures;

- Emphasize the possibility of ingesting mercury by hand-to-mouth contact when good personal hygiene is not practiced;

- Inform employees of measures necessary to protect them from exposures in excess of the permissible exposure limit. The wearing and turning-in of protective clothing should be stressed;

- Instruct employees as to the purpose, proper use, and limitations of respirators;

- Provide employees with a description of, and explain the purposes for, the medical surveillance program; and

- Inform employees where written procedures and hazard information are available on the premises.

346.    Based upon sworn testimony, a complete and full disclosure of the hazards of mercury was never provided to Plaintiff Workers. Quite the contrary is true. Plaintiff Workers were assured that the mercury at the FACILITY would not harm them. They were further assured that if they were to be exposed, the levels of their exposure would not harm them. OLIN and the CONTRACTOR DEFENDANTS knew these statements were false when they were made, and Plaintiffs justifiably relied on them in continuing to work at the FACILITY.

347.    Eric P. Holman, the Plaintiff OLIN Worker we have heard from on other issues, said it this way:

Having standard operating procedures for PPE in certain jobs, and having Earl Hilson, who ran the FACILITY safety training, tell me when I should wear my half-mask dual-cartridge respirator, made me feel safe. I thought, then, that the officials in charge of safety must know what would be safe for me, because they were the experts. I never even thought about the possibility that I could have

been endangering myself or my family just by doing my job. I thought that I was safe because I was following all the rules.

Holman Aff, Ex. 9, page 8.

348. Plaintiff Contractor Worker Jeffrey F. Sloan discussed his Safety Training as a new hire this way:

During orientation after I was hired in, I was given a safety book about as big as my hand. It had different safety topics. In the conference room, Earl Hilson, the FACILITY Manager, read out of the book and showed slides for the different topics. Every month, there would be a safety meeting for contractor construction workers. Bobby Adkinson, my contractor Supervisor, ran it for us most of the time, and Earl Hilson and Andy Lowe, both FACILITY officials, ran it a few times. About twice a year, there were meetings on mercury and chlorine safety. I remember the mercury safety meetings being about PPE to wear around mercury. No one laid out the details of the dangers of mercury exposure. The FACILITY's main concern was exposure to chlorine. There was significantly less emphasis on mercury exposure.

Sloan Aff, Ex. 22, page 5.

349. Plaintiff Contractor Worker William J. Elmore had a similar experience.

Elmore trusted what he was told about mercury:

My Cell House Supervisor, Bobby Adkinson, used to tell us that mercury would never be an issue if we wore the PPE we were supposed to and when we were supposed to. "Just follow what we tell you, keep yourself protected, and you'll be all right," he would say to us regularly.

Elmore Aff, Ex. 7, page 10.

350.    Plaintiff Contractor Worker Lance M. Hieke sums it up this way:

> Nurse Cynthia Williams told me that if I practiced good hygiene, my mercury levels would be fine, and that high mercury levels were due to bad hygiene. The hygiene she was referring to was showering when required at the FACILITY and washing our hands. I did this.

Hieke Aff, Ex. 8, page 5.

351.    Informative training and information were clearly not provided to the Plaintiff Workers; quite the contrary is evidenced. Defendants fraudulently informed the Plaintiff Workers that the exposures they were experiencing would not harm them. Plaintiff Workers believed that Defendants would keep them safe at the FACILITY. Defendants lied, and these lies have caused catastrophic consequences.

352.    The failure of Defendants to create and implement a proper Chemical Safety Program constitutes a breach of Industrial Safety practices and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

353.    The failure of OLIN and CONTRACTOR DEFENDANTS to implement an effective Chemical Safety Program constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

354.    Defendants had a legal duty to make truthful statements and not to conceal information from Plaintiffs regarding the harm that would be caused by the failure to implement an effective Chemical Safety Program.

**Decontamination of Workers' Bodies to avoid Cross-Contamination**

*Individuals Working at Chlor-Alkali Facilities, Like the Plaintiff Workers, Must Decontaminate Their Bodies and Clothes in Order to Avoid Contaminating Their Homes and Loved Ones.*

355.    Workers performing tasks where mercury exposure has occurred must decontaminate their hands prior to entering any clean room area. Hands should also be cleaned prior to eating, and using tobacco products should be prohibited. Bar soaps are not recommended because they can transfer contamination.[254] OSHA makes the following minimum requirements regarding workers exposed to mercury:[255]

A. Workers subject to skin contact with liquid mercury should wash with soap or a mild detergent and water any areas of the body which may have contacted mercury at the end of a workday.

---

[254] Ross Healthcare, Inc., Mercury Hygiene Program Decontamination Procedure (2007).
[255] OSHA, Occupational Health Guideline for Inorganic Mercury (1979).

B. Skin that becomes contaminated with mercury should be promptly washed or showered with soap or mild detergent and water to remove any mercury.

C. Eating and smoking should not be permitted in areas where mercury is handled, processed, or stored.

D. Employees who handle mercury should wash their hands thoroughly with soap or a mild detergent and water before eating, drinking, or using toilet facilities.

E. Employers should provide hand brushes and employees should be instructed to use hand brushes on fingernails while their hands are submerged in water.

F. Used paper or fabric towels exposed to mercury should be treated as contaminated.

G. Personal belongings normally worn on the hands and wrists should not be brought into contact with mercury or its compounds, and frames of eyeglasses should be cleaned thoroughly following every shift.

H. Contact lenses should not be worn in areas where one may be exposed to mercury vapors, dusts, or mists.

356. According to Euro Chlor, clothing worn by personnel who are working in a Chlor-Alkali plant using the mercury process will be contaminated with mercury, and persons who handle such clothing have a potential for

exposure. Clothing awaiting collection or being transferred to the laundry should be kept in a sealed bag or closed container clearly labelled as "mercury contaminated clothing," and, additionally, Euro Chlor offers the following recommendations:[256]

a.  In order to avoid exposure of external personnel, it is highly recommended that laundering should be done at the work location, separated from laundering of other work clothes from the plant.

b.  If this is not feasible, the management of the external laundry should be informed about the health effects of mercury exposure, possible exposure routes, best practical working procedures and medical surveillance. A risk assessment for external laundering should be carried out.

c.  Mercury is very retentive in clothing. Oxidative bleach and acidic rinsing will assist in removal of mercury from clothing.

---

[256] Euro Chlor, HEALTH 2 - Code of Practice: Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (6th ed. 2010).

d. Occasional measurements for mercury contamination of cleaned work clothes could be made to ensure that laundering has been effective.

e. Waste mercury in washing water should be handled as contaminated mercury water and must be disposed of following national guidelines.

357. The Chlorine Institute states that "all work clothing should be removed in change rooms and deposited in marked laundry containers. If clothing is not laundered at the plant, the laundry that will be cleaning the clothes should be informed that the clothes may be contaminated with mercury. Contaminated clothing or footwear should not leave the plant except in packages for laundry, decontamination, or disposal."[257]

358. Based on sworn testimony, OLIN and the CONTRACTOR DEFENDANTS failed to exercise due diligence regarding decontamination in the basic ways. First, they failed to inform Plaintiff Workers of the dangers of working in and around mercury. Secondly, they failed to supply and

---

[257] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (2004).

properly decontaminate uniforms to protect Plaintiff Workers from dermal exposure.

359.    OLIN and the CONTRACTOR DEFENDANTS operated in an unsafe manner that injuriously caused mercury to be transmitted outside the FACILITY to the Plaintiff Family Members who were in close contact with the mercury-contaminated clothing of Plaintiff Workers.

360.    Plaintiff Workers were clearly not able to properly decontaminate themselves prior to leaving the site and returning home to their families.

361.    Additionally, OLIN and the CONTRACTOR DEFENDANTS allowed contaminated uniforms to be cross-contaminated with each other.

362.    Based upon sworn testimony, some Plaintiff Workers were supplied with work uniforms. Most of these uniforms were washed onsite by OLIN's workers. These uniforms were contaminated with mercury. As they were laundered, they often cross-contaminated the other uniforms. In addition, this process cross-contaminated the washing machine and the dryer.

363.    As OLIN laundered these uniforms week after week, these uniforms were cumulatively contaminated, increasing their toxicity. As a result, those wearing these contaminated uniforms were wearing a mercury vapor source every day while they worked.

364. During the course of operations, OLIN and the CONTRACTOR DEFENDANTS failed to protect the Plaintiff Workers from contamination. This affected both Plaintiff OLIN Workers and Plaintiff Contractor Workers.

365. The failure of OLIN to properly decontaminate contaminated uniforms created added sources of mercury contamination increasing the exposure of mercury vapor to Plaintiff Workers as well as creating cross-contamination exposure to the Augusta Community, thus creating a public health threat.

366. In addition to not properly decontaminating uniforms supplied, these Defendants often failed to supply uniforms at all. Many of those working at the FACILITY were not supplied uniforms, thus, they were working in a highly contaminated environment in their personal work clothes. Wearing these personal work clothes home clearly presented a health threat to their families.

367. The contamination of personal work clothes is illustrated in the following sworn testimony from Plaintiff Crossover Contractor Worker Lance M. Hieke, who describes his experience this way:

> There was a clean side and a dirty side in the Change Room. I had one locker located on each side. Every morning, I'd go to my clean locker and change from my personal clothes into my cotton coveralls. I would leave on my T-shirt and boxers under my coveralls.

> I would bring my underclothes, T-shirt, and boxers home
> with me in a bag. I'd put them in the dirty clothes hamper,
> and my wife would wash them. All family clothes were
> washed together. I interacted with my wife and kids when
> I came home. I would usually shower again before bed. I
> had a vehicle that I drove to and from work that my wife
> and kids rode in. My wife, Mirranda Chavous, lived with
> me during my time at the FACILITY

Hieke Aff, Ex. 8, page 4.

368.    Plaintiff Family Members saw mercury contamination of the clothes of

the Plaintiff Workers living with them, which resulted in take-home

exposure in the home. For example, Lance M. Hieke describes this way

regarding his wife Mirranda:

> My wife, Mirranda Chavous, has had sleep issues, like
> mine, which started while I was working at the FACILITY.
> She struggles to fall asleep and stay asleep. She only gets
> about four or five hours of sleep each night. She also has
> issues with her short-term memory since I've worked at
> the FACILITY.

Hieke Aff, Ex. 8, page 5.

369.    OLIN and the CONTRACTOR DEFENDANTS were fully aware of

the mercury exposure experienced by all Plaintiff Workers while at the

FACILITY, whether employees of OLIN or the CONTRACTOR

DEFENDANTS.

370. These Plaintiff Workers went home in their vehicles and home to their families in the same work clothes and boots they had been wearing while working at the FACILITY.

371. Failure of OLIN and the CONTRACTOR DEFENDANTS to design, implement, monitor and enforce an appropriate Decontamination Program constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Plaintiff Workers Were Highly Exposed During Decommissioning and Demolition**

*The D&D Process, Due to its Inherently Dangerous Nature, is Highly Regulated to Ensure That Systems are in Place to Manage the Safety of Those Involved in the D&D.*

372. The requirements that are essential for protecting workers during operation and maintenance of a Chlor-Alkali facility become even more important during the D&D Process. As the Chlor-Alkali industry knows, the risks increase exponentially during a D&D event.

373. Let us now turn to examples of Industry and Regulatory Agencies' considerations in other D&D sites.

374.    The D&D at the Maine HoltraChem/Mallinckrodt site may be taken as an example of good planning. Their Phase 4 Supplement to the Decommissioning and Demolition Plan establishes the following air monitoring program in the work zone for the control of worker exposure. [258]

- Air monitoring will be performed within the active work zones to: 1) assess the appropriate level of health and safety respiratory protection required to perform the work, 2) evaluate the effectiveness of mercury vapor controls, and 3) assess the average ambient air concentration. Work zone ambient air measurements will be collected daily at a minimum, and once per shift if more than one shift is performed. Air quality measurements will be collected using either a Jerome Model 431X or Bacharach Model MV2 mercury vapor analyzer.

- If concentrations in ambient air exceed 0.1 mg/m$^3$, the activity creating the mercury vapors will be suspended and work practices will be evaluated and modified as needed to reduce vapor generation. These methods worked well in the cell process dismantling project and are anticipated to adequately protect workers and the environment during this phase.

---

[258] Mallinckrodt, Phase 4 Supplement to the Decontamination and Demolition Plan (2006).

375.    The Health and Safety Plan for Decommissioning and Demolition at the LCP Chemicals plant in Brunswick, Georgia offers another good example of sufficient planning and establishes the following air monitoring program in the work zone for the control of worker exposure.[259]

- Monitoring will be conducted in the breathing space of the workers. Air monitoring data will be entered in the site health and safety logbook. This will include calibration data and all readings collected. Two types of air monitoring will be undertaken: (i) direct reading; and (ii) air sampling. The direct-reading measurements will be used to evaluate local and immediate hazardous situations. Air sampling will be used to characterize the specific constituents present and to predict which constituents might pose a hazard for future operations at the site, specifically the removal action.

- The LCP FACILITY had an established mercury monitoring system in place for the Cell Buildings. This system continued during work in the cell rooms.

376.    The United States Government has established specific standards that governed several aspects of the D&D process at the FACILITY. First, OSHA has established regulations for Process Safety Management of Highly

---

[259] LCP Chemicals, Inc., Health and Safety Plan,68-69 (1994).

Hazardous Materials ("PSM"). The OSHA standard for PSM (29 CFR § 1910.119) emphasizes the management of hazards associated with highly hazardous chemicals and establishes a comprehensive management program that integrates technologies, procedures, and management practices.[260]

377.    As a FACILITY that manufactures chlorine, the FACILITY is covered by the requirements of 29 CFR § 1910.119 including its requirements for the Management of Change ("MOC") which applied to the D&D process. The regulatory requirements of PSM remain in place until less than 1500 pounds of chlorine remain on site and the site is deregistered from the PSM program.

378.    While OLIN owned and operated the FACILITY, it performed D&D of the mercury cell operations. Initially, while the mercury cell system was still being utilized to produce chlorine, OLIN performed D&D on two of its mercury cells. This was done to install a test system for the new mercury-free membrane production section.

379.    While the remaining cells were in operation, OLIN performed additional D&D activities at the FACILITY. OLIN demolished additional cells as it transitioned to the mercury-free membrane cells.

---

[260] 29 CFR § 1910(h).

380.    Following these events, OLIN proceeded to decommission the remaining portion of the mercury cell system. Once the mercury cells were decommissioned, OLIN then performed demolition of certain component parts of this system.

381.    This sworn testimony of Plaintiff Contractor Worker Timothy K. Kelley explains his extended stay in Augusta to assist with the D&D at the FACILITY as follows:

> The purpose of my extended stay in Augusta was to assist with the decommissioning and demolition of the old Cell House at the FACILITY. I had already worked for OLIN through PEN in Charleston, Tennessee for eight or nine years at this point. I also assisted with the decommissioning and demolition of a similar Cell House in Charleston, Tennessee. Since PEN and OLIN knew I had this kind of experience under my belt, I was asked to travel and assist in repeating the process in Augusta. Robert Bressler was my PEN Supervisor in Augusta. When the job in Augusta was finished, I returned to my job in Charleston and continued to work at OLIN through PEN until 2020.

Kelley Aff, Ex. 11, page 1.

> It took about six months to demolish all the mercury cells after the walls were taken down. After that, and for the next six months or so, we started taking out all the piping in the building. The procedure was much the same. We would remove large sections of pipe and have them taken out to the wash pad to be washed off and washed out after we cut them into smaller sections suitable for transport. There were still substantial amounts of residual mercury in much of the piping. The cutting torches and grinders

continued to "activate" the mercury on contact. I've learned this since the Tennessee and Georgia investigations. Keeping our mercury tests in range was still a struggle for me and several other men. That was the job. It had to be done. I feel like I was exposed even more than I would normally have been because of the inexperienced men that PEN was hiring. OLIN let PEN handle all of that. Everything that came out of the Augusta Cell House, whether hazmat or not, was carried away on a truck. I have no idea where it all went, but I don't think the FACILITY kept any of it. There was a tremendous amount of mercury and chlorine to deal with. The FACILITY set up a large caustic bath, big enough to hold large pieces of equipment, outside the Cell House. It was there to remove as much of the residual mercury as possible from equipment coming out of the building, and there was a lot of equipment coming out. We would dip the used pipes and other equipment in the caustic bath, let them sit for forty-five minutes or an hour, and then place them in a rubber lined dumpster that would later be carried away. We were told that the hoppers were being filled with concrete offsite and buried like that. I believe the FACILITY direct Supervisor, Rick (I do not remember his last name), told us this. Rick has since passed away, but he was tall and of average weight. I never saw that. It was definitely hazardous material, but I never saw anyone label a hopper or the trailer that carried it away as such. As large as that caustic bath was, there were massive amounts of equipment that we didn't have time to put in it. There were literally tons of equipment that we just pressure washed and put into a container.

Kelley Aff, Ex. 11, pages 2 and 3.

It was evident that the Augusta Cell House had been leaking mercury for decades. We were taking down a transformer on the backside of the building one day, and I couldn't help but notice that there was a lot of gravel around a pole that just looked out of place. It wasn't pea

gravel; it was the big slag rocks like you see on either side of a railroad track. I couldn't figure out why it was there. After walking around on it for a little while, I realized it was covering a big deposit of mercury. It was like walking on a foam mattress that continuously tries to resume its original shape. It was spongy and didn't feel like walking on gravel at all. I had already been around mercury enough to know what it felt like, and there was a bunch of it underneath that gravel. I knew I was right about it later that day when we pulled the pole that the transformer was sitting on out of the ground. It wasn't water that started seeping into the hole from the surrounding dirt; it was mercury. I was one of only a handful of people who had some experience with a project like this, so the FACILITY had me running a crew of men. I was one of the "go to" guys for questions about equipment, tools, and procedures. My immediate Supervisor was a PEN guy, like me, named Robert Bressler. Part of the reason I found myself answering so many questions was that the FACILITY hired a bunch of temporary workers off the street, many of whom had little or no construction or mechanical experience. Most of the temporary workers also had little to no experience dealing with harsh chemicals, like mercury or chlorine. It wasn't ideal. They were not bad people. They just had no idea what they were doing. It made a job that was difficult and drawn out even more difficult and drawn out. I got so exasperated with the situation that at one point I went to Mr. Bressler and asked him to replace me as a supervisor and just let me be a worker. I was so tired of answering questions and, for lack of a better term, babysitting. As an example, one of the men that PEN hired was serving wine and cheese at a bridal shop the week before. He was completely out of his element. He could barely pick up some of the tools we worked with. Mr. Bressler would not reassign me and insisted that I stay in the supervisory capacity I was in. I did not really expect that he would, but I had to ask.

Kelley Aff, Ex. 11, page 3.

382.    Timothy K Kelley suffers from a number of health problems:

> I deal with a lot of mood swings, some of them severe. I have anger issues. Sometimes I get mad for no real reason and stay that way for two or three days. I have anxiety and worry about trivial things and important things. I worry about everything. I used to be a jokester. I used to have an enjoyable time with people. I am not a jokester anymore. I go to a mental health doctor every other month. They told me sometime in the summer of 2023 that I have Mad Hatter Disease (Mad Hatter Disease, or Erethism, is a form of chronic mercury poisoning. Depending on the level of exposure, it can cause symptoms like vomiting, skin rashes, tremors, twitching, and excitability. The condition is called "Mad Hatter Disease" because it commonly affected hat makers in the 18th to 20th centuries). Depression hit me extremely hard. I'm a grown man, but I would find myself sitting alone and crying for reasons I just could not put a finger on. The medication helps. I have not sat alone and cried in quite a while, but now I worry about running out of medicine. It got really bad before I got some help. Nobody wanted to be around me. I said terrible things. I didn't even like myself. It is very frustrating to remember how I used to be compared to how I am now. All these behavioral issues started before I retired and have gradually worsened over time. My doctor has prescribed Prozac to help with depression, mood swings, and anger issues.

Kelley Aff, Ex. 11, pages 5 and 6.

> I have been diagnosed as a type II diabetic, and I have prescriptions for that. I think I had it while still working at the FACILITY, but I was not officially diagnosed until shortly after I left. I have been diagnosed with hypertension, and I have prescriptions for that. I have been diagnosed with COPD (Chronic Obstructive Pulmonary

Disease), and I have medication and three different inhalers for that. The COPD diagnosis came before I ever left the FACILITY. I don't do much around the house anymore because I can't. Five minutes of washing dishes wears me out. My legs and back start to ache and I get short-winded and dizzy. I make sure the inhalers are within reach anytime I am moving around

Kelley Aff, Ex. 11, page 5.

383.    Plaintiff Contractor Worker Timothy K. Kelley talks about the involvement of CONTRACTOR DEFENDANT PEN. Kelley worked for PEN and his mercury levels in urine tests were high:

This was an extremely long process and a tremendous amount of work. I worked at the Augusta site for the better part of fourteen months. Eight-hour shifts were the bare minimum, and they were rare. I usually worked more like ten or twelve hours a shift. All the pipes and equipment from the building had to be removed and cleaned. Initially, I worked to tear out the mercury cells from the cell floor. They were large and heavy and still heavily contaminated with residual mercury. Each cell had to go through a process that took at least a day, usually a day and a half, and sometimes two days. Disconnecting the cell from the electricity and then from the floor was just the beginning. All the pipes running in and out of each cell had to be severed. Each cell had to be completely disconnected from everything so they could be, one at a time, picked up by a crane and moved outdoors. We had each one moved to a "wash down" pad where there were pressure washers and water hoses to clean them inside and out as best we could. There was no way to get all the mercury out of them, but it got most of it. Then, we began the process of cutting the cell into pieces. Some of the parts were made of copper or

nickel. Those parts had to be collected and kept separate for sale to a salvage yard. There was a guy named Glenn Ingram that I was acquainted with. He owned or operated (or both) a salvage yard in Chattanooga. He was at the jobsite in Augusta a lot. My natural assumption was that he was transporting offsite whatever was salvageable. I am not sure if those were his trucks carrying off the hazmat stuff or not. We had been demolishing cells for several days or maybe a couple of weeks. This was long enough that we had gotten into a decent groove when everything came to an abrupt halt, and we were all redirected.

Kelley Aff, Ex. 11, page 2.

384.    While performing this work, OLIN elevated the mercury vapors and mercury exposures of all those working at the FACILITY.

385.    Upon information and belief, OLIN failed to perform a proper pre-D&D safety analysis. It failed to design a new safety plan for this increased exposure potential and failed to increase safety practices to protect against these exposures.

386.    During the course of these events, again, OLIN failed to conduct a Safety Analysis, prepare a Safety Plan and implement the safety measures required.

387.    The failure of OLIN to perform these Safety Measures violated the accepted Industrial Standard of Care and constituted a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

388.    Upon information and belief, OLIN contracted with certain CONTRACTOR DEFENDANTS to perform the D&D activities at the FACILITY.

389.    The injurious actions of OLIN and certain CONTRACTOR DEFENDANTS during D&D of the FACILITY were done in an unsafe manner that created an unreasonable and foreseeable risk of harm to Plaintiff Workers at both the FACILITY.

390.    The failure of OLIN and the CONTRACTOR DEFENDANTS to implement an effective Job Safety Analysis Program constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Contamination Transported Offsite**

*Materials Contaminated with Mercury were Routinely and Consistently Transported from the FACILITY, Resulting in Cross-Contamination.*

391.    During the operation of the FACILITY by OLIN and CONTRACTOR DEFENDANTS, it was common for uniforms contaminated with mercury and other toxicants to be transported offsite.

392.    Contaminated uniforms, rubber mats, rugs, and similar reusable materials from the FACILITY were sent offsite to be cleaned by outside

contractors including, but not limited to, Cintas Uniform Service ("CINTAS"). OLIN failed to inform, train, or warn CINTAS that the materials being cleaned were contaminated with mercury and other toxicants. When cleaning these contaminated materials, CINTAS was exposing its employees to mercury and other toxicants. By cleaning these contaminated materials, CINTAS was cross-contaminating other items that were being cleaned for other customers. See Michelle D. Williams Aff, Ex. 23 and Gloria L. Brown Aff, Ex. 4

393. This sworn testimony of Plaintiff Contractor Worker, Gloria J. Brown, who worked at CINTAS, explains the laundering process as follows:

> As a Lead Clerk, I was responsible for ensuring the rest of the workers on my team were on task. My coworkers and I on my shift were tasked with pulling uniforms after being washed and dried to fold and hang them. CINTAS Driver, Joe Banks, Jr., would drive to the FACILITY to retrieve the OLIN uniforms. The uniforms came to CINTAS in large bags with each worker's name tag ironed on the front of the shirt and the OLIN logo stitched on the opposite side. The uniform bags would be placed in the Stockroom until one of the Clerks (usually Vince Brihm) brought them to the washing area. Every company's uniforms would be washed together in a large, industrial-sized washing machine. Pants and shirts were washed separately. I remember seeing small, silver beads the size of BBs falling out of the OLIN uniform pockets every week, before and even after being washed. I did not see these beads in every uniform, but I saw six or seven beads at a time. After the Georgia Mercury Investigation, I now

> believe that this was mercury. These beads would be swept and thrown away into an unlabeled trash can that was used for day-to-day garbage. The OLIN uniforms would need to be washed twice, due to the thick layer of gray mud, clay, and dust they were coated in. I now believe that this was mercury mud.

Affidavit of Gloria J. Brown, Aff. Ex. 4, page 1

> While handling the uniforms that came from OLIN, I noticed that small, silver beads that looked like BBs would fall out of the pockets every week. Six or seven beads would fall out of the majority of OLIN uniforms every time they were laundered. I now believe that this was mercury. The floor would be swept daily, and the dust, dirt, debris, and BBs that came from every CINTAS customer would be disposed of in an unlabeled trash can. OLIN uniforms would also have to be washed at least twice to remove the thick layer of mud, clay, and dust that was covering them. I now believe that this was mercury mud.

Brown, G. Aff, Ex. 4, page 2.

394.    Plaintiff Contractor Worker Michelle D. Williams, who performed work as a Utility Worker for CINTAS from 1998 until 2007, explains the process this way:

> Since the pickup drivers were assigned several stops on any given day, the OLIN uniforms always arrived mixed in with clothing from other businesses that CINTAS serviced. Joe Banks, Jr., was the driver assigned to pick up the clothes from OLIN since they were on his route. Once the uniforms arrived from the FACILITY, they would be thrown into the washing machines by Vincent Brihm, along with the other uniform clothing picked up on the other stops Joe had to make that day. It was standard

practice at CINTAS to wash all the companies' uniforms together. They would only be separated after they had been completely washed, repaired (if needed), and dried. There were only two exceptions to this process. The first was the uniforms that CINTAS received from Shapiro Packing Co. in Augusta. Shapiro was a meat packing company, and most of the clothing we received from them would be covered in blood, so it would have to be separated and washed separately. The second exception was the uniforms from John Deere's Augusta location. Their contract called for their uniforms to be washed separately as well as pressed and ironed once they had finished drying. CINTAS never gave us any specific instructions, including washing OLIN uniforms separately.

I usually recognized OLIN uniforms when they came to my work area because they were almost always covered in a gray mud, small silver-colored stains, or with silver metal shavings that looked like lint inside the pockets, so they would need to be rewashed. When I worked repairing the clothes, they were still wet from the washer. I often laid them across my lap to perform needed repairs. Every week, at least some of the OLIN uniforms had to be washed again to remove all the mud and silver-colored stains from the fabric. Vincent Brihm would unload all the clothing from the washing machines. After Vincent unloaded the uniforms, other workers in the wash area would hang them, tag them if they needed repairs, and place them onto a conveyor belt that would bring them to my work area. There were some uniforms that would make it to my work area still dirty. Whenever this happened, I would send them back to the washing area to be put through the washing process another time. This most often occurred with the OLIN uniforms.

Affidavit of Michelle D. Williams, Ex. 23, page 2.

395.    Plaintiff Contractor Worker Joe L. Banks, Jr., who was a driver for CINTAS from approximately 2001 until 2019. He describes his route this way:

> The OLIN FACILITY in Augusta was one of my stops as an SSR Route Driver. I did this route by myself. The road to the FACILITY was about 300 yards long. Once I arrived, I had to pull off to the side of the road, exit my vehicle, and go inside the guard shack to sign in. After that, I was buzzed through the security gate. I was given a breathing apparatus in a bag. I do not recall being told what the breathing apparatus was or what it was used for. I remember the guard being very nonchalant about it. Now that I have joined the Georgia Mercury Investigation, I have learned that this was a chlorine escape respirator. There were two buildings that I frequented, but I do not know the names of the buildings.

> One of these buildings was a locker room and shower area. This is where most of the dirty uniforms were located. CINTAS supplied the FACILITY with buggies (big baskets on wheels) for the dirty uniforms to go in. Before I gathered the dirty uniforms, I dropped off the clean ones. I placed clean uniforms into buggies and rolled them into the building with the lockers, then hung the clean uniforms up near the lockers. From there, I'd wheel the buggies with the dirty uniforms out to the truck, grab the uniforms by hand, and throw them in the back into piles. The piles were only separated by shirts, pants, and fire-retardant clothes ("FRCs"). I recall that OLIN's uniforms had laundry tags on them that had the account number and day of the week of the pickup. They also had the OLIN emblem on the front of the shirts.

Affidavit of Joe L. Banks, Jr. Ex. 3, pages 1 and 2.

> Both dirty and clean clothes from different places of business were piled in the back of my vehicle at one time. For example, dirty OLIN uniforms were mixed with clean uniforms going to International Paper (now called Clearwater Paper). Clean clothes were hung on rails in the back, but it was highly common for them to fall onto the dirty clothes piled on the floor due to the natural movement of the vehicle. Clothes were also mixed when washed together at the CINTAS location. All uniforms from all accounts were separated by shirts, pants, material, and route. They were not separated by account until they were washed and dried.
>
> Clean and dirty rugs were also in the back of my vehicle. The clean and dirty rugs would often get mixed together because the rugs were heavy. They would fall on top of each other due to the movement of the vehicle. The rugs were washed together at the CINTAS location in Augusta. Rugs were not assigned to certain places of business. A rug that was at OLIN one week could be at a restaurant the next week. The only labelling on the rugs was their sizes.

Banks, Jr., Aff, Ex. 3, pages 2 and 3.

396. During the D&D of the FACILITY by OLIN and certain CONTRACTOR DEFENDANTS, it was common for materials contaminated with mercury and other toxicants to be transported off-site as regular waste or scrap.

397. This sworn testimony of Plaintiff Direct Worker Thomas K. Kelley, who worked at the FACILITY during the decommissioning and demolition process, explains his work at the FACILITY as follows:

The FACILITY set up a large caustic bath, big enough to hold large pieces of equipment, outside the Cell House. It was there to remove as much of the residual mercury as possible from equipment coming out of the building, and there was a lot of equipment coming out. We would dip the used pipes and other equipment in the caustic bath, let them sit for forty-five minutes or an hour, and then place them in a rubber lined dumpster that would later be carried away. We were told that the hoppers were being filled with concrete offsite and buried like that. I believe the FACILITY direct Supervisor, Rick (I do not remember his last name), told us this. Rick has since passed away, but he was tall and of average weight. I never saw that. It was definitely hazardous material, but I never saw anyone label a hopper or the trailer that carried it away as such. As large as that caustic bath was, there were massive amounts of equipment that we didn't have time to put in it. There were literally tons of equipment that we just pressure washed and put into a container. This equipment still had mercury on it, or in it. Sometimes the containers we put the equipment in would leak mercury while we loaded it onto a truck. Mercury would continue to leak as the truck went down the road. I have watched grown men, with a regular old Shop-Vac, vacuum mercury off the road as the dripping truck rolled offsite.

Kelley Aff, Ex. 11, pages 2 and 3.

Everything that came out of the Augusta Cell House, whether hazmat or not, was carried away on a truck. I have no idea where it all went, but I don't think the FACILITY kept any of it. There was a tremendous amount of mercury and chlorine to deal with.

Kelley Aff, Ex. 11, page 2.

398.    Upon information and belief, OLIN failed to follow strict Federal materials decontamination guidelines and toxic waste management regulations by allowing highly contaminated materials to leave the site. This distribution of contaminated waste and scrap has created a public health hazard to those unsuspecting victims handling these materials and an environmental danger wherever these materials were taken.

399.    Failure of OLIN to comply with strict state and federal regulations regarding the handling, transportation, and disposal of mercury-contaminated materials is a breach of EH&S Guidelines and of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**OLIN Failed to Protect Plaintiff Contractor Workers**

*OLIN Failed to Ensure the Health and Safety of their Plaintiff Contractor Workers who Performed Work at the FACILITY.*

400.    OSHA standards provide that, to the extent that a subcontractor of any tier agrees to perform any part of the contract, it also assumes responsibility for complying with OSHA standards. Thus, the prime contractor assumes the entire responsibility under the contract and the subcontractor assumes responsibility with respect to his portion of the work. With respect to

subcontracted work, the prime contractor and any subcontractor or subcontractors shall be deemed to have joint responsibility.[261]

401.    OLIN knew or should have known that entering areas where mercury and the vapors from mercury were known to be present during these activities would pose a danger to workers. Dangerous conditions exist when the concentrations of mercury and its vapors exceed the level of protection afforded by the PPE. The actions of OLIN contributed to creating this dangerous condition.

402.    Upon information and belief, hazardous conditions were created by OLIN by allowing work at the Chlor-Alkali FACILITY without first verifying that:

- A sufficient, comprehensive Health and Safety Plan ("HASP") was developed for the work scope of D&D operations;

- Training was properly performed, and a plan was established to evaluate the effectiveness of said training throughout the work scope of operations, maintenance, and D&D operations;

- A Process Hazards Analysis ("PHA") was performed for the work scope of D&D operations;

---

[261] OSHA, CPL 02-00-124: Multi-Employer Citation Policy (1999).

- Based on the PHA, the administrative and engineering controls were in place to mitigate worker exposure to mercury;

- An industrial hygiene exposure assessment for the work scope of D&D operations was performed by an industrial hygienist or other qualified health and safety professional;

- A Respiratory Protection Program was developed based on results of the worker exposure assessment performed by an industrial hygienist or other qualified safety and health professional which established sufficiently protective PPE options for inclusion in the site HASP; and

- Medical health baselines including biological monitoring baselines were established by a qualified physician for all workers who may be exposed to mercury, and a medical surveillance plan was instituted as a secondary protective measure to quantify and track worker exposures and to evaluate the effectiveness of both the Respiratory Protection Plan and the site HASP.

403.    As part of the FACILITY's safety management program, a safety representative for the FACILITY should have been designated by OLIN. The safety representatives or designees should have been assigned the responsibility of a Correcting Employer.[262] A comprehensive safety and

---

[262] *Ibid.*

health management system should have been implemented at the FACILITY. OLIN'S safety representatives or designees should have regularly inspected the work environment, corrected hazards, and communicated the specific health and safety rules so workers could understand and mitigate the hazards of mercury. OLIN's safety representatives, designees, or supervisors should have directed the correction of unsafe conditions as quickly as possible after discovery of a hazard based on the severity of the hazard. OLIN was a Correcting Employer.[263]

404.    Plaintiff Contractor Workers and others were exposed to the mercury hazard that OLIN created. While operations, maintenance, and D&D were taking place, the Site Safety Manager for OLIN failed to reasonably supervise and provide health and safety monitoring to the Plaintiff Contractor Workers. OLIN owed a duty to the Plaintiff Contractor Workers to refrain from engaging in conduct that created an unreasonable and foreseeable risk of harm to them.

405.    The failure of OLIN to provide proper supervision of the FACILITY, exposure monitoring, medical monitoring, or PPE to protect against the

---

[263] *Ibid.*

hazards of mercury, and the active concealment of the hazardous condition of mercury, caused the workers performing operations, maintenance, and D&D to be exposed to dangerous levels of mercury.

406.    While operations, maintenance, and D&D were taking place, the Site Safety Manager for OLIN failed to reasonably supervise and provide health and safety monitoring to the Plaintiff Contractor Workers. Kelley, Aff, Ex. 11, and Cannon Aff, Ex. 5,

407.    The failure of OLIN to properly supervise activities at the FACILITY, its failure to properly perform exposure assessments, its failure to properly perform medical monitoring, its failure to provide proper PPE to protect against the hazards of mercury, and its active concealment of the hazards of mercury during work at the FACILITY violated applicable industrial standards of care that resulted in the dangerous conditions not being identified and properly controlled.

408.    The failure of OLIN to properly conduct a safety analysis, develop, and implement the appropriate safety plan, and enforce and maintain these safety implementations constitutes a breach of EH&S Guidelines and the duty of care owed to the Plaintiff Contractor Workers. This breach proximately

caused injuries to both Plaintiff Contractor Workers and Plaintiff Family Members.

**Failure to Recognize Current Scientific Epidemiology**

*OLIN and the CONTRACTOR DEFENDANTS Failed To Follow Scientific Evidence about Mercury Exposure Clearly Established Within The Scientific Community.*

409.    The Chlor-Alkali Industry has not only had the benefit of industry studies and governmental regulations. It has also had the results of epidemiological studies to help guide its decision making. Few industries enjoy the marriage of regulation and science seen in the Chlor-Alkali industry. In spite of this, the Chlor-Alkali Industry has ignored and rejected every opportunity afforded to improve its processes. This rejection has led to the mercury exposure of people and communities all over the country.

410.    The industry itself has been the subject of a number of epidemiological studies. These studies have asserted and repeatedly affirmed that this industry is a source of significant toxicity that has contributed to negative environmental and physiological outcomes. These studies have taken place around these facilities and in some cases even within the facilities.

411.    The results of these studies were not known by Plaintiffs or readily discoverable by Plaintiffs during the time of their work at the FACILITY.

412.    On March 10, 1982, the Agency for Toxic Substances and Disease Registry released a report in which they supported a study that followed Chlor-Alkali workers who had inadvertently tracked mercury out of the plant and into their homes. This study found that workers did bring mercury into their homes and that normal housekeeping tasks (vacuuming and washing the floors) increased the levels of mercury in those families studied.[264]

413.    Another study found that only thirty-one percent (31%) of mercury dedicated to chlorine production was retained. That was a reported loss of sixty-nine percent (69%) of mercury used in the system.[265] This represents the critical failings of the Chlor-Alkali industry to effectively combat the fugitive release of mercury and the contamination of the environment in and around the plant. This calls into question the monitoring within the plant itself as this study focused on the internal data from these plants. Also, this finding demonstrates the level of mercury that is entering the environment beyond where workers are performing tasks.

---

[264] NIOSH, Mercury Control Technology Assessment Study, Olin Chemicals Group, Charleston, Tennessee, Preliminary Survey Report for the Site Visit of July 21, 1981 (1981).
[265] Reinaldo Caban et al., Losses of Mercury from Chlorine Plants, 18 AIChE J. 5 (1972).

414.    Though the systems in place have improved and modern losses are somewhat more controlled, the industry has not made significant gains in waste management and systems control. This is exemplified by the 65-ton loss of mercury from chlorine plants in Spain in 2000.[266] These studies confirm that this industry routinely releases mercury into the environment either through negligence or through improperly-managed safety programs.[267]

415.    Additionally, studies performed in and around chlorine plants in the European Union have found that although outdoor releases may not rise to the IDLH standard in the surrounding environment, they do exceed permissible exposures.[268]

416.    These studies clearly indicate the high levels of mercury contamination generated by these industrial processes and the cross-contamination of communities and family members of the workers.

417.    Despite their knowledge of these studies and data, OLIN and the CONTRACTOR DEFENDANTS continued to recklessly ignore the high

---

[266] Jose Maria Esbri et al., Evaluation of Mercury Dispersion from Chlor-Alkali Industries in Spain, Envtl Engineering & Mgmt., 112 128 (2009).
[267] R. Ferrara et al., Dissolved Gaseous Mercury Concentration and Mercury Evasional Flux from Seawater in Front of a Chlor-Alkali Plant, 22 Envtl. Tech. 971 (2001).
[268] Darija Gibicar et al., Human Exposure to Mercury in the Vicinity of Chlor-Alkali Plant, 109 Envtl. Res. 355 (2009).

levels of mercury contamination at the FACILITY. Ignoring the science, all Defendants continued to expose the Plaintiff Workers and the Plaintiff Family Members to toxic mercury while actively concealing the serious potential harm to which they were exposed.

418. The failure of Defendants to review and apply this scientific, epidemiological knowledge constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

## Defendants Recklessly Ignored Established Data and Information

*OLIN and the CONTRACTOR DEFENDANTS Recklessly and Deliberately Ignored Voluminous Published Materials Detailing the Proper and Appropriate Manner in which to Operate, Maintain, Decommission, and Demolish Chlor-Alkali Facilities Utilizing Mercury.*

419. In addition to the foregoing governmental, engineering, and epidemiological guidance provided to the Chlor-Alkali Industry, the industry practice itself demonstrates guidance on the in-the-field application of applicable safety principles. Let us now turn to the industry itself and observe how other manufacturers have applied safety standards to protect their workers and the environment.

420.    There were a number of resources that were available to OLIN and the CONTRACTOR DEFENDANTS providing guidance regarding workplace safety at the FACILITY. Such resources included, but were not limited to: Euro Chlor publications, Chlorine Institute ("CI") pamphlets, US Environmental Protection Agency ("EPA") documentation, and lessons learned by other mercury cell Chlor-Alkali plants that had already completed similar operations, maintenance, and D&D closure activities.

421.    These workplace safety resources were not known by Plaintiffs or readily discoverable by Plaintiffs during the time of their work at the FACILITY.

422.    Euro Chlor is an organization of European chlorine producers, representing more than 80% of worldwide Chlor-Alkali production.[269] The Euro Chlor Guideline for Decommissioning of Mercury Chlor-Alkali Plants provides recommendations, techniques, and standards that are based on the experiences and best practices adopted by member companies of Euro Chlor.[270] As of 2009, the European Chlor-Alkali Industry had closed, decommissioned, and/or demolished 55 such facilities. Utilizing the

---

[269] Euro Chlor About Us (2024).
[270] Euro Chlor, Guideline for Decommissioning of Mercury Chlor-Alkali Plants, Env. Prot. 3, (5th ed. 2009).

environmental, process safety, and engineering data, much has been learned about the dangers associated with the operations, maintenance, and decommissioning and demolishing of these facilities. In 2009, Euro Chlor published much of this data and drafted its Guideline for Decommissioning of Mercury Chlor-Alkali Facilities.[271] These guidelines are not binding in the United States and, thus, can serve only as professional, scientific, and industrial benchmarks. Employees and their families, however, were unlikely to encounter these guidelines as they remained in professional and industrial circles for many years, and Euro Chlor is far from a household name.

423.    For years, the Euro Chlor organization provided the source of the standard of care for the safety, health, and environmental practices in the manufacture, handling, and use of Chlor-Alkali products. These practices are developed by Euro Chlor in order to assist their members in achieving continuous improvements. Euro Chlor has also developed state-of-the-art practices for the management of mercury-contaminated sites.[272]

---

[271] *Ibid.*
[272] *Ibid.*

424.    The Euro Chlor code of practice for the protection of workers' health establishes the standard of care and the controls required to mitigate and control personnel exposures to mercury.[273] Euro Chlor recommends air monitoring for mercury vapors so that the correct respirators can be selected. Euro Chlor warns that air concentrations of mercury vapor will likely increase 10 to 20 times over normal operations during D&D work due to the disturbance of liquid mercury, or due to mercury contacting hot surfaces.[274]

425.    During the 1990s, the United States Government as well as independent environmental organizations pushed for regulations to restrict the level of mercury emissions generated by facilities utilizing the mercury cell process. In addition to these efforts, governmental and non-governmental organizations increased efforts to study the physiological impacts of mercury toxicity.[275] Through this work, a greater scientific understanding was obtained regarding the true environmental and physiological damage associated with the mercury cell process. This new knowledge and understanding have been available to both OLIN and the CONTRACTOR

---

[273] Euro Chlor, HEALTH 2 - Code of Practice: Control of Worker Exposure to Mercury in the Chlor-Alkali Industry, (6th ed. 2010).
[274] *Ibid.*
[275] Kathryn R. Mahaffey, Mercury Exposure: Medical and Public Health Issues, 116 Trans. Am. Clin. Climatological Ass'n 127 (2005).

DEFENDANTS who had a duty to familiarize themselves with this scientific knowledge and protect their workers from harm.

426.    The first D&D event of notoriety at a mercury cell Chlor-Alkali FACILITY in the United States occurred at the LCP Chemicals site in Brunswick, Georgia. The 813-acre LCP site includes an area where various industrial facilities operated from the early 1920s to 1994. The US EPA placed the LCP site on the Superfund program's National Priorities List ("NPL") in 1996 because of contaminated groundwater, soil, and sediment resulting from FACILITY operations.[276] Following the demolition of this FACILITY, an EPA investigation resulted in federal criminal indictments of corporate executives.[277]

427.    A second mercury cell D&D event was undertaken at the HoltraChem Manufacturing Company FACILITY, owned by Mallinckrodt and located in Orrington, Maine. The HoltraChem site is located on 235 acres on the banks of the Penobscot River. Approximately 77 acres were affected by site operations including 50 acres that are developed and include the manufacturing FACILITY, five landfills, a surface impoundment, and a

---

[276] EPA, Superfund Program: LCP Chemicals Georgia Site, Brunswick, Georgia (2024).
[277] EPA, Officials of Georgia Company Indicted, Release (1998).

waste pile.[278] The HoltraChem site opened in 1967, utilizing the mercury cell process and manufactured chlorine, caustic soda (sodium hydroxide), and chlorine bleach (sodium hypochlorite). The FACILITY closed in September 2000.[279] Mallinckrodt's consultant Camp Dresser & McKee ("CDM") drafted Site Investigation Reports, Corrective Measures Studies, Health and Safety Plans, and other documents related to the HoltraChem D&D as well as to the LCP site in Georgia and a third mercury cell D&D in New Castle, Delaware:

- CDM – Phase 4 Supplement to the Decontamination, 2006;

- Cell Process Dismantling/ Perimeter Air Monitoring Program, 2–03;

- CDM – Site Remediation/ Health and Safety Plan, 2002;

- COM-Dismantling Quality Assurance Plan (2002, 2003, 2004);

- OXYCHEM Delaware – Health & Safety Plan – Interim Measures, (Occidental Chemical – New Castle, Delaware), 2001; and

- LCP Chemicals Health and Safety Plan, (LCP Chemicals – Brunswick, Georgia, 1994).

---

[278] Maine Dept of Envtl Protection, Mallinckrodt (formerly HoltraChem).
[279] Portland Press Herald, Maine High Court Clears the Way for Cleanup of Former HoltraChem Plant, (2014)

428.    All of these documents were available to OLIN and the CONTRACTOR DEFENDANTS to be used as reference material in conducting work at the FACILITY.[280]

429.    Even more compelling is the fact that epidemiological studies have been completed in and around these plants for years. Scientists had definitively proven the personal injuries and cross-contamination from mercury occurring at these facilities in the early 1980s. All of these Defendants recklessly ignored this scientific work. Many of these materials, as is the challenge with scientific materials generally, remained inaccessible to the general population in the walled gardens of professional organizations or the ivory towers of scientific journals and academia. Knowing this, it was the duty and ethical obligation of the Defendants who would have the ability to access these materials, not only to employ them to help protect their employees, but also to provide their employees with the information they had.

430.    The failure of OLIN and the CONTRACTOR DEFENDANTS to avail themselves of this plethora of information was a reckless disregard of their

---

[280] EPA, Holtrachem Manufacturing, Waste Site Cleanup and Reuse in New England (n.d.).

recognized duty of care owed to the Plaintiffs, which proximately caused their injuries.

### Fraud by OLIN

*Defendant OLIN Falsely, and with the Deliberate Intent to Mislead, Communicated to Plaintiff Contractor Workers that the FACILITY was Safe and Posed no Threat to Plaintiff Contractor Workers' Health or the Health of Their Families*

431.    Throughout the relevant time frame, OLIN perpetuated two fundamental types of fraud. First, OLIN overtly and falsely represented that it was maintaining safety processes at the FACILITY that would keep those at the FACILITY safe. OLIN even represented that it was monitoring urine to keep Plaintiff Contractor Workers safe. OLIN further represented that, if the Plaintiff Contractor Workers were presented with any danger, Plaintiff Contractor Workers would be informed. The second form of fraud OLIN perpetuated was that of suppression or concealment. OLIN actively concealed information regarding the dangers present at the FACILITY despite a duty to inform those working at its FACILITY of these dangers. Let us now turn to this fraudulent conduct specifically.

**Fraudulent Misrepresentations**

432.    Throughout the relevant time frame, OLIN knowingly, intentionally, and with scienter made numerous fraudulent misrepresentations regarding the safety of working in the FACILITY. For example, the testimony of Plaintiff Olin Worker Eric P. Holman establishes that:

> We were told that mercury was in a safe state if it was in water. Mercury was not in water during my job as a Boiler House Operator, because it was in the "filter cake" that was filtered from wastewater. I remember hearing that mercury was a toxin, and we were told not to touch it with our bare hands because it could absorb into skin and could affect our organs, mental health, and teeth. We were told that this could happen if we were not careful, but we were told that we were safe from any dangers of mercury as long as we wore the PPE that the FACILITY required during certain jobs. I believed that wearing the required PPE would keep me safe from any possible danger. Earl Hilson was in charge of safety training for the FACILITY. I also had simulation training for the Rescue Team and Incident Commander roles about two or three times a year. We did not have any simulation training with mercury. John Grant oversaw a lot of the simulation training.

Holman Aff, Ex. 9, page 5.

433.    Throughout the relevant time frame, OLIN  knowingly, intentionally, and with scienter made false representations and repeatedly concealed material information regarding the hazards associated with mercury exposure. The testimony of Plaintiff Contractor Worker, Lance M. Hieke,

explains an example in approximately January 2003 by OLIN's onsite Nurse:

> I was also told by Nurse Cynthia Williams that if I kept up my hygiene, my mercury levels would be fine, and that high mercury levels were due to bad hygiene. The hygiene she was referring to was showering before lunch and before leaving for the day and washing our hands. I did this.

Hieke Aff, Ex. 8, page 3.

434.    The testimony of other Plaintiff Workers demonstrates that OLIN knowingly, intentionally, and with scienter fraudulently assured the Plaintiff Contractor Workers that the FACILITY was safe if they used the Personal Protective Equipment ("PPE") that was provided. This occurred repeatedly throughout the relevant time frame. See Sloan Aff, Ex 22, page 5; Kelley Aff, Ex. 11, page 6; Collins Aff, Ex. 6, and Keller Aff, Ex. 10, pages 13 and 14.

435.    Throughout the relevant time frame, Plaintiff Contractor Workers would regularly observe mercury on and around the work surfaces where they were working. They were required to report their observed mercury to their supervisors. Even with this information, OLIN knowingly, intentionally, and with scienter made fraudulent assurances to the Plaintiff

Contractor Workers that the conditions were safe. This was a lie, and OLIN knew it.

436.    Throughout the relevant time frame, OLIN was monitoring the urine mercury levels of select Plaintiff Contractor Workers. While monitoring these levels, OLIN would knowingly, intentionally, and with scienter made fraudulent assurances to the Plaintiff Contractor Workers that these levels were acceptable and that by temporarily removing them from these exposures they would be okay. Jeffrey F. Sloan explains it this way:

> I had to urinate in a bottle in the locker room every week to be tested for mercury levels. We gave our samples to the nurse, Cynthia Williams. She was the nurse throughout my whole time at the FACILITY. When someone tested high for mercury, they were pulled to a non-contaminated area of the FACILITY to work until their level came back down. The same people weren't always working in the Cell House because everyone's urine test results were usually pretty high. I had to be pulled from the Cell House to work in the pipe shop or work on outside pipes. I was not required to wear more restrictive PPE in the pipe shop or while working on the outside pipes when I worked after testing high. I remember feeling nauseated and having a metallic taste in my mouth when my mercury levels were reported high. OSHA's mercury level in urine standard was one number in parts per million. The FACILITY's standard was below that. I don't remember what those number standards were, but my test results were high, above both numbers, at least a dozen times.

Sloan Aff, Ex. 22, page 6.

437.    Another example is from Plaintiff William Elmore who explains it this

way:

> Because of the constant exposure to mercury and other contaminants, we were required to submit a urine specimen once a week to monitor mercury levels. Specimens were collected every Friday. Unless the laboratory was backed up with other work, they normally had the testing done and results provided to the company nurse and my Supervisor Mr. Adkinson by Monday morning. There were numerous times when I was told that I had tested high for mercury. I would have to see the nurse and sign a paper saying that I had been informed my test was high and she would tell me to do everything I could to get my level down. Most of the time the FACILITY let it ride for a week and waited for the results of my next test. If I was still high after a week, Mr. Adkinson would tell me to get a new pair of boots and some new socks and to get rid of my old ones. He would also tell me to give my PPE a good cleaning with soap and water. Then he would have me shower even more. In addition to showering at lunchtime and at the end of the day, I would shower another couple of times, during breaks. We would try all these things for another week. If the next test still came back high, which it did several times, the FACILITY would move me out of the Cell House for two or three weeks and have me work with the General Maintenance and Construction crew again. I would still submit a urine sample on Fridays and just keep doing what I was doing until my mercury level dropped into the acceptable range for the FACILITY. Then I went back to my job in the Cell House and started over again. It was cyclical and imprecise.

Elmore Aff, Ex. 7, page 7.

438.    Throughout the relevant time frame, OLIN would use their inadequate mercury urine program to knowingly, intentionally, and with scienter falsely represent that Plaintiff Contractor Workers were being protected from harm from mercury when the urine results themselves clearly demonstrated toxic mercury exposures. See Kelley Aff, Ex. 11, page 2; Darryl Mims Aff, Ex. 15, page 5; and Sloan Aff, Ex. 22, page 2.

## Misrepresentation by Concealment by OLIN

*Dangers of physical harm from mercury exposure of the entire site.*

439.    Throughout the relevant time frame, OLIN had the benefit of specific scientific knowledge regarding the physical harm caused by overexposure to mercury. OLIN had a duty to disclose this information to Plaintiff Workers regarding the hazards of the conditions in the FACILITY. However, OLIN knowingly, intentionally, and with scienter concealed from all Plaintiff Contractor Workers, including their family members and the contractors coming in contact with the site or hazardous materials from the site, that the FACILITY, encompassing the indoor spaces, outdoor property, equipment, and material, was contaminated with high levels of mercury and the dangers of physical contact that such exposure could cause.

*Suppression of the physical symptoms of mercury toxicity.*

440.    Throughout the relevant time frame, OLIN had the benefit of specific scientific knowledge regarding the physical symptoms caused by overexposure to mercury. OLIN had a duty to disclose this information to Plaintiff Workers regarding the hazards of the conditions in the FACILITY. However, OLIN knowingly, intentionally, and with scienter concealed from all Plaintiff Contractor Workers, including their family members and the contractors coming in contact with the site or hazardous materials from the site, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury and the probability that significant physical symptoms from such exposure could occur. Furthermore, OLIN failed to communicate what these physical symptoms could be.

*Knowledge of the levels of mercury contamination of the entire site.*

441.    Throughout the relevant time frame, OLIN had the benefit of scientific testing of the air, water, soil, equipment, and structure of the site. OLIN had a duty to disclose this information to Plaintiff Workers regarding the hazards of the conditions in the FACILITY. However, OLIN knowingly,

intentionally, and with scienter concealed from all Plaintiff Contractor Workers, including family members and contractors coming in contact with the site or hazardous materials from the site, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury.

*Insufficiencies and inaccuracies of their Safety Plan and Policies*

442.    Throughout the relevant time frame, OLIN had safety plans that were completely inadequate and non-compliant with EH&S Guidelines. OLIN had a duty to disclose this information to Plaintiff Workers regarding the hazards of the conditions in the FACILITY. OLIN knowingly, intentionally, and with scienter concealed these known safety failures from the Plaintiff Contractor Workers, including those working on the site, their family members, and others working in contact with materials from the site.

*Inaccurate and Insufficient Air, Water, and Soil Monitoring*

443.    Throughout the relevant time frame, OLIN implemented inaccurate and insufficient environmental monitoring practices based on EH&S Guidelines. OLIN had a duty to disclose this information to Plaintiff Workers regarding the hazards of the conditions in the FACILITY. OLIN knowingly,

intentionally, and with scienter concealed these known deficiencies from the Plaintiff Contractor Workers, including those working onsite, their family members, and others coming in contact with materials from the site.

*Inaccurate and Insufficient Medical Monitoring Program*

444.    Throughout the relevant time frame, OLIN knowingly, intentionally, and with scienter failed to disclose to the Plaintiff Contractor Workers that their Medical Monitoring Program was inadequate based upon EH&S Guidelines.

*Inadequate Personal Protective Equipment (PPE) Policies*

445.    Throughout the relevant time frame, OLIN knowingly, intentionally, and with scienter failed to disclose to the Plaintiff Contractor Workers that these PPE Programs were grossly inadequate based upon EH&S Guidelines.

*Urine Monitoring Data Demonstrated Mercury Contamination*

446.    Throughout the relevant time frame, the Mercury Urine Monitoring conducted by OLIN clearly demonstrated that select workers were getting exposed to mercury vapor. OLIN had a duty to disclose this information to Plaintiff Workers regarding the hazards of the conditions in the FACILITY. OLIN knowingly, intentionally, and with scienter concealed this information

from the Plaintiff Contractor Workers, including those working on site, their family members, and those coming into contact with contaminated materials onsite.

*Allowing Contaminated Materials to Leave the Site*

447.    Throughout the relevant time frame, OLIN routinely knowingly, intentionally, and with scienter concealed from Plaintiff Contractor Workers and third parties who would come in contact with contaminated materials from the site, the levels or even the possibility of contamination of these materials.

448.    Throughout the relevant time frame, contaminated materials would routinely leave the FACILITY with the authorization and direction of OLIN. These materials were highly contaminated with mercury.  Said highly contaminated materials would be placed into the community with no disclosure or warning of the dangers they presented. OLIN knowingly, intentionally, and with scienter concealed this information.

449.    These contaminated materials exposed Plaintiff Workers, Plaintiff Family Members and members of the general public to dangerous levels of mercury vapor.

450.    As a result of OLIN's active concealment of this information regarding the hazards present at the FACILITY and Plaintiffs' exposure to toxic mercury, Plaintiffs had no reason to suspect that their medical conditions were caused by OLIN's or the CONTRACTOR DEFENDANTS' wrongful acts.

451.    Plaintiff Contractor Workers and Plaintiff Family Members commenced this action within two years of the date on which they became reasonably aware that they had a potential claim.

452.    During the times Plaintiff Contractor Workers performed work at the FACILITY, and as a direct and proximate result of OLIN's continuing and fraudulent misrepresentations, and continuing and fraudulent nondisclosure and concealment, of their true exposure to mercury and/or the harmful nature of their true mercury exposure at the FACILITY, Plaintiff Contractor Workers and Plaintiff Family Members were reasonably unaware of their peril until within two years of this lawsuit.

453.    During the times Plaintiff Contractor Workers performed work at the FACILITY, and as a direct and proximate result of OLIN's continuing and fraudulent misrepresentations, and continuing and fraudulent nondisclosure and concealment, of their true exposure to other toxicants and/or the harmful

nature of their true exposure to other toxicants at the FACILITY, Plaintiff Contractor Workers and Plaintiff Family Members were reasonably unaware of their peril until within two years of this lawsuit.

454.    As a direct result of OLIN's concealment described above, Plaintiff Family Members were unaware of their exposure to mercury, or the injury derived from it.

455.    Plaintiff Family Members were exposed to mercury by take-home exposure through their sharing of the household with Plaintiff Workers, with said exposure being a direct and proximate result of the actions of Defendants. Therefore, all of OLIN's actions that affected the Plaintiff Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

456.    OLIN's fraudulent representations and fraudulent concealment have proximately caused the injuries suffered by these Plaintiff Contractor Workers and the Plaintiff Family Members.

457.    OLIN was in a position of superior knowledge and had a duty to the Plaintiff Contractor Workers and Plaintiff Family Members to accurately represent the true potential of mercury toxicity and not to suppress their knowledge regarding the exposures and dangers of exposures.

458.    In failing to accurately represent and/or to conceal the true facts, OLIN proximately caused the physical injuries of the Plaintiffs.

459.    Plaintiff Family Members were exposed to other toxicants by take-home exposure through their sharing of the household with Plaintiff Contractor Workers, with said exposure being a direct and proximate result of the actions of OLIN. Therefore, OLIN's actions that affected the Plaintiff Contractor Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

**Misrepresentation by Concealment by Contractor Defendants**

*Dangers of physical harm from mercury exposure of the entire site.*

460.    Contractor Defendants had the benefit of specific scientific knowledge regarding the physical harm caused by exposure to mercury. Contractor Defendants had a duty to disclose this information to Plaintiff OLIN Workers regarding the hazards of the conditions in the FACILITY. However, each of the Contractor Defendants knowingly, intentionally, and with scienter concealed from all Plaintiff OLIN Workers, and their family members, that the FACILITY, encompassing the indoor spaces, outdoor property, equipment, and material, was contaminated with high levels of mercury and the dangers of physical contact that such exposure could cause.

*Misrepresentation and Concealment of the physical symptoms of mercury toxicity.*

461.    Throughout the relevant time frame, Contractor Defendants had the benefit of specific scientific knowledge regarding the physical symptoms caused by exposure to mercury. Contractor Defendants had a duty to disclose this information to Plaintiff OLIN Workers regarding the hazards of the conditions in the FACILITY. However, each of the Contractor Defendants knowingly, intentionally, and with scienter concealed from all Plaintiff OLIN Workers, including their family members, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury and the probability that significant physical symptoms from such exposure could occur. Furthermore, Contractor Defendants failed to communicate what these physical symptoms could be.

*Knowledge of the levels of mercury contamination of the entire site.*

462.    Throughout the relevant time frame, Contractor Defendants had the benefit of scientific quantitative testing of the air, water, soil, equipment, and structure(s) of the site. Contractor Defendants had a duty to disclose this information to Plaintiff OLIN Workers regarding the hazards of the conditions in the FACILITY. However, each of the Contractor Defendants

knowingly, intentionally, and with scienter concealed from all Plaintiff OLIN Workers and their family members that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury.

*Insufficiencies and inaccuracies of their Safety Plan and Policies*

463.    Throughout the relevant time frame, Contractor Defendants had safety plans that were completely and knowingly inadequate and non-compliant with industry standards, federal and state regulations, and scientific recommendations. These safety failures were knowingly, intentionally, and with scienter concealed from Plaintiff OLIN Workers and their family members.

*Inaccurate and Insufficient Air, Water, and Soil Monitoring*

464.    Throughout the relevant time frame, Contractor Defendants implemented knowingly inaccurate and insufficient environmental monitoring practices. These deficiencies were knowingly, intentionally, and with scienter concealed from the Plaintiff OLIN Workers and their family members.

*Inaccurate and Insufficient Medical Monitoring Program*

465.    Throughout the relevant time frame, Contractor Defendants knowingly, intentionally, and with scienter failed to disclose to the Plaintiff OLIN Workers and their family members that their Medical Monitoring Program was inadequate based upon EH&S Guidelines.

*Inadequate Personal Protective Equipment (PPE) Policies*

466.    Throughout the relevant time frame, Contractor Defendants knowingly, intentionally, and with scienter failed to disclose to the Plaintiff OLIN Workers and their family members that these PPE Programs were grossly inadequate based upon EH&S Guidelines.

*Allowing Contaminated Materials to Leave the Site*

467.    Throughout the relevant time frame, Contractor Defendants knowingly, intentionally, and with scienter concealed from Plaintiff OLIN Workers and their family members the levels or even the possibility of contamination of these materials.

468.    Throughout the relevant time frame, Contaminated materials would routinely leave the FACILITY with the authorization of Contractor Defendants. These materials were highly contaminated with mercury. Said highly contaminated materials would be placed into the community with no

disclosure or warning of the dangers they presented. Contractor Defendants knowingly, intentionally, and with scienter concealed this information.

469.    Throughout the relevant time frame, these contaminated materials exposed Plaintiff OLIN Workers and their family members to mercury vapor.

470.    Plaintiff OLIN Workers and Plaintiff Family Members commenced this action within two years of the date on which they became reasonably aware that they had a potential claim.

471.    During the times that Plaintiff OLIN Workers were present at the FACILITY, and as a direct and proximate result of Contractor Defendants' continuing and fraudulent misrepresentations, and continuing and fraudulent nondisclosure and concealment, of their true exposure to mercury and/or the harmful nature of their true mercury exposure at the FACILITY, Plaintiff OLIN Workers and Plaintiff Family Members were reasonably unaware of their peril until within two years of this lawsuit.

472.    During the times that Plaintiff OLIN Workers were present at the FACILITY, and as a direct and proximate result of Contractor Defendants' continuing and fraudulent misrepresentations, and continuing and fraudulent nondisclosure and concealment, of their true exposure to other toxicants

and/or the harmful nature of their true exposure to other toxicants at the FACILITY, Plaintiff OLIN Workers and Plaintiff Family Members were reasonably unaware of their peril until within two years of this lawsuit.

473.    Plaintiff Family Members were exposed to mercury by take-home exposure through their sharing of the household with Plaintiff Workers, with said exposure being a direct and proximate result of the actions of the Contractor Defendants. Therefore, all of the Contractor Defendants' actions that affected the Plaintiff Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

474.    Contractor Defendants' fraudulent representations and fraudulent concealment have proximately caused the injuries suffered by these Plaintiff OLIN Workers and the Plaintiff Family Members.

475.    Contractor Defendants were in a position of superior knowledge and had a duty to the Plaintiff OLIN Workers and Plaintiff Family Members to accurately represent the true potential of mercury toxicity and not to suppress their knowledge regarding the exposures and dangers of exposures.

476.    In failing to accurately represent and/or to conceal the true facts, Contractor Defendants proximately caused the physical injuries of the Plaintiffs.

477.     Plaintiff Family Members were exposed to other toxicants by take-home exposure through their sharing of the household with Plaintiff OLIN Workers, with said exposure being a direct and proximate result of the actions of the Contractor Defendants. Therefore, each of the Contractor Defendants' actions that affected the Plaintiff OLIN Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

## CHAPTER X: TOLLING

478.     Based on the facts and circumstances alleged herein, Plaintiffs have timely filed their causes of action within the applicable statute of limitations period. The Plaintiff Workers and Plaintiff Family Members were injured due to their exposure to the toxic chemical mercury and other toxicants. This exposure was caused by some or all of Defendants, as discovery will show.

479.     After being diagnosed with, treated for, or aware of one or more (eventual mercury-related) nonspecific health conditions, Plaintiff Workers and Plaintiff Family Members remained unaware until recently of the existence of the causal relationship to mercury and that they suffered an injury as a result of Defendants' wrongful conduct.

480.     As described above, the nature of the Plaintiffs' injuries involves a latency period where the harmful effects of the toxic exposure were not

discoverable for many years. As explained herein, the epidemiology of mercury toxicity is such that symptoms take many years to arise. When the Plaintiff Workers and Plaintiff Family Members experienced symptoms, these nonspecific symptoms were reasonably attributable to another cause.

481.    Neither the Plaintiffs nor the medical healthcare community were aware of the significant mercury exposures that were ongoing. Despite a duty to disclose critical safety information regarding mercury exposure, Defendants actively concealed these facts from the community. Plaintiffs contend that the "medical healthcare community" did not include OLIN's company-paid doctor and medical staff that was clearly aware of these exposures and concealed said knowledge.

482.    Mercury toxicity creates a constellation of nonspecific symptoms and injuries. Connecting these symptoms and injuries to a mercury exposure requires a subjective understanding over time. For the Plaintiffs, this understanding has only been acquired within the applicable time period for the filing of this complaint.

483.    This information was acquired by the Plaintiffs within the applicable statute of limitations period. Therefore, action on behalf of the Plaintiffs was tolled until such times that the Plaintiffs were reasonably aware.

## CHAPTER XI: COUNTS

484.    For the discussion of the Counts, Plaintiffs refer to Exhibit 1. This Matrix of Plaintiff Claims was introduced at the beginning of this Complaint and is hereby incorporated fully and completely, as if specifically stated herein. The Matrix of Plaintiff Claims includes a chart detailing the names, employers, relevant timelines, and counts for each identified Plaintiff OLIN Worker, Plaintiff Contractor Worker, Plaintiff Crossover Direct Worker, Plaintiff Family Member, and Plaintiff Crossover Family Member. The rows for Plaintiff Family Members specify the family member who exposed them to contaminants, along with their timeline of exposure. Additionally, the chart enables quick identification of Plaintiffs who have submitted affidavits, as previously mentioned. A legend is provided at the beginning of the exhibit to facilitate the interpretation of the data presented

## Count I – Negligence

*All Plaintiff Contractor Workers against OLIN*

485.    Plaintiff Contractor Workers repeat and re-allege all prior allegations of this Complaint.

486.    This count is brought by Plaintiff Contractor Workers against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

487.    OLIN owed a duty to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

488.    On a daily, regular, and frequent basis while working at the FACILITY, Plaintiff Contractor Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

489.    Depending upon the task, Plaintiff Contractor Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or on the premises, and sometimes their nearby co-workers were doing so.

490.    Despite knowing about the dangers of mercury, OLIN actively and knowingly failed to warn Plaintiff Contractor Workers, or others similarly situated, and failed to eliminate, avoid, or mitigate the dangers to Plaintiff Contractor Workers, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, on the jobsite.

491.    Through its negligent acts and active malfeasance, OLIN breached its duties of care to Plaintiff Contractor Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Contractor Workers.

492.    OLIN's negligence and breach of its said duties of care, included, but were not limited to:

a.  In failing to adequately warn Plaintiff Contractor Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b.  In failing to adequately warn Plaintiff Contractor Workers, or others similarly situated, of the dangers presented by OLIN's mercury-contaminated premises;

c.  In failing to properly train Plaintiff Contractor Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d.  In failing to provide Plaintiff Contractor Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g.  In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when OLIN knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h.  In inducing Plaintiff Contractor Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i.  In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j.  In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY;

k.  In failing to meet OLIN's continuing duty to warn or advise Plaintiff Contractor Workers, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of

its workers, contractor workers and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY;

m. In failing to provide instructions or a method for the safe use of mercury;

n.  In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.  In failing to provide Plaintiff Contractor Workers with a reasonably safe place at which to work;

p.  In allowing or causing Plaintiff Contractor Workers to be improperly exposed to toxic mercury;

q.  In engaging in malfeasance that set in motion a risk of harm to Plaintiff Contractor Workers;

r.  In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods related to the monitoring, safety,

protection from or containment of mercury releases within and/or around the FACILITY;

s.  In designing, planning, repairing, or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY;

t.  In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect those Plaintiff Contractor Workers from mercury exposure;

u.  In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY;

v.  In failing to maintain safe working conditions at or around the FACILITY with respect to preventing mercury exposure;

w. In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

x. In failing to adequately monitor, implement and/or perform mercury monitoring; and

y. In breaching the standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Contractor Workers the true dangers of and the true levels of the mercury exposures.

493.    As a direct and proximate result of OLIN's negligence, Plaintiff Contractor Workers were caused personal injuries and damages as set out in this Complaint.

494.    WHEREFORE, Plaintiff Contractor Workers demand, individually and jointly, in this prayer for relief against OLIN compensatory damages, in such amounts as are properly determined by the trier of fact, in an individual judgment entered for each Plaintiff Contractor Worker individually, in an amount in excess of $75,000 each.

## Count II – Negligence

*All Plaintiff Crossover Contractor Workers against OLIN*

495.    Plaintiff Crossover Contractor Workers repeat and re-allege all prior allegations of this complaint.

496.    This count is brought by Plaintiff Crossover Contractor Workers against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

497.    OLIN owed a duty to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

498.    On a daily, regular, and frequent basis while working at the FACILITY, Plaintiff Crossover Contractor Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

499.    Depending upon the task, Plaintiff Crossover Contractor Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or on the premises, and sometimes their nearby co-workers were doing so.

500.    Despite knowing about the dangers of mercury, OLIN actively and knowingly failed to warn Plaintiff Crossover Contractor Workers, or others similarly situated, and failed to eliminate, avoid, or mitigate the dangers to Plaintiff Crossover Contractor Workers, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, on the jobsite.

501.    Through its negligent acts and active malfeasance, OLIN breached its duties of care to Plaintiff Crossover Contractor Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Crossover Contractor Workers.

502.    OLIN's negligence and breach of its said duties of care, included, but were not limited to:

    a. In failing to adequately warn Plaintiff Crossover Contractor Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

    b. In failing to adequately warn Plaintiff Crossover Contractor Workers, or others similarly situated, of the dangers presented by OLIN's mercury-contaminated premises;

    c. In failing to properly train Plaintiff Crossover Contractor Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

    d. In failing to provide Plaintiff Crossover Contractor Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

    e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g.  In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when OLIN knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h.  In inducing Plaintiff Crossover Contractor Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i.  In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j.  In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY;

k.  In failing to meet OLIN's continuing duty to warn or advise Plaintiff Crossover Contractor Workers, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body,

clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY;

m.  In failing to provide instructions or a method for the safe use of mercury;

n.  In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.  In failing to provide Plaintiff Crossover Contractor Workers with a reasonably safe place at which to work;

p.  In allowing or causing Plaintiff Crossover Contractor Workers to be improperly exposed to toxic mercury;

q.  In engaging in malfeasance that set in motion a risk of harm to Plaintiff Crossover Contractor Workers;

r.  In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods related to the monitoring, safety,

protection from or containment of mercury releases within and/or around the FACILITY;

s.  In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY;

t.  In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect those Plaintiff Crossover Contractor Workers from mercury exposure;

u.  In failing to disclose to Plaintiff Crossover Contractor Workers their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

v.  In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY;

w.  In failing to maintain safe working conditions at or around the FACILITY with respect to preventing mercury exposure;

x.  In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations

with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

y. In failing to adequately monitor, implement and/or perform mercury monitoring; and

z. In breaching the standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Crossover Contractor Workers the true dangers of and the true levels of the mercury exposures.

503.    As a direct and proximate result of OLIN's negligence, Plaintiff Crossover Contractor Workers were caused personal injuries and damages as set out in this Complaint.

504.    WHEREFORE, Plaintiff Crossover Contractor Workers demand, individually and jointly, in this prayer for relief against OLIN compensatory damages, in such amounts as are properly determined by the trier of fact, in an individual judgment entered for each Plaintiff Crossover Contractor Worker individually, in an amount in excess of $75,000 each.

**Count III – Negligence**

*All Plaintiff Family Members against OLIN*

505.    Plaintiff Family Members, including Plaintiff Crossover Family Members, repeat and re-allege all prior allegations of this complaint.

506.    This count is brought by Plaintiff Family Members, including Plaintiff Crossover Family Members, against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

507.    OLIN negligently breached duties of care to Plaintiff Family Members and Plaintiff Crossover Family Members, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Family Members and Plaintiff Crossover Family Members.

508.    OLIN's negligence and breach of their said duties of care, included, but were not limited to:

a.  OLIN negligently allowed or caused Plaintiff Family Members to be improperly exposed to toxic mercury;

b.  OLIN had scientific knowledge of the harmful level of exposure to the chemical mercury, plus knowledge that the Plaintiff Family Members were/or would be exposed to such quantities;

c. OLIN negligently performed and/or failed to perform workplace safety and/or failed to adequately monitor mercury exposures and/or failed to provide adequate equipment, devices, or goods, related to the monitoring, safety, protection from or containment of mercury emissions within and/or around the FACILITY;

d. OLIN negligently designed, planned, repaired, or constructed the buildings and/or equipment and/or systems therein, such as adversely affected mercury monitoring, containment safety or emissions at the FACILITY;

e. OLIN negligently failed to maintain a safe workplace and/or safe working conditions at or around the FACILITY with respect to preventing mercury exposure; and

f. OLIN negligently failed to adequately monitor and contain mercury-contaminated materials from leaving the FACILITY.

509. As a direct and proximate result of OLIN's negligence, Plaintiff Family Members were caused personal injuries and damages as set out in this Complaint.

510. WHEREFORE, Plaintiff Family Members demand, individually and jointly, in this prayer for relief against OLIN compensatory damages, in such amounts as are properly determined by the trier of fact, in a judgment entered

for each Plaintiff Family Member individually, in an amount in excess of $75,000 each.

## Count IV - Negligence

*Plaintiff OLIN Workers against certain Contractor Defendants who performed work at the FACILITY*

511.    Plaintiff OLIN Workers repeat and re-allege all prior allegations of this complaint.

512.    Plaintiff OLIN Workers are maintaining this claim against the Contractor Defendants who performed work at the FACILITY while said Plaintiffs were working at the FACILITY, for the relevant time frame(s) set forth in Exhibit 1.

513.    These Contractor Defendants owed a duty to Plaintiff OLIN Workers to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

514.    On a daily, regular, and frequent basis while working at the FACILITY, Plaintiff OLIN Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

515.    Depending upon the task, Plaintiff OLIN Workers were personally handling or working with mercury and/or mercury-containing or

contaminated materials, equipment, or on the premises, and sometimes their nearby co-workers were doing so.

516.    Despite knowing about the dangers of mercury, Contractor Defendants actively and knowingly failed to warn Plaintiff OLIN Workers, their family members, or others similarly situated, and failed to eliminate, avoid, or mitigate the dangers to Plaintiff OLIN Workers, their family members, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the FACILITY.

517.    Through its negligent acts and active malfeasance, the Contractor Defendants breached their duties of care to Plaintiff OLIN Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff OLIN Workers.

518.    The said Contractor Defendants' negligence and breach of their said duties of care, included, but were not limited to:

   a. In failing to adequately warn Plaintiff OLIN Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b. In failing to adequately warn Plaintiff OLIN Workers, or others similarly situated, of the dangers presented by Defendants' work on mercury-contaminated premises;

c. In failing to properly train Plaintiff OLIN Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d. In failing to provide Plaintiff OLIN Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g. In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when Defendants knew or should have known that such materials,

equipment, and premises caused injuries in those persons exposed to mercury;

h. In inducing Plaintiff OLIN Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i. In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j. In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY;

k. In failing to meet Contractor Defendants' continuing duty to warn or advise Plaintiff OLIN Workers, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers, and invitees away from the home environment;

l. In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY;

m. In failing to provide instructions or a method for the safe use of mercury;

n. In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o. In failing to provide Plaintiff OLIN Workers with a reasonably safe place at which to work;

p. In allowing or causing Plaintiff OLIN Workers to be improperly exposed to toxic mercury;

q. In engaging in malfeasance that set in motion a risk of harm to Plaintiff OLIN Workers;

r. In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around the FACILITY;

s. In designing, planning, repairing, or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY;

t.  In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect Plaintiff OLIN Workers from mercury exposure;

u.  In failing to disclose to Plaintiff OLIN Workers their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

v.  In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY;

w.  In failing to maintain safe working conditions at or around the FACILITY with respect to preventing mercury exposure;

x.  In failing to adhere to legally-required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases, and/or containment, such as constituted negligence per se;

y.  In failing to adequately monitor, implement, and/or perform mercury monitoring; and

z. In breaching the standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff OLIN Workers the true dangers of and the true levels of the mercury exposures.

519.    As a direct and proximate result of the said Contractor Defendants' negligence, Plaintiff OLIN Workers suffered personal injuries and damages as set out in this Complaint.

520.    WHEREFORE, Plaintiff OLIN Workers demand, individually and jointly, in this prayer for relief against all Contractor Defendants compensatory damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff OLIN Worker, individually, in an amount in excess of $75,000 each.

## Count V - Negligence

*Plaintiff Crossover OLIN Workers against certain Contractor Defendants who performed work at the FACILITY*

521.    Plaintiff Crossover OLIN Workers repeat and re-allege all prior allegations of this complaint.

522.    Plaintiff Crossover OLIN Workers are maintaining this claim against Contractor Defendants who performed work at the FACILITY while said

Plaintiffs were working at the FACILITY, for the relevant time frame(s) set forth in Exhibit 1.

523.    These Contractor Defendants owed a duty to these Plaintiff Crossover OLIN Workers to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

524.    On a daily, regular, and frequent basis while working at the FACILITY, Plaintiff Crossover OLIN Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

525.    Depending upon the task, Plaintiff Crossover OLIN Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or on the premises, and sometimes their nearby co-workers were doing so.

526.    Despite knowing about the dangers of mercury, Contractor Defendants actively and knowingly failed to warn Plaintiff Crossover OLIN Workers, their family members, or others similarly situated, and failed to eliminate, avoid, or mitigate the dangers to Plaintiff Crossover OLIN Workers, their family members, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the FACILITY.

527.    Through its negligent acts and active malfeasance, the Contractor Defendants breached their duties of care to Plaintiff Crossover OLIN Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Crossover OLIN Workers.

528.    The said Contractor Defendants' negligence and breach of their said duties of care, included, but were not limited to:

    a. In failing to adequately warn Plaintiff Crossover OLIN Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

    b. In failing to adequately warn Plaintiff Crossover OLIN Workers, or others similarly situated, of the dangers presented by Defendants' work on mercury-contaminated premises;

    c. In failing to properly train Plaintiff Crossover OLIN Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

    d. In failing to provide Plaintiff Crossover OLIN Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g.  In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when Defendants knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h.  In inducing Plaintiff Crossover OLIN Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i.  In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j.  In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY;

k.  In failing to meet Contractor Defendants' continuing duty to warn or advise Plaintiff Crossover OLIN Workers, and others similarly

situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers, and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY;

m. In failing to provide instructions or a method for the safe use of mercury;

n.  In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.  In failing to provide Plaintiff Crossover OLIN Workers with a reasonably safe place at which to work;

p.  In allowing or causing Plaintiff Crossover OLIN Workers to be improperly exposed to toxic mercury;

q.  In engaging in malfeasance that set in motion a risk of harm to Plaintiff Crossover OLIN Workers;

r.  In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods related to the monitoring, safety, protection from or containment of mercury releases within and/or around the FACILITY;

s.  In designing, planning, repairing, or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY;

t.  In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect Plaintiff Crossover OLIN Workers from mercury exposure;

u.  In failing to disclose to Plaintiff Crossover OLIN Workers their exposure to mercury in the workplace, and/or the true dangers and risks of mercury;

v.  In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY;

w. In failing to maintain safe working conditions at or around the FACILITY with respect to preventing mercury exposure;

x. In failing to adhere to legally-required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

y. In failing to adequately monitor, implement and/or perform mercury monitoring; and

z. In breaching the standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Crossover OLIN Workers the true dangers of and the true levels of the mercury exposures.

529.    As a direct and proximate result of the said Contractor Defendants' negligence, Plaintiff Crossover OLIN Workers suffered personal injuries and damages as set out in this Complaint.

530.    WHEREFORE, Plaintiff Crossover OLIN Workers demand, individually and jointly, in this prayer for relief against all Contractor Defendants compensatory damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff

Crossover OLIN Worker, individually, in an amount in excess of $75,000 each.

## Count VI – Misrepresentation by Concealment

*All Plaintiff Contractor Workers and their Plaintiff Family Members against OLIN*

531.    All Plaintiff Contractor Workers, and all Plaintiff Family Members associated with said workers, repeat and re-allege all prior allegations of this complaint.

532.    Plaintiff Contractor Workers, and all Plaintiff Family Members associated with said workers, are maintaining this claim against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

533.    Prior to exposure of Plaintiff Contractor Workers to OLIN's equipment and processes utilizing toxic mercury and other toxicants, OLIN possessed knowledge of substantial medical and scientific data by which OLIN knew its mercury processes were, or were likely to become, hazardous to the life, health, and safety of persons in the position of all Plaintiff Contractor Workers who were exposed to their processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation, and other resources, as described above, which established

that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

534.    Nevertheless, prompted primarily by pecuniary motives, OLIN failed and refused to act upon such medical and scientific data, to warn Plaintiff Contractor Workers of the life and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Contractor Workers.

535.    Further, OLIN knowingly, intentionally and with scienter made false representations and repeatedly assured Plaintiff Contractor Workers that the FACILITY was safe despite knowledge that those statements were false. OLIN, in wanton and reckless disregard for human life and health, deliberately, intentionally, and purposely withheld and concealed such safety information from those exposed to their processes and materials including Plaintiff Contractor Workers. See the detailed allegations, quotations and affidavit citations located at paragraphs 435, 438, 439, 440, and 441.

536.    With the intent to induce, deceive and mislead Plaintiff Contractor Workers, OLIN knowingly, intentionally and with scienter made false

representations and repeatedly suppressed for many years material facts from Plaintiff Contractor Workers, to whom it had a duty to disclose, regarding the dangers of mercury and other toxicants. These omissions were material and were made intentionally, falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred, and with the intent of misleading Plaintiff Contractor Workers into relying upon them. Throughout the time period in question, Supervisors at the FACILITY, including but not limited to OLIN FACILITY Manager, Earl Hilson, fraudulently misrepresented safety instructions to Plaintiffs Workers, beginning from the time they first started working at the FACILITY. An example of such a fraudulent misrepresentation occurred in approximately 1991, when Hilson gave Plaintiff Contractor Worker Thomas Lacy a consultation when Mr. Lacy was first hired and falsely stated to Mr. Lacy that everything was safe as long as Mr. Lacy went where he was told to go, used the respirator when he needed to, and wore the right shoes. (Lacy Affidavit, pg. 8)

For further  detailed allegations see t paragraphs 435, 438, 439, 440, and 441.

537.    Upon information and belief, the individuals who made these fraudulent misrepresentations, and the dates on which they were made are

known to OLIN and will be further identified in discovery in this matter. Plaintiff Contractor Workers reasonably relied upon OLIN's representations, concealments, and suppressions because of OLIN's superior knowledge and duty of care toward the health and safety of Plaintiff Contractor Workers and Plaintiff Family Members, and suffered resulting injuries proximately caused by their reliance.

538.    Plaintiff Contractor Worker were not aware of the material facts concealed or suppressed by OLIN (regarding the dangers of mercury and other toxicants), and they would have acted differently if they had known.

539.    As a direct and proximate result of OLIN's ongoing misrepresentations, concealments, and suppressions, which continued for many years, Plaintiff Contractor Workers were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and continued exposure to mercury, ultimately leading to personal injuries to Plaintiff Contractor Workers and Plaintiff Family Members.

540.    OLIN'S fraudulent statements were made continuously throughout the time stated above, to the Plaintiff Contractor Workers while at the FACILITY, and more specifically were made as follows:

a.  That adequate mercury monitoring was being conducted when in fact OLIN knew that monitoring was inaccurate, sporadic, and at times non-existent;

b.  That levels of mercury exposure were reasonably safe and that work exposures and processes posed no threat of danger for toxic mercury contamination when in fact OLIN knew these statements were false and possessed significant data contrary to these statements;

c.  That the FACILITY was a safe workplace when in fact, OLIN knew that the FACILITY and premises were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff Contractor Workers to excessive levels of mercury;

d.  That the FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact OLIN knew that it did not, as described above, which led to Plaintiff Contractor Workers being exposed to dangerous levels of mercury;

e.  That mercury containment, devices, and warning systems, and/or equipment at the FACILITY were adequate to prevent harmful mercury

exposures when in fact OLIN knew that the same were ineffective to prevent dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY were within safe and/or acceptable levels, when in fact, OLIN knew that Plaintiff Contractor Workers were exposed at the FACILITY to unsafe and unacceptably dangerous levels of mercury exposure; and

g.  That periodic, employer-sponsored, urine testing of workers adequately or accurately revealed the mercury exposure of Plaintiff Contractor Workers, when in fact, OLIN knew that testing was ineffective to show actual levels.

541.  Plaintiff Contractor Workers and Plaintiff Family Members were unaware of the dangers to life and health resulting from exposure to OLIN's toxic mercury and, not possessing the degree of superior technical knowledge and expertise of OLIN concerning toxic mercury and its use, continued to work with and around OLIN's mercury and were deprived by the above described acts and omissions of OLIN of the free and informed opportunity to remove themselves from exposure to OLIN's mercury and otherwise to protect themselves from exposure thereto.

542.    OLIN's fraudulent conduct of concealment or suppression was a direct and proximate cause of mercury-related disease and damages to Plaintiff Contractor Workers and Plaintiff Family Members.

543.    OLIN'S conduct as alleged in this count exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

544.    WHEREFORE, Plaintiff Contractor Workers and Plaintiff Family Members demand, individually and jointly, in this prayer for relief against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Contractor Worker individually and for each Plaintiff Family Member individually, in an amount in excess of $75,000 each.

## Count VII –Misrepresentation by Concealment

*All Plaintiff Crossover Contractor Workers, and their Plaintiff Crossover Family Members, against OLIN*

545.    All Plaintiff Crossover Contractor Workers, and the Plaintiff Crossover Family Members associated with such workers, repeat and re-allege all prior allegations of this complaint.

546.    Plaintiff Crossover Contractor Workers, and all Plaintiff Crossover Family Members associated with said workers, are maintaining this claim against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

547.    Prior to exposure of Plaintiff Crossover Contractor Workers to OLIN's equipment and processes utilizing toxic mercury and other toxicants, OLIN possessed knowledge of substantial medical and scientific data by which OLIN knew its mercury processes were, or were likely to become, hazardous to the life, health, and safety of persons in the position of all Plaintiff Crossover Contractor Workers who were exposed to their processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation, and other resources, as described above, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

548.    Nevertheless, prompted primarily by pecuniary motives, OLIN failed and refused to act upon such medical and scientific data, to warn Plaintiff Crossover Contractor Workers of the life- and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and

potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Crossover Contractor Workers.

549.    Further, OLIN knowingly, intentionally and with scienter made false representations and repeatedly assured Plaintiff Crossover Contractor Workers that the FACILITY was safe despite knowledge that those statements were false. OLIN, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such safety information from those exposed to their processes and materials including Plaintiff Crossover Contractor Workers. See the detailed allegations, quotations, and affidavit citations located at paragraphs 435, 438, 439, 440, and 441.

550.    With the intent to induce, deceive and mislead Plaintiff Crossover Contractor Workers, OLIN knowingly, intentionally and with scienter concealed or suppressed for many years material facts from Plaintiff Crossover Contractor Workers, to whom it had a duty to disclose, regarding the dangers of mercury and other toxicants. These omissions were material and were made intentionally, falsely, with scienter and with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred, and with the intent of

inducing and misleading Plaintiff Crossover Contractor Workers into relying upon them. Throughout the time period in question, Supervisors at the FACILITY, including but not limited to OLIN Supervisor Rick (last name unknown), routinely gave Plaintiffs fraudulent safety instructions. An example of such a fraudulent misrepresentation occurred in approximately 2014 and 2015, when a Plaintiff Crossover Contractor Worker was repeatedly told that fresh air would help keep their mercury levels down during Decommissioning and Demolition. (Kelley Affidavit, pg. 4)

For further detailed allegations   see paragraphs 435, 438, 439, 440, and 441.

551.   Upon information and belief, the individuals who made these fraudulent misrepresentations and the dates on which they were made are known to OLIN and will be further identified in discovery in this matter.

552.   Plaintiff Crossover Contractor Workers reasonably relied upon OLIN's representations, concealments, and suppressions because of OLIN's superior knowledge and duty of care toward the health and safety of Plaintiff Crossover Contractor Workers and Plaintiff Crossover Family Members, and suffered resulting injuries proximately caused by their reliance.

553.   Plaintiff Crossover Contractor Workers were not aware of the material facts concealed or suppressed by OLIN (regarding the dangers of mercury

and other toxicants), and they would have acted differently if they had known.

554.   As a direct and proximate result of OLIN's ongoing misrepresentations, concealments, and suppressions, which continued for many years, Plaintiff Crossover Contractor Workers were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and continued exposure to mercury, ultimately leading to personal injuries to Plaintiff Crossover Contractor Workers and Plaintiff Family Members.

555.   OLIN'S fraudulent statements were made continuously throughout the time stated above, to the Plaintiff Crossover Contractor Workers while at the FACILITY, and more specifically were made as follows:

a. That adequate mercury monitoring was being conducted when in fact OLIN knew that monitoring was inaccurate, sporadic, and at times non-existent;

b. That levels of mercury exposure were reasonably safe and that work exposures and processes posed no threat of danger for toxic mercury contamination when in fact OLIN knew these statements were false and possessed significant data contrary to these statements;

c.  That the FACILITY was a safe workplace when in fact, OLIN knew that the FACILITY and premises were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff Crossover Contractor Workers to excessive levels of mercury;

d.  That the FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact OLIN knew that it did not, as described above, which led to Plaintiff Crossover Contractor Workers being exposed to dangerous levels of mercury;

e.  That mercury containment devices and warning systems, and/or equipment at the FACILITY were adequate to prevent harmful mercury exposures when in fact OLIN knew that the same were ineffective to prevent dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY were within safe and/or acceptable levels, when in fact, OLIN knew that Plaintiff Crossover Contractor Workers were exposed at the FACILITY to unsafe and unacceptably dangerous levels of mercury exposure; and

g.  That periodic, employer-sponsored urine testing of workers adequately or accurately revealed the mercury exposure of Plaintiff Crossover

Contractor Workers, when in fact, OLIN knew that testing was ineffective to show actual levels.

556.    Plaintiff Crossover Contractor Workers and Plaintiff Crossover Family Members were unaware of the dangers to life and health resulting from exposure to OLIN's toxic mercury and not possessing the degree of superior technical knowledge and expertise of OLIN concerning toxic mercury and its use, continued to work with and around OLIN's mercury and were deprived by the above described acts and omissions of OLIN of the free and informed opportunity to remove themselves from exposure to OLIN's mercury and otherwise to protect themselves from exposure thereto.

557.    OLIN's fraudulent conduct of concealment or suppression was a direct and proximate cause of mercury-related disease and damages to Plaintiff Crossover Contractor Workers and their Plaintiff Crossover Family Members.

558.    OLIN'S conduct as alleged in this count exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

559.    WHEREFORE, Plaintiff Crossover Contractor Workers and their Plaintiff Crossover Family Members demand, individually and jointly, in

this prayer for relief against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Crossover Contractor Worker individually and for each Plaintiff Crossover Family Member individually, in an amount in excess of $75,000 each.

## Count VIII – Misrepresentation by Concealment

*Plaintiff OLIN Workers and their Plaintiff Family Members against Contractor Defendants who performed work at the FACILITY.*

560.    All Plaintiff OLIN Workers, and the Plaintiff Family Members associated with such workers, repeat and re-allege all prior allegations of this complaint.

561.    Plaintiff OLIN Workers and their Plaintiff Family Members are maintaining this claim against Contractor Defendants who performed work at the FACILITY while said Plaintiffs (or their family member) were working at the FACILITY, for the relevant time frame(s) set forth in Exhibit 1.

562.    Prior to exposure of Plaintiff OLIN Workers to Contractor Defendants' equipment and processes utilizing toxic mercury and other toxicants, Contractor Defendants possessed knowledge of substantial medical and

scientific data by which Contractor Defendants knew their mercury processes were, or were likely to become, hazardous to the life, health, and safety of persons in the position of all Plaintiff OLIN Workers who were exposed to their processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation, and other resources, as described above, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

563.     Nevertheless, prompted primarily by pecuniary motives, Contractor Defendants failed and refused to act upon such medical and scientific data to warn Plaintiff OLIN Workers of the life- and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff OLIN Workers.

564.     Further, Contractor Defendants falsely and repeatedly assured Plaintiff OLIN Workers that the FACILITY was safe despite knowledge that those statements were false. Contractor Defendants, in wanton and reckless disregard for human life and health, deliberately, intentionally, and

purposely withheld and concealed such safety information from those exposed to their processes and materials, including Plaintiff OLIN Workers. See the detailed allegations located at paragraphs 462 and 463.

565.    With the intent to induce, deceive, and mislead Plaintiff OLIN Workers, Contractor Defendants concealed or suppressed for many years material facts from Plaintiff OLIN Workers, to whom they had a duty to disclose, regarding the dangers of mercury and other toxicants. These omissions were material and were made intentionally, falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred, and with the intent of misleading Plaintiff OLIN Workers into relying upon them. See the detailed allegations located at paragraphs 462 and 463.

566.    Upon information and belief, the individuals who made these fraudulent misrepresentations and the dates on which they were made are known to Contractor Defendants and will be further identified in discovery in this matter.

567.    Plaintiff OLIN Workers reasonably relied upon Contractor Defendants' representations, concealments, and suppressions because of Contractor Defendants' superior knowledge and duty of care toward the health and

safety of Plaintiff OLIN Workers, and Plaintiff OLIN Workers suffered resulting injuries proximately caused by their reliance.

568.    Plaintiff OLIN Workers were not aware of the material facts concealed or suppressed by Contractor Defendants (regarding the dangers of mercury and other toxicants), and they would have acted differently if they had known.

569.    As a direct and proximate result of Contractor Defendants' ongoing misrepresentations, concealments, and suppressions, which continued for many years, Plaintiff OLIN Workers were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and continued exposure to mercury, ultimately leading to personal injuries to Plaintiff OLIN Workers and Plaintiff Family Members.

570.    Contractor Defendants' fraudulent statements were made continuously throughout the time stated above, to the Plaintiff OLIN Workers while at the FACILITY, and more specifically were made as follows:

    a.  That adequate mercury monitoring was being conducted when in fact the Contractor Defendants knew that monitoring was inaccurate, sporadic, and at times non-existent;

b. That levels of mercury exposure were reasonably safe and that work exposures and processes posed no threat of danger for toxic mercury contamination when in fact the Contractor Defendants knew these statements were false and possessed significant data contrary to these statements;

c. That the FACILITY was a safe workplace when in fact, the Contractor Defendants knew that the FACILITY and premises were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff OLIN Workers to excessive levels of mercury;

d. That the FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact the Contractor Defendants knew that it did not, which led to Plaintiff OLIN Workers being exposed to dangerous levels of mercury;

e. That mercury containment devices and warning systems, and/or equipment at the FACILITY were adequate to prevent harmful mercury exposures when in fact the Contractor Defendants knew that the same were ineffective to prevent dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY were within safe and/or acceptable levels, when in fact, the Contractor Defendants knew that Plaintiff OLIN Workers were exposed at the FACILITY to unsafe and unacceptably dangerous levels of mercury exposure; and

g.  That periodic, employer-sponsored urine testing of workers adequately or accurately revealed the mercury exposure of Plaintiff OLIN Workers, when in fact, the Contractor Defendants knew that testing was ineffective to show actual levels.

571.    Plaintiff OLIN Workers and Plaintiff Family Members were unaware of the dangers to life and health resulting from exposure to Contractor Defendants' toxic mercury and not possessing the degree of superior technical knowledge and expertise of Contractor Defendants concerning toxic mercury and its use, continued to work with and around mercury and were deprived by the above-described acts and omissions of Contractor Defendants of the free and informed opportunity to remove themselves from exposure to mercury and otherwise to protect themselves from exposure thereto.

572.    Contractor Defendants' fraudulent conduct of concealment or suppression was a direct and proximate cause of mercury-related disease and damages to Plaintiff OLIN Workers and their Plaintiff Family Members.

573.    Contractor Defendants' conduct as alleged in this count exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

574.    WHEREFORE, Plaintiff OLIN Workers and their Plaintiff Family Members demand, individually and jointly, in this prayer for relief against Contractor Defendants compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Direct Worker and their Plaintiff Family Member individually, in an amount in excess of $75,000 each.

## Count IX –Misrepresentation by Concealment

*Plaintiff Crossover OLIN Workers, with their Plaintiff Family Members, against Contractor Defendants who performed work at the FACILITY*

575.    All Plaintiff Crossover OLIN Workers, and their Plaintiff Family Members associated with such workers, repeat and re-allege all prior allegations of this complaint.

576.    Plaintiff Crossover OLIN Workers, and their Plaintiff Family Members are maintaining this claim against Contractor Defendants who performed work at the FACILITY while said Plaintiffs (or their family member) were working at the FACILITY, for the relevant time frame(s) set forth in Exhibit 1.

577.    Prior to exposure of Plaintiff Crossover OLIN Workers to Contractor Defendants' equipment and processes utilizing toxic mercury and other toxicants, Contractor Defendants possessed knowledge of substantial medical and scientific data by which Contractor Defendants knew their mercury processes were, or were likely to become, hazardous to the life, health, and safety of persons in the position of all Plaintiff Crossover OLIN Workers who were exposed to their processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation, and other resources, as described above, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

578.    Nevertheless, prompted primarily by pecuniary motives, Contractor Defendants failed and refused to act upon such medical and scientific data, to warn Plaintiff Crossover OLIN Workers, of the life and health-threatening

dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Crossover OLIN Workers.

579.    Further, Contractor Defendants knowingly, intentionally and with scienter made false representations and repeatedly assured Plaintiff Crossover OLIN Workers that the FACILITY was safe despite knowledge that those statements were false. Contractor Defendants, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such safety information from those exposed to their processes and materials including Plaintiff Crossover OLIN Workers. See the detailed allegations located at paragraphs 462 and 463.

580.    With the intent to induce, deceive and mislead Plaintiff Crossover OLIN Workers, Contractor Defendants knowingly, intentionally and with scienter concealed or suppressed for many years material facts from Plaintiff Crossover OLIN Workers, to whom they had a duty to disclose, regarding the dangers of mercury and other toxicants. These omissions were material and were made intentionally, falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false

that knowledge may be inferred, and with the intent of misleading Plaintiff Crossover OLIN Workers into relying upon them. Another series of example of such a fraudulent misrepresentations are based on the sworn testimony of Plaintiff Crossover OLIN Worker Darryl Mims. Mr. Mims testified to the following fraudulent misrepresentations that were made to him by various OLIN medical and supervisory personnel:

a) In approximately mid-2000: "I was told by (onsite Nurse for OLIN) Nurse Cynthia Williams and (OLIN Supervisor) Earl Parrish that the cotton coveralls provided were mercury resistant."

b) In approximately May of 2000: "I was told by (onsite Nurse for OLIN) Nurse Cynthia Williams and my Supervisors that if I washed my hands, kept them out of my mouth, and took a shower, I would be safe from mercury exposure. Cynthia and my Supervisors also said that if my mercury levels were high, then I had bad hygiene."

c) In approximately May of 2000: "I was told by (onsite Nurse for OLIN) Nurse Cynthia Williams about people in Africa mining for gold and how they were exposed to mercury on the job. She said those people were put in sweat boxes to sweat out the mercury. Therefore, she said, we would be safe from mercury by sweating it out." Mims

Affidavit, p. 4 For further detailed allegations see paragraphs 462 and 463.

581.    Upon information and belief, the individuals who made these fraudulent misrepresentations and the dates on which they were made are known to Contractor Defendants and will be further identified in discovery in this matter.

582.    Plaintiff Crossover OLIN Workers reasonably relied upon Contractor Defendants' representations, concealments, and suppressions because of Contractor Defendants' superior knowledge and duty of care toward the health and safety of Plaintiff Crossover OLIN Workers, and Plaintiff Crossover OLIN Workers and their Plaintiff Family Members suffered resulting injuries proximately caused by their reliance.

583.    Plaintiff Crossover OLIN Workers were not aware of the material facts concealed or suppressed by Contractor Defendants (regarding the dangers of mercury and other toxicants), and they would have acted differently if they had known.

584.    As a direct and proximate result of Contractor Defendants' ongoing misrepresentations, concealments, and suppressions, which continued for many years, Plaintiff Crossover OLIN Workers were reasonably unaware of

their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and continued exposure to mercury, ultimately leading to personal injuries to Plaintiff Crossover OLIN Workers and their Plaintiff Family Members.

585. Contractor Defendants' fraudulent statements were made continuously throughout the time stated above, to the Plaintiff Crossover OLIN Workers while at the FACILITY, and more specifically were made as follows:

a. That adequate mercury monitoring was being conducted when in fact the Contractor Defendants knew that monitoring was inaccurate, sporadic, and at times non-existent;

b. That levels of mercury exposure were reasonably safe and that work exposures and processes posed no threat of danger for toxic mercury contamination when in fact the Contractor Defendants knew these statements were false and possessed significant data contrary to these statements;

c. That the FACILITY was a safe workplace when in fact, the Contractor Defendants knew that the FACILITY and premises were contaminated with excessive levels of mercury and the work processes used

dangerously exposed Plaintiff Crossover OLIN Workers to excessive levels of mercury;

d.  That the FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact the Contractor Defendants knew that it did not, as described above, which led to Plaintiff Crossover OLIN Workers being exposed to dangerous levels of mercury;

e.  That mercury containment devices and warning systems, and/or equipment at the FACILITY were adequate to prevent harmful mercury exposures when in fact the Contractor Defendants knew that the same were ineffective to prevent dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY were within safe and/or acceptable levels, when in fact, the Contractor Defendants knew that Plaintiff Crossover OLIN Workers were exposed at the FACILITY to unsafe and unacceptably dangerous levels of mercury exposure; and

g.  That periodic, employer-sponsored urine testing of workers adequately or accurately revealed the mercury exposure of Plaintiff OLIN Workers, when in fact, the Contractor Defendants knew that testing was ineffective to show actual levels.

586.    Plaintiff Crossover OLIN Workers and their Plaintiff Family Members were unaware of the dangers to life and health resulting from exposure to Contractor Defendants' toxic mercury and not possessing the degree of superior technical knowledge and expertise of Contractor Defendants concerning toxic mercury and its use, continued to work with and around mercury and were deprived by the above described acts and omissions of Contractor Defendants of the free and informed opportunity to remove themselves from exposure to mercury and otherwise to protect themselves from exposure thereto.

587.    Contractor Defendants' fraudulent conduct of concealment or suppression was a direct and proximate cause of mercury-related disease and damages to Plaintiff Crossover OLIN Workers and their Plaintiff Family Members.

588.    Contractor Defendants' conduct, as alleged in this count, exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

589.    WHEREFORE, Plaintiff Crossover OLIN Workers and their Plaintiff Family Members demand, individually and jointly, in this prayer for relief

against Contractor Defendants compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Crossover OLIN Worker and their Plaintiff Family Member individually, in an amount in excess of $75,000 each.

**Count X- Intentional (Fraudulent) Misrepresentation/Reckless Misrepresentation**

*Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers against OLIN*

590.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers repeat and re-allege all prior allegations of this complaint.

591.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers are maintaining this claim against OLIN for the relevant time frame(s) set forth in Exhibit 1.

592.    Prior to exposure of Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers to OLIN equipment and processes utilizing toxic mercury and other toxicants, OLIN possessed knowledge of substantial medical and scientific data by which OLIN knew its mercury processes were, or were likely to become, hazardous to the life, health and safety of persons in the positions of Plaintiff Contractor Workers and Plaintiff

Crossover Contractor Workers, who were exposed to its processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation, and other resources, as described above, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

593.    Nevertheless, prompted primarily by pecuniary motives, OLIN made representations of existing or past material facts that were false when made, and failed and refused to act upon such medical and scientific data, to warn Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers of the life and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers. See the detailed allegations, quotations, and affidavit citations located at paragraphs 435, 438, 439, 440, and 441.

594.    Further, OLIN knowingly, intentionally and with scienter made false representations and repeatedly assured Plaintiff Contractor Workers and

Plaintiff Crossover Contractor Workers that the FACILITY was safe despite knowledge that those statements were false. OLIN, in wanton and reckless disregard for human life and health, knowingly, without belief in its truth, and/or recklessly (without regards to its truth or falsity) made material misrepresentations of such safety information to those exposed to OLIN's processes and materials including Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers. One example of these fraudulent misrepresentations to Plaintiff Workers took place repeatedly from approximately 2010 to approximately 2013 by NES Supervisor Bobby Adkinson when he was working as the Cell House Supervisor, as contracted OLIN to NES. Adkinson repeatedly told Plaintiffs, including but not limited to Plaintiff Contractor Worker William Elmore that "mercury would never be an issue if we wore the PPE we were supposed to and when we were supposed to. Just follow what we tell you, keep yourself protected, and you'll be all right, he would say to us regularly." (Elmore Affidavit, pg. 5) For further detailed allegations see quotations, and affidavit citations located at paragraphs 435, 438, 439, 440, and 441.

595.    OLIN knowingly, with scienter, without belief in its truth, and/or recklessly made intentional misrepresentations of material facts with intent

to deceive the Plaintiff Contractor Workers and Plaintiff Crossover Contractor Worker, to whom they had a duty to disclose the dangers of mercury and other toxicants. These misrepresentations were about existing or past material facts regarding the dangers of mercury and/or safety measures at the FACILITY and were false when made, and Plaintiff Contactor Workers and Plaintiff Crossover Contractor Workers reasonably relied upon these misrepresented material facts. See the detailed allegations, quotations, and affidavit citations located at paragraphs 435, 438, 439, 440, and 441.

596.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers reasonably relied upon OLIN's representations because of OLIN's superior knowledge and duty of care owed to Plaintiff Contractor Workers' and Plaintiff Crossover Contractor Workers' health and safety, and Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers suffered resulting injuries proximately caused by their reliance on the misrepresentations and the fraud perpetrated by OLIN.

597.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers were not aware of the material facts being misrepresented by OLIN

(regarding the dangers of mercury and other toxicants), and they would have acted differently if they had known the dangers and risks.

598.    As a direct and proximate result of OLIN's ongoing misrepresentations of material facts, Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers reasonably relied upon the misrepresentations of material facts and were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY, and continued exposure to mercury, ultimately leading to Plaintiff Contractor Workers' and Plaintiff Crossover Contractor Workers' personal injuries.

599.    OLIN's intentional or reckless misrepresentations of material facts were made continuously throughout the time stated above and as stated in the relevant time frames set out in Exhibit 1, to the Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers while at the FACILITY, and more specifically were made as follows:

a.  That adequate mercury monitoring was being conducted when in fact OLIN knew that monitoring was inaccurate, sporadic, and at times non-existent;

b. That levels of mercury exposure were reasonably safe, and that work exposures and processes posed no threat of danger for toxic mercury contamination when in fact OLIN knew that these statements were false and possessed significant data to the contrary;

c. That the FACILITY and premises were a safe workplace when in fact, OLIN knew that the FACILITY and premises were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers to excessive levels of mercury;

d. That the FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact OLIN knew that it did not, as described above, which led Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers to being exposed to dangerous levels of mercury;

e. That mercury containment devices and warning systems, and/or equipment at the FACILITY were adequate to prevent harmful mercury exposures when in fact OLIN knew that the same were ineffective to prevent dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY were within safe and/or acceptable levels, when in fact, OLIN knew that Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers were exposed at the FACILITY to unsafe and unacceptably dangerous levels of mercury exposure;

g.  That periodic, OLIN-sponsored, urine testing of workers adequately or accurately revealed the Plaintiff Contractor Workers' Plaintiff Crossover Contractor Workers' mercury exposure, when in fact, OLIN knew that that testing was ineffective to show actual levels;

h.  That safety briefings and safety meetings were held at the FACILITY with the intention of keeping individuals at the FACILITY safe, when in fact, OLIN knew that the safety briefings and safety meetings rarely, if ever, even mentioned mercury and utterly failed in warning individuals of the dangers of working at the FACILITY;

i.  That PPE provided at the FACILITY to Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers would protect them from any dangers or risks related to their exposure to mercury, mercury vapors, or other dangerous toxicants, when in fact, OLIN knew that the PPE provided to and worn by Plaintiff Contractor Workers and Plaintiff

Crossover Contractor Workers was insufficient to provide adequate
protection; and

j.  That adequate medical monitoring, medical care, and medical advice
were being provided at the FACILITY by doctors and nurses to Plaintiff
Contractor Workers and Plaintiff Crossover Contractor Workers, when
in fact, OLIN knew that that monitoring, care, and advice was sporadic,
inaccurate, non-existent, misleading, and inadequate to protect Plaintiff
Contractor Workers from mercury exposure.

600.    OLIN's intentional (fraudulent) misrepresentations and/or reckless
misrepresentations of material facts were a direct and proximate cause of
Plaintiff Contractor Workers' and Plaintiff Crossover Contractor Workers'
mercury-related diseases and related damages.

601.    The fraudulent scheme and fraudulent intent as described above was
committed and carried out by Defendants at the FACILITY with the intent
to induce and deceive the Plaintiff Contractor Workers and Plaintiff
Crossover Contractor Workers, to obtain pecuniary gain, to maximize
production and profits at the expense of the health of Plaintiff Contractor
Workers and Plaintiff Crossover Contractor Workers, with knowledge that
in order to keep workers and to keep production up, Plaintiff Contractor

Workers and Plaintiff Crossover Contractor Workers needed to believe they were safe and that their health was not at risk.

602.    OLIN's conduct as alleged in this count exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

603.    WHEREFORE, Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers demand, individually and jointly, in this prayer for relief against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Contractor Worker and Plaintiff Crossover Contractor Worker individually, in an amount in excess of $75,000 each.

## Count XI - Premises Liability

*Plaintiff Contractor Workers against OLIN.*

604.    Plaintiff Contractor Workers repeat and re-allege all prior allegations of this complaint.

605.    Plaintiff Contractor Workers are maintaining this claim against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

606.    On numerous occasions and for substantial periods of time, Plaintiff Contractor Workers worked at the FACILITY and were therefore invited onto and lawfully entered upon property owned and controlled by OLIN.

607.    OLIN owed a duty to Plaintiff Contractor Workers to maintain the FACILITY in a reasonably safe condition. OLIN breached this duty.

608.    OLIN owed a duty to Plaintiff Contractor Workers to use due care to maintain their property free of unreasonably dangerous or defective conditions and to adequately warn Plaintiff Contractor Workers of existing dangerous or defective conditions on the premises, including the presence of toxic mercury. OLIN breached this duty.

609.    At all times complained of herein, OLIN had actual or constructive knowledge that large quantities of hazardous toxic mercury and mercury vapor were present at the FACILITY.

610.    While upon property owned and controlled by OLIN, Plaintiff Contractor Workers were exposed to large quantities of toxic mercury and mercury vapor without their knowledge.

611.    At all times complained of herein, OLIN knew or should have known large quantities of mercury were present upon their premises including in

and upon equipment and materials with which Plaintiff Contractor Workers were working.

612.    At all times complained of herein, OLIN knew or should have known that Plaintiff Contractor Workers were exposed to dangerous levels of toxic mercury and mercury vapor at the FACILITY.

613.    At all times complained of herein, OLIN knew or should have known that the PPE provided to Plaintiff Contractor Workers would not adequately protect Plaintiff Contractor Workers from the dangerous levels of toxic mercury and mercury vapor at the FACILITY.

614.    OLIN knew or should have known that Plaintiff Contractor Workers would necessarily work with, around, or in close proximity to toxic mercury and mercury vapor.

615.    At all times complained of herein, OLIN knew or should have known the exposure to, and inhalation of, toxic mercury and mercury vapor could cause severe illnesses, conditions, and diseases, as set forth herein. Those include, but are not limited to, neuropathy, memory loss, renal and hepatic failure, emotional dysregulation, cardiovascular diseases, loss of sensory abilities, seizures, attention and cognitive issues, reproductive injuries, depression, anxiety, and suicidality.

616.    At all times complained of herein, OLIN knew or should have known Plaintiff Contractor Workers were unaware of the dangers associated with toxic mercury exposure, or the full magnitude of that danger, and therefore were not capable of taking adequate measures to protect themselves, their co-workers, or their Plaintiff Family Members.

617.    At all times complained of herein, OLIN failed to otherwise exercise ordinary care as owners of the FACILITY in a manner calculated to maintain their premises free of exposure to toxic mercury and mercury vapor, an unnecessarily dangerous or defective condition, and thereby protect the health of the workers and their families.

618.    At all times complained of herein, OLIN failed to exercise ordinary care to contain the toxic mercury and mercury vapor or to provide Plaintiff Contractor Workers with safe and adequate PPE to render the FACILITY safe.

619.    OLIN knew or should have known of the conditions set forth in the paragraphs above and at all times complained of herein were in a superior position to that of Plaintiff Contractor Workers to know the dangers of toxic mercury.

620.    OLIN was negligent in its failure to warn Plaintiff Contractor Workers, and other persons similarly situated, of the dangerous or defective condition of the materials, equipment, or premises brought about by the presence of toxic mercury.

621.    OLIN was negligent in its failure to warn Plaintiff Contractor Workers, and other persons similarly situated, that the Plaintiff Family Members could also be harmed by the dangerous or defective condition of the premises brought about by the presence of toxic mercury and the cross-contamination of their homes and community.

622.    The actions or omissions of OLIN set forth in the paragraphs above of this Complaint were the cause of or were a significant contributing factor in bringing about the physical injuries set forth in this Complaint and all damages suffered by Plaintiff Contractor Workers resulting from these physical injuries.

623.    OLIN's conduct as alleged in this count exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

624.    WHEREFORE, Plaintiff Contractor Workers demand, individually and jointly, in this prayer for relief against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Contractor Worker individually, in an amount in excess of $75,000 each.

## Count XII - Premises Liability

*Plaintiff Crossover Contractor Workers against OLIN*

625.    Plaintiff Crossover Contractor Workers repeat and re-allege all prior allegations of this complaint.

626.    Plaintiff Crossover Contractor Workers are maintaining this claim against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

627.    On numerous occasions and for substantial periods of time, Plaintiff Crossover Contractor Workers worked at the FACILITY and were therefore invited onto and lawfully entered upon property owned and controlled by OLIN.

628.    OLIN owed a duty to Plaintiff Crossover Contractor Workers to maintain the FACILITY in a reasonably safe condition. OLIN breached this duty.

629.    OLIN owed a duty to Plaintiff Crossover Contractor Workers to use due care to maintain their property free of unreasonably dangerous or defective conditions and to adequately warn Plaintiff Crossover Contractor Workers of existing dangerous or defective conditions on the premises, including the presence of toxic mercury. OLIN breached this duty.

630.    At all times complained of herein, OLIN had actual or constructive knowledge that large quantities of hazardous toxic mercury and mercury vapor were present at the FACILITY.

631.    While upon property owned and controlled by OLIN, Plaintiff Crossover Contractor Workers were exposed to large quantities of toxic mercury and mercury vapor without their knowledge.

632.    At all times complained of herein, OLIN knew or should have known large quantities of mercury were present upon their premises including in and upon equipment and materials with which Plaintiff Crossover Contractor Workers were working.

633.    At all times complained of herein, OLIN knew or should have known that Plaintiff Crossover Contractor Workers were exposed to dangerous levels of toxic mercury and mercury vapor at the FACILITY.

634. At all times complained of herein, OLIN knew or should have known that the PPE provided to Plaintiff Crossover Contractor Workers would not adequately protect Plaintiff Crossover Contractor Workers from the dangerous levels of toxic mercury and mercury vapor at the FACILITY.

635. OLIN knew or should have known that Plaintiff Crossover Contractor Workers would necessarily work with, around, or in close proximity to toxic mercury and mercury vapor.

636. At all times complained of herein, OLIN knew or should have known the exposure to, and inhalation of, toxic mercury and mercury vapor could cause severe illnesses, conditions, and diseases, as set forth herein. Those include, but are not limited to, neuropathy, memory loss, renal and hepatic failure, emotional dysregulation, cardiovascular diseases, loss of sensory abilities, seizures, attention and cognitive issues, reproductive injuries, depression, anxiety, and suicidality.

637. At all times complained of herein, OLIN knew or should have known Plaintiff Crossover Contractor Workers were unaware of the dangers associated with toxic mercury exposure, or the full magnitude of that danger, and therefore were not capable of taking adequate measures to protect themselves, their co-workers, or their Plaintiff Family Members.

638.    At all times complained of herein, OLIN failed to otherwise exercise ordinary care as owners of the FACILITY in a manner calculated to maintain their premises free of exposure to toxic mercury and mercury vapor, an unnecessarily dangerous or defective condition, and thereby protect the health of the workers and their families.

639.    At all times complained of herein, OLIN failed to exercise ordinary care to contain the toxic mercury and mercury vapor or to provide Plaintiff Crossover Contractor Workers with safe and adequate PPE to render the FACILITY safe.

640.    OLIN knew or should have known of the conditions set forth in the paragraphs above and at all times complained of herein were in a superior position to that of Plaintiff Crossover Contractor Workers to know the dangers of toxic mercury.

641.    OLIN was negligent in its failure to warn Plaintiff Contractor Workers, and other persons similarly situated, of the dangerous or defective condition of the materials, equipment, or premises brought about by the presence of toxic mercury.

642.    OLIN was negligent in its failure to warn Plaintiff Crossover Contractor Workers, and other persons similarly situated, that the Plaintiff Family

Members could also be harmed by the dangerous or defective condition of the premises brought about by the presence of toxic mercury and the cross-contamination of their homes and community.

643. The actions or omissions of OLIN set forth in the paragraphs above of this Complaint were the cause of or were significant contributing factors in bringing about the physical injuries set forth in this Complaint and all damages suffered by Plaintiff Crossover Contractor Workers resulting from these physical injuries.

644. OLIN's conduct as alleged in this count exhibited willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

645. WHEREFORE, Plaintiff Crossover Contractor Workers demand, individually and jointly, in this prayer for relief against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Contractor Worker individually, in an amount in excess of $75,000 each.

## Count XIII - Negligence Per Se

*All Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers against OLIN.*

646.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers repeat and re-allege all prior allegations of this complaint.

647.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers are maintaining this claim against OLIN, for the relevant time frame(s) set forth in Exhibit 1.

648.    It is imperative to Georgia public policy that the state does not allow employers to disregard the requirements of the standards required by OSHA.

649.    The statutes setting forth the OSHA regulations were enacted for the safety of workers, particularly those, like the Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers, working in positions that might expose them to hazardous chemicals. See paragraph 264.

650.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers were members of the class of persons the OSHA standards were intended to benefit and protect, as Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers engaged in work in or around the vicinity of the FACILITY where hazardous chemicals, including mercury, were located and used. See paragraph 264.

651.    This standard of care required by OSHA was set forth as a standard of conduct which was designed to avoid the harm Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers suffered.

652.    OLIN violated OSHA standards and in so doing, fundamentally breached its duty to Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers and failed to comply with the standard of conduct set forth in OSHA's required standard of care.

653.    OLIN negligently failed to adhere to legally-required manufacturing practices, and/or failed to adhere to governmental standards, rules, and/or regulations with regard to Mandatory Medical Evaluations required by OSHA Standards, specifically the Respiratory Protection Program mandatory requirement to have medical evaluations prior to using a respirator, such as to constitute negligence per se. See paragraph 264.

654.    OLIN negligently failed to adhere to legally required manufacturing practices, and/or failed to adhere to governmental standards, rules, and/or regulations with regard to implementing a written respiratory protection program required by OSHA. See paragraph 264.

655.    OLIN negligently failed to adequately monitor and/or implement and/or perform medical evaluations prior to mercury monitoring and that

OLIN breached the standard of care by not adequately providing said services and/or by not disclosing same to Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers.

656.    OLIN's violation of the OSHA statutes is a direct and proximate cause of Plaintiff Contractor Workers' and Plaintiff Crossover Contractor Workers' injuries.

657.    Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers reasonably relied upon the misrepresentations of material facts and were reasonably unaware of the relevant OSHA standards. This lack of awareness led to their continued exposure to dangerous levels of mercury, resulting in their continued employment at the FACILITY and continued exposure to mercury, ultimately leading to Plaintiff Contractor Workers' and Plaintiff Crossover Contractor Workers' personal injuries.

658.    WHEREFORE, Plaintiff Contractor Workers and Plaintiff Crossover Contractor Workers demand, individually and jointly, in this prayer for relief against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff Contractor Worker and Plaintiff Crossover Contractor Worker individually, in an amount in excess of $75,000 each.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs request that process issue and be served on each Defendant and that each Defendant be required to answer within the time set forth by law.

659.    In addition, Plaintiffs demand compensatory and punitive damages against each Defendant individually and jointly, in such amounts as are properly determined by the trier of fact, in a judgment entered for each Plaintiff individually, in an amount in excess of $75,000 each, and in an amount in excess of $5,000,000 in the aggregate.

660.    Furthermore, Plaintiffs ask for their discretionary costs of the cause, for interest on the judgment at the legal rate, for such other relief as the Court deems appropriate, that court costs be adjudged against Defendants, and that this case be tried jointly to a jury on all issues.

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing pleading has been prepared with Times New Roman, 14-point font, in compliance with L.R. 5.1C.


*/s/ O. Mark Zamora*
O. MARK ZAMORA

Respectfully submitted this the 17th day of July 2025.

/s/ O. Mark Zamora
O. Mark Zamora (GBN: 784239)
Mark Zamora, Esquire
2142 Vista Dale Court
Tucker, GA 30084
Telephone:   (770) 414-5473
Facsimile:   844-335-6579
Email:        mark@markzamora.com

Mark D. Link (GBN: 453153)
Link Law
2142 Vista Dale Court
Tucker, GA 30084
Telephone:   (770) 414-5473
Facsimile:   844-335-6579
Email:        mark@marklink.law

/s/ Joey K. James
Joey K. James (ASB: 9672S76J) – Lead Counsel
(pro hac vice pending)
David A. Tomlinson (ASB: 3984N73D)
(pro hac vice pending)
Heather L. Stephens (ASB: 1429A04F)
(pro hac vice pending)
Jevon Reinke (ASB: 8912K14G)
(pro hac vice pending)
Joey James Attorney at Law, LLC
412 South Court Street, 5th Floor

Florence, AL 35630
Telephone:  (256) 246-2500
Facsimile:  (256) 246-1086
 Email:        joey@joeyjameslaw.com
                    david@joeyjameslaw.com
                    heather@joeyjameslaw.com
                    jevon@joeyjameslaw.com


/s/ Jude B. Streb
Jude B. Streb (Ohio Bar #0071529) (pro hac vice
pending)
Joshua E. O'Farrell (Ohio Bar #0087061) (pro hac
vice pending)
Justin S. Greenfelder (Ohio Bar #0077924) (pro
hac vice pending)
Erin L. Dickinson (Ohio Bar #0079312) (pro hac
vice pending)
BUCKINGHAM, DOOLITTLE &
BURROUGHS, LLC
4277 Munson Street NW
Canton, Ohio 44718
Telephone:  (330) 492-8717
Facsimile:  (330) 492-9625
E-mail:        jstreb@bdblaw.com
                    jofarrell@bdblaw.com
                    jgreenfelder@bdblaw.com
                    edickinson@bdblaw.com


## JURY DEMAND

Plaintiffs respectfully demand trial by jury on all issues herein so triable

pursuant to Rule 38 of the Federal Rules of Civil Procedure.